IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | CHAPTER 13 |
| DOMINIC JOSEPH DECANTIS; AKA DOMINIC DECANTIS; AKA DOMINIC J DECANTIS,<br>Debtor | CASE NO. 5-22-bk-01826-MJC |

## DEBTOR'S BRIEF IN SUPPORT OF FEE APPLICATION

This brief and accompanying affidavit are being submitted as allowed by this Court at the August 7, 2024 hearing in this matter.

1. **In Counsel's cases, the median amount paid by debtors towards combined attorney's fees and unsecured debt is much less than the median amount paid in cases filed by other attorneys.**

At the hearing, the Court questioned "what actual work was performed that was reasonable and necessary to move this case forward and that benefited the debtor and/or the estate." N.T. at 10:45.[1] Counsel submits that the above-average amount of time that is spent in Counsel's cases results in the typical debtor paying *less* overall, even after factoring in a higher attorney's fee. That result is a clear benefit to the debtor.

Two reports that the Trustee provided to Counsel help demonstrate the effectiveness of Counsel's efforts. One report is titled "Legal Claims Paid to Debtor Attorney Carlo Sabatini" (hereinafter "the Sabatini Report")(Affidavit of Carlo Sabatini in Support of Fee Application ("Aff.") ¶ 1.) The Trustee describes the cases that populate the Sabatini Report as: "Legal claims of Debtor Attorney, and Plan was completed, and Petition date is after September 30, 2013 and

---

[1] The August 7, 2024 hearing was not transcribed; therefore, Notes of Testimony ("N.T.") will refer to the time of day for the hearing's audio recording.

through September 11, 2024 @ 9:49 am."[2] (Aff. ¶ 2.) The second report is titled "Legal Claims

Paid to Debtor Attorney **Excluding** Carlo Sabatini" (hereinafter "the Other Attorney Report,"

emphasis added). (Aff. ¶ 4.) The description for the Other Attorney Report is the same as the

Sabatini Report, except that the ending time is a few minutes later. (Aff. ¶ 5.) The two reports

each provide four pieces of data for each case on the report: the case number; the total amount of

*filed* unsecured claims; the total amount *paid* to unsecured claims; and the total amount of

attorney fees paid through the Trustee. (Aff. ¶ 6.) Counsel used this information to calculate for

each of his cases the amount of attorney fees and unsecured claims that the trustee paid in each

case expressed as a percentage of the unsecured claims. (Aff. ¶ 7.) Thus, the applicable formula

is expressed as follows:

$$\frac{\text{(Total Unsecured Paid + Attorney Fees Paid)}}{\text{Total Unsecured}} = \text{Percentage paid}$$

(Aff. ¶ 8.)

Take, for example, case number 20-02046. The Sabatini Report shows the following

information for that case:

| Total Unsecured | Total Unsecured Paid | Attorney Fees Paid |
|---|---|---|
| $42,823.33 | $2,196.06 | $5,425.72 |

(Aff. ¶ 12.)

This information was entered into the above formula as follows:

$$\frac{\$2,196.06 + \$5,425.72}{\$42,823.33} = 17.8\%$$

---

[2] The report also contains this notation: "Note: 'Attorney Fees Paid' column shows only attorney fees paid through the Trustee.  Direct payments from the Debtor are excluded." (Aff. ¶ 3.)

(Aff. ¶ 13.)

Thus, in this sample case, the amount that the debtor paid through the plan for the combined amount of attorney's fees and unsecured claims was a figure that was equal to 17.8% of the total amount of filed unsecured claims.[3] After completing that calculation for each case, Counsel then determined the median amount the Trustee paid in his cases during the period for which data was provided. That median amount was 17.8%.[4] (Aff. ¶ 10.)

Counsel then repeated that exercise for the cases on the Other Attorney Report. (Aff. ¶ 14.) The median amount paid by the Trustee in cases filed by attorneys other than Sabatini during the same period was 36.43%. (Aff. ¶ 15.) Thus, the percentage that the Trustee paid in the median Other Attorney case was more than *twice* as much as what was paid in the median Sabatini case.[5]

Counsel submits that these statistics support that the time spent by Counsel is time *well* spent. If, by spending extra hours reviewing the budget, re-running calculations, or testing alternative plan formulations an attorney can save a debtor even just $100 or $200 a month, then

---

[3] The debtor actually paid only 5.13% of the unsecured claims that were filed.

[4] The fact that the median calculation is the same as the sample in the previous paragraph is no coincidence. That case was chosen for use as the sample *because* that case represents the median. (Aff. ¶ 11.)

[5] Note that the *median* is being used rather than the *mean* because the latter statistic is misleading as it is dramatically impacted by outliers. For example, the Other Attorney report includes a $10,000,000 unsecured claim that was filed in case 18-00593, (Aff. ¶ 16.) and which was actually entered in the Trustee's system as a $1,000,000,000 claim. (Aff. ¶ 17.) Because that claim is included in the Other Attorney Report, the "average" amount of unsecured claims filed per case during this period is $233,535. (Aff. ¶ 18.) Once that claim is removed, the case average drops to less than $50,000. (Aff. ¶ 19.) This case highlights the extreme effect that outliers can have on averages. The "median" statistic does not suffer from the same weakness, so that statistic is used here instead.

that difference can amount to a savings of $3,600 - $12,000 over the course of a three-to-five-year plan.

### 2. The Presumptively Reasonable Fee is not an appropriate benchmark.

Lawyers who charge the Presumptively Reasonable Fee have little *financial* motivation to spend numerous hours trying to save their clients a few hundred dollars a month. Of course, many scrupulous attorneys are well-motivated by their *professional* and *ethical* obligations to do the best job that they reasonably can for their client. However, there are limits on what a busy attorney can do. As this Court noted at the hearing, in its own experience with a busy practice, spending too much time was impossible: "Again, maybe you have the time in your practice to sit and look at these numbers and look at them again and look at them again. But I just know that I was a fairly busy practitioner, and I looked at it as best I did. I think I did a thorough job for my client, but I never ever spent that kind of time in a simple chapter 13 case." N.T at 10:27.

Counsel here does limit the volume of his practice so that he has time to look at the numbers and, if there might be a benefit to be gained for the client, to look at them again and to look at them yet again. That approach generally yields dividends for the client – not only with a smaller overall payment to unsecured creditors and attorney's fees (as demonstrated above), but also with a much greater likelihood of success.

For Counsel's Chapter 13 cases that closed during the 5-year period ending on December 31, 2020, only 5% ended with a dismissal instead of a discharge.[6] (Aff. ¶ 20.) The district-wide

---

[6] This statistic was calculated using a report that Counsel believes was obtained from the Clerk in 2021. (Aff. ¶ 21.) Rather than burdening the Clerk with a separate request for an updated report, Counsel is refraining from updating the statistic. However, from Counsel's review of his own records, it appears that none of the cases that closed in 2021, 2022 or 2023 were dismissed rather

statistic for the same period is very different: 45% of the cases closed with a dismissal instead of a discharge. (Aff. ¶ 23.) Of course, it is likely that a substantial reason that Counsel's cases succeed much more often than cases filed by other attorneys is because Counsel's clients are paying so much less to their lawyer and unsecured creditors, which in turn, translates into a smaller plan payment which is easier to make.

However, this approach is not financially feasible if Counsel is hamstrung by the Presumptively Reasonable Fee. For example, Judge Van Eck spent the first five years of his practice using the no-look fee and then spent the remaining 13 years using the lodestar. He has "very clear opinions about which approach is better for both the client and the attorney . . . . clients get a much better representation from a lodestar approach." (*In re Merriweather* 21-bk-00110, Tr. of October 27, 2021 Hearing, Ex. A, 29:24-30:4.) Furthermore, Judge Van Eck believes that the Presumptively Reasonable Fee is ***irrelevant*** when evaluating a lodestar application, even where the total application might seem high. In *Merriweather*, the U.S. Trustee attempted to use the Presumptively Reasonable Fee as a yardstick, and was quickly shot down:

> MR. SCHALK:
> ***
> Beyond that, Your Honor, we state no position on the reasonableness of the fees that have been sought as to the hourly rate. But, again, Your Honor, we are -- there is a general concern when it comes to the fact that we do have a presumptively reasonable rate to get a case to confirmation of [$4,500], and we're seeing applications to get a fairly standard case to confirmation that's double that. And –
>
> THE COURT: Well, you see, I think that's a mistake. I don't think that one has anything to do with the other, and I've heard that before, and I just want to say that it doesn't matter to me.

---

than discharged. (Aff. ¶ 22.) Thus, if this figure were updated to an 8-year period ending on December 31, 2023, it should be less than 5%.

Ex. A at 26:17-27:3.

And after some additional colloquy, the court reiterated emphatically that there is no connection between the Presumptively Reasonable Fee and the lodestar: **"But if all the charges add up to an amount that's twice what the normal no-look fee is, I don't care, that doesn't bother me a bit."** (Ex. A at 28:25-29:2 (emphasis added).) Judge Van Eck's analysis is correct. *Busy Beaver* instructs that the relevant market by which a fee should be judged is *non*-bankruptcy services. *Busy Beaver*, 19 F.3d at 849. Thus, the existence of the Presumptively Reasonable Fee – which applies only in bankruptcy cases – is not a reason to reduce a fee.

However, here, the Court seems to be creating a requirement that an applicant seeking to be compensated on a lodestar basis must demonstrate why a case is complex enough to justify a substantial departure from the Presumptively Reasonable Fee. *See e.g.,* N.T. at 10:18 ("And maybe I guess what I'm asking you is can you identify what in particular makes this case so unique, or complicated, or complex to be almost double or more than double, perhaps almost triple what is the $4,500 PRF in this district." *See also,* N.T. at 10:38-10:39 ("Again, when the presumptive reasonable fee for an entire chapter 13 case in this district is 4,500 or 5,000 or 5,500 . . . it's just it's hard for the Court to determine or to find exactly what work . . . or services that you provided to generate $5,000 in fees.")

Extra time is being spent on these cases not because they are unusually complicated, but instead because the expectation is that the additional attention to detail will have a net benefit to the client. And, as demonstrated above, that expectation is borne out – the Trustee disburses less than half as much to Counsel and unsecured creditors as might be expected from a case filed by a different law firm. And the likelihood of the case failing is a mere one-ninth of the district average.

One example of the type of additional detail that Counsel spends is on Schedule J. At the hearing, the Court described the quantity of numbers that are on the typical set of bankruptcy schedules, and the amount of time that might be expected to work with those numbers:

> I mean, if you took Schedule I and in particular Schedule J out of it as far as the volume of numbers actually being entered, there's about 15 numbers, 20 numbers, 30 numbers don't hold me, but there's not thousands of numbers, not thousands of entries that could put into schedules. So, Mr. Sabatini, in all of these cases that we've been going around and around on, I'm at a loss as to how you spend 26 hours preparing schedules.

N.T at 10:17-10:18.

Part 2 of Schedule J is where a debtor is required to estimate ongoing monthly expenses. (Aff. ¶ 24.) That part has 35 separate lines for different categories of expenses. (Aff. ¶ 25.) By comparison, the budget that Mr. DeCantis completed for Counsel contained 161 lines for different categories of expenses. (Aff. ¶ 26.) That information was then used to prepare the 35 lines that are required for Schedule J. (Aff. ¶ 26.) In Counsel's experience, the more granular the information that is requested from a debtor, the more comprehensive it is likely to be. (Aff. ¶ 27.) For example, Line 12 of Schedule J asks for "Transportation. Include gas, maintenance, bus or train fare." (Dkt. Entry 1, p. 31.) A debtor tasked with that generic instruction could easily fail to include other transportation-related expenses that might simply be forgotten, such as for vehicle registration, vehicle inspections, and driver's license renewals. For Mr. DeCantis, those three categories summed to $131.63/year, (Aff. ¶ 28), which means that he will pay $394.89 less to the Trustee over the life of this case as compared to if those expenses had been missed.

Of course, some of the 35 lines on Schedule J specifically combine expenses that are listed separately on the 161-line budget that was completed by DeCantis. For example, Line 6c of Schedule J asks for "Telephone, cell phone, Internet, satellite, and cable services." Each of

those five categories is simply a separate entry on the 161-line budget. So, one might expect both budgets to fully capture the same information. However, by breaking the categories apart separately, it is more practical for the paralegal who is preparing the schedules to verify the accuracy of each claimed expense. Here, that verification process caused the amount budgeted for cable to be increased from Debtor's original estimate of $88/month to a documented amount of $93.25/month, and Debtor's internet expense to be increased from an estimated amount of $87/month to a documented amount of $110.79/month. (Aff. ¶ 29.) That combined monthly additional expense of $29.04 will translate to Mr. DeCantis saving $1,045.44 over the three-year plan.

Counsel follows the same detail-oriented procedures in every case, because he believes that the net result benefits the client. (Aff. ¶ 30.) These procedures are followed *even if the plan does not have enough funds to pay for the time that such additional detail requires*.[7] (Aff. ¶ 31.) And in cases such as this one where the plan funding is inadequate, the fee application almost always waives excess fees. (Aff. ¶ 32.) See Dkt. Entry 48, p. 2 ("To the extent that the Trustee

---

[7] At the hearing, the Court raised, and then dismissed, the specter of a possibility that Counsel's work is related to the amount of plan funding available:

> It seems as though, you know, if I looked at it. It's interesting, I guess if I wanted to be difficult or make this personal with you, I could say something like the plan and your invoice seems to be nicely situated so that you can get all of your fees. Now I know that's not the case here. I think the Trustee has indicated that your billing under funds the plan by four or five thousand dollars, which I guess means that out of your $11,000 bill, you may only get six or seven thousand dollars through the plan. So, I don't think your billing is tied to the plan. I'm not making that . . . finding in any way shape or form because I know these bills are pretty consistent over the last couple of years from what our hearings have shown.

N.T at 10:46 – 10:47.

does not have sufficient funds to pay the amount requested, then Applicant waives the remaining fees. Applicant estimates that the total amount actually received from the Trustee's office will be less than $7,068.77.")[8]

### 3. The settlement with the Trustee

In *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 845 (3d Cir. 1994), the Circuit held that

> Congress' grant of authority to the UST to challenge fee petitions merely bestows the UST with standing and/or encourages the UST to do so; it in no way signifies by negative implication that the bankruptcy court is without the power and duty to review fee applications independently ***when the UST does not object***. Unless the parties in interest or the bankruptcy courts take on this task, many if not most fee applications would receive no effective review.

*Id.* at 842, emphasis added.

Of course, this Court has the power to review a fee application *sua sponte* whether or not there is an objection. But, where the Chapter 13 Trustee has taken an active role in carefully reviewing and objecting to the application, the need for this Court to conduct a detailed secondary review is greatly diminished. "Because its time is precious, the reviewing court need only correct reasonably discernible abuses, not pin down to the nearest dollar the precise fee to which the professional is ideally entitled." *Id.* at 845. If the Court chooses to rely on the Trustee's investigation, the reasonableness of that decision would be readily apparent here, where the Court is already of the opinion that "the Trustee did an excellent job in her objections

---

[8] At the hearing, the Court also questioned why this case was filed under Chapter 13 rather than Chapter 7. One reason was to cure the $8,761.81 secured claim on Debtors' residence as described in § 2.C of the Plan. (See Dkt. Entry 5.)

and really identified pretty much what the Court looks at as well as to what just does not appear to be reasonable." N.T. at 10:23.

Here, the Trustee settled his objection to the application.[9] (Aff. ¶ 33.) As part of that settlement, the parties agreed that Counsel would charge for only six hours of paralegal time and two hours of attorney time for preparing the petition, schedules and plan. (Ex. B, ¶ 4; Aff. ¶ 34.) The additional discount represented on the settlement document to effectuate that compromise amounts to $2,753.00. (Dkt. Entry 57, pp. 1 – 3, grey cells in last column; Aff. ¶ 35.)[10]

Six hours of paralegal time and two hours of attorney time to prepare a petition and schedules is certainly not a "reasonably discernable abuse." Other judges in this district have approved far more. See, e.g., *In re Barker*, 5:20-bk-02896, Dkt. Entries 34-2 and 37, (Judge Henry Van Eck approving without reduction $18,437 in fees for pre-confirmation services, including 10.1 hours of paralegal time and 6.4 hours of attorney time preparing the budget, schedules, or the plan, and an additional 8.8 hours of time working on checklists, Aff. ¶ 40); *In re DeSanto*, 18-bk-01167, Dkt. Entries 30-2 and 31 (Judge Robert Opel, II approving without reduction $11,007.50 in fees for services through the day after confirmation, including 24.5 hours of paralegal time and 4.5 hours of attorney time preparing schedules or the plan, processing checklists, and preparing for and meeting with the client and filing the case, Aff.

---

[9] Per the Court's instruction at the hearing, Counsel has filed on the docket the adjusted bill that reflects the settlement. (See Dkt. Entry 57, Aff. ¶ 36) Also, as explained at that hearing, that document contains color coding which explains the resolutions of the various line items that the Trustee had objected to. (Aff. ¶ 37.) That color coding is described in the email from Sabatini to McHale which was sent on July 3, 2024, (Aff. ¶ 38), a copy of which is attached as Exhibit B.

[10] In preparing this brief, Counsel discovered that the paralegal time which was retained rather than discounted amounted to 6.5 hours rather than just 6 hours. (Aff. ¶ 39.) Counsel apologizes for this error. $75.00 should be removed from the bill, representing the additional .5 hours of paralegal time.

¶ 41); and *In re Sumski*,[11] 17-bk-02507, Dkt. Entries 39-2 and 40 (Judge John Thomas approving without reduction $20,517.59 in fees for services through the day after confirmation, including 44.2 hours of paralegal time and 2.6 hours of attorney time for work related to preparing schedules or the plan, meeting with the clients, and filing the case, Aff. ¶ 42).

At the hearing, the Court specifically questioned three entries of attorney time: 1.7 hours on June 23, 2022, .6 hours on June 29, 2022, and 1.7 hours on July 1, 2022.[12] Each of those entries was related to the preparation of the schedules and plan. Counsel, as promised, has reviewed his files but has been unable to determine precisely what aspect of schedule preparation or plan review was being conducted on those dates. (Aff. ¶¶ 43 - 44.) When these time entries were created, Counsel was unaware that the Court expected greater detail. (Aff. ¶ 45.) However, Counsel submits that the entries do provide more than sufficient detail to comply with the standards set by the Third Circuit.

In *Rode v. Dellarciprete*, 892 F.2d 1177 (3d Cir. 1990) the district court had found that a fee petition failed to include "adequate and specific descriptions of services and the time devoted to those services." *Id.* at 1190. The Circuit reversed, finding that the information provided was "very specific. . . ." *Id.* at 1191. The Circuit listed the following sample entries to support its holding that the entries were very specific, and that the information was enough for the district court to determine if the fees claimed were reasonable:

---

[11] This case is another example of the Counsel's practice of doing the work even when there is no prospect of being paid. (Aff. ¶ 39.) The *Sumski* fee application was filed less than six months into a five-year case where the total base plan was only $9,000.00. *Id.* Over $10,000 of the Court-ordered fees were written off after discharge. *Id.* Additionally, Counsel never filed an application to be paid for all of the additional work done during the last 54 months of the case. *Id.*

[12] Counsel is not suggesting that the Court has no other objection to the bill. Rather, the Court made it clear that it is questioning why the overall bill is so much greater than the Presumptively Reasonable Fee.

1. Time of Laurence W. Dague, Esquire: Settlement: 12.9 hours; Application for Attorney's Fees: 4.1 hours; and miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses: 1.3 hours. Total hours: 18.3.

2. Time of Dianne E. Dusman, Esquire: Settlement: 1.8 hours; Trial Brief: 5.2 hours; and miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses: .2 hours. Total hours: 7.2.

3. Time of Carol L. Karl, law clerk/paralegal: Settlement: 1.9 hours; and miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses: 1.8 hours. Total hours: 3.7.

4. Time of Michael Fenten, law clerk: miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses: .2 hours. Total hours: .2.

Id. at n. 13.

Counsel submits that the three time entries identified by the Court here provide substantially more specificity than what the Circuit found acceptable in *Rode*. In the first entry, Counsel worked with I, J, the Means Test and the Plan. In the second entry, Counsel was working to answer questions that had been specifically flagged for him by the paralegal who was doing the bulk of the work on the case. And in the final entry, Counsel drafted instructions for the client, drafted the attachment for the plan, and completed a review of the petition and the schedules. This level of detail is substantially more than the Circuit requires.

Counsel submits that it would be appropriate for the Court to credit the Trustee's decision to settle the objection, and for the Court to award the amounts agreed to by the parties.

Respectfully submitted,

s/ Carlo Sabatini

Carlo Sabatini, Attorney for Debtor
Sabatini Law Firm, LLC
216 N. Blakely St.
Dunmore, PA 18512

Phone (570) 341-9000
Facsimile (570) 504-2769
Email ecf@bankruptcypa.com
Bar Number PA 83831

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF PENNSYLVANIA
## HARRISBURG DIVISION

```
IN RE:                        )  Case No. 1:21-bk-00110-HWV
                              )  Chapter 13
                              )
PATSY MERRIWEATHER,           )  Bankruptcy Courtroom No. 1
f/k/a Patsy Corbett,          )  Ronald Reagan Federal Building
                              )  228 Walnut Street
                              )  Harrisburg, PA 17101
          Debtor.            )
                              )  October 27, 2021
                              )  9:52 a.m.
```

TRANSCRIPT OF FIRST APPLICATION FOR ALLOWANCE OF COMPENSATION &
EXPENSES. NOTICE SERVED ON 9/16/2021. FILED BY GARY J. IMBLUM
OF IMBLUM LAW OFFICES, P.C. ON BEHALF OF PATSY MERRIWEATHER.
OBJECTIONS DUE BY 10/7/2021 (37);  OBJECTION TO FIRST
APPLICATION OF ATTORNEY FOR CHAPTER 13 DEBTOR FOR COMPENSATION
AND REIMBURSEMENT OF EXPENSES FILED BY TRUSTEE (RE: RELATED
DOCUMENT(S) (43)
BEFORE HONORABLE HENRY W. VAN ECK
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

APPEARANCES:

```
For the Debtor:            Imblum Law Offices, P.C.
                           By:  GARY J. IMBLUM, ESQ.
                           4615 Derry Street
                           Harrisburg, PA 17111

For Chapter 13 Trustee:    Standing Chapter 13 Trustee Office
                           By:  JAMES K. JONES, ESQ.
                           8125 Adams Drive, Suite A
                           Hummelstown, PA 17036

For U.S. Trustee:          U.S. Trustee's Office
                           By:  JOSEPH SCHALK, ESQ.
                           228 Walnut Street, Suite 1190
                           Harrisburg, Pennsylvania 17101

AUDIO OPERATOR:            KAREN DAVIS
```

**TRANSCRIPTION SERVICE:**      **TRANSCRIPTS PLUS, INC.**
**435 Riverview Circle**
**New Hope, Pennsylvania 18938**
**Telephone: 215-862-1115**
**e-mail CourtTranscripts@aol.com**

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

1          THE COURT:  I did pass over Merriweather, I know that

2 that's a status conference at this point, but let's do the

3 motions to dismiss, if you don't mind first, there's very few

4 of them, it will be quick.

5      (Recess from Merriweather matter 9:52 a.m.)

6      (Recommence Merriweather matter 9:55 a.m.)

7          THE COURT:  I want to go back to the Merriweather

8 matter now.

9          Mr. Jones, there aren't any -- is there anything else

10 besides Merriweather?

11          MR. JONES:  Merriweather and Mintscheff, I believe.

12          THE COURT:  Well, that's not until 10, we've got a

13 minute on that.

14          MR. JONES:  Okay, I'm sorry.

15          THE COURT:  So -- yeah, Mintscheff we'll be dealing

16 with next.

17          Let's go with Patsy Merriweather, Number 14 on my

18 list.  Begin with entry of appearances; is there anyone here

19 for the Debtor?

20          MR. IMBLUM:  Gary Imblum for the Debtor, Your Honor.

21          THE COURT:  Good.  Can you make sure that microphone

22 is close enough to you?

23          MR. IMBLUM:  Excuse me.

24          THE COURT:  Not too close, but close enough to hear.

25          MR. IMBLUM:  Is that good?

3

1             THE COURT:  Yeah, that sounds good.  She'll let me
2   know if it's not.
3             And, of course, Mr. Jones, you're on behalf of the
4   Chapter 13 Office.
5             So there was an application --
6             MR. SCHALK:  Your Honor?
7             THE COURT:  Yeah?
8             MR. SCHALK:  Joseph Schalk on behalf of the Office of
9   the United States Trustee.
10            THE COURT:  Oh, I wasn't aware that you were
11  appearing in the matter, Mr. Schalk, I thought you were just
12  here to keep us company.
13            MR. SCHALK:  Nope.
14            THE COURT:  Okay; good to know you're here.
15            MR. JONES:  Give his paralegal back there some work,
16  uhm-hum, yeah.
17            THE COURT:  Yeah.  Yeah, an assistant.
18            First application for allowance of compensation with
19  the Trustee objection.  So it's technically your application,
20  Mr. Imblum, what's going on?
21            MR. IMBLUM:  Well, I discussed this with Mr. Jones,
22  and I guess the procedure under Busy Beaver, if I'm not
23  mistaken, is that the Court would issue an opinion on the
24  objections, and then I could ask for a hearing if I disagreed,
25  is that the correct procedure?

4

1              THE COURT:  The way I read <u>Busy Beaver</u> is I have an

2    independent duty to review all applications, lodestar

3    applications, and I apply the standard in <u>In Re Busy Beaver</u> if

4    -- and I've called your office -- my chambers has called your

5    office with questions about time entries.  I can remember one

6    occasion where I think it was a two-hour entry for what

7    appeared to be a very short phone call, and it was a typo.

8              MR. IMBLUM:  Right, and it was point two, yes.

9              THE COURT:  Right.  So that is sort of a microcosm of

10   what I see the process is.

11             If I had more serious concerns, I would list it for

12   hearing, and you would come in.  And under <u>In Re Busy Beaver</u>, I

13   cannot really deduct anything until I've explained to you what

14   my concerns are, and then given you an opportunity, after a

15   reasonable period of time, 30 days or so, to come to the Court

16   to defend your time entries, and that's when the hearing would

17   take place.

18             MR. IMBLUM:  Okay.

19             THE COURT:  Now that's if I'm exercising my

20   independent duty under <u>In Re Busy Beaver</u>.

21             Here, we have an objecting party who has also a

22   commensurate obligation as the Chapter 13 Trustee's office to

23   review these things, and where appropriate, object.

24             Now under that circumstance, I think the procedure

25   would be slightly different in that I am to hear the objection;

5

1  decide if I agree or disagree with the objection.  If I

2  disagree, I think I overrule the objection and grant the fee

3  application.

4       If I agree with all or part of the objection, I would

5  then have to provide you, Mr. Imblum, with the basis of that,

6  and then provide you with an opportunity, 30 days or so, to

7  come back to court and explain why I shouldn't be concerned

8  about those entries.

9       MR. IMBLUM:  Okay.

10      THE COURT:  So that's how I see it.  Mr. Jones, do

11  you agree?

12      MR. JONES:  That's how we see it, too, Your Honor.  I

13  mean, basically this whole matter arose from Judge Conway

14  objecting in the Badyrka case.  I'm not sure if you're familiar

15  with that, it was an initial fee app, again, over $10,000 right

16  after confirmation, and he just believed that that was just a

17  bit outrageous for a District where normally cases are settled

18  -- are completed with about a 45 hundred dollars attorney fee,

19  but he raised that issue.

20      The Trustee wanted to raise the same issue in our

21  District, again, to sort of get some direction as to where the

22  Court sits as far as some of these fee apps that seem to be out

23  of the normal, let's say, as far as the $4,500 presumptively

24  reasonable fee that we have in the District.

25      So there were some objections that were made.  And,

1  again, we're kind of looking at them both in a microcosm, as

2  far as the individual entry, but we're also looking at the

3  macro of the whole matter in that, you know, individually,

4  they may not seem out of the ordinary.  But as has been

5  indicated, you can die by a thousand paper cuts.  In other

6  words, they're small, but when they accumulate, it becomes a

7  situation where the fees are just out of line for a fairly

8  ordinary case.

9         So as I indicated, the Trustee believed that there

10  were certain billing methods that were excessive, wanted to

11  raise them at a time when Judge Conway was, likewise,

12  reviewing, and to determine whether the bench has changed, or

13  just guidance as far as where we stood.

14         The reason we asked for a status conference was I

15  don't believe it really would help any of us if I just sat here

16  and read the objections to the Court.  Obviously under the --

17         THE COURT:  Oh, I read them.

18         MR. JONES:  You read them; yeah, that's what I mean.

19         THE COURT:  Yeah, I read them.

20         MR. JONES:  I mean, you read them.  For me to read

21  them into the record, or whatever, and so we were unsure how

22  exactly you wanted to proceed.

23         There are actually five -- there's the set of five

24  objections, Merriweather was the first one that was set for

25  today; there are two more set for Wednesday; there is one that

7

1  I believe still has not been scheduled; and there's another

2  case that's dismissed, but that may come back.  So there's five

3  altogether, and we wanted to get an idea -- in light of

4  Merriweather, in light of the others, how the Court wanted to

5  proceed.

6           THE COURT:  Sure.

7           MR. IMBLUM:  Actually just for clarification, that

8  case isn't dismissed.  It was -- you filed a certification of

9  default; I filed an objection.

10         MR. JONES:  Oh, objection, okay.

11         MR. IMBLUM:  So the case was not actually dismissed.

12         MR. JONES:  Okay; I'm sorry.

13         MR. IMBLUM:  It was -- that's -- well --

14         MR. JONES:  I thought it was -- well, a

15  reconsideration; I'm sorry.

16         MR. IMBLUM:  Yes.

17         MR. JONES:  Okay, yeah.

18         THE COURT:  So it's an important issue, and I can --

19  we also have a relatively new standing Chapter 13 Trustee who

20  is trying to figure out with a new Judge -- and a still fairly

21  new judge in four and a half years so, you know, I've been

22  around for a little while, but not as long as some of my

23  predecessors.

24         So I understand why the objections were filed; I read

25  the objections; I understand them.  I think that your office

1  has followed the spirit of <u>In Re Busy Beaver</u>.  You can

2  obviously quibble over the objections and their impact on the

3  case examined, as you said, in isolation.  Some of those

4  charges are point six, right, which is the smallest increment,

5  Mr. Imblum, that you can bill at, correct?

6          MR. IMBLUM:  You mean point one for six minutes of

7  time?

8          THE COURT:  I'm sorry; point one, yes, six minutes.

9          MR. IMBLUM:  I'm sorry, just to clarify, Your Honor,

10  yes.

11          THE COURT:  No, you're correct, it's a six-minute

12  increment, that's what I meant to say.

13          MR. IMBLUM:  Okay.

14          THE COURT:  Which is a point one.

15          MR. IMBLUM:  Yes.

16          THE COURT:  There's no smaller -- under your fee

17  agreement, there's no smaller increment of time, right?

18          MR. IMBLUM:  No.

19          THE COURT:  So in isolation, it may look a bit like

20  nitpicking, but actually it follows the spirit of <u>In Re Busy</u>

21  <u>Beaver</u>.  One of the things in there is not just the total

22  amount, which, frankly, I look at, but to me, it's not a

23  starting point, nor is it an ending point.

24          The whole point of lodestar is that it is done on a

25  contemporaneous basis with the activity itself, and that you're

1  tracking your time pursuant to a fee agreement, and that you're

2  entitled to the fair market value of your services.

3          So the number one thing I look at -- and I'm not

4  familiar with the case, Mr. Jones, that you referenced.  I

5  don't know, was there an objection in that case?

6          MR. JONES:  I'm sorry, which case?

7          THE COURT:  You referenced the case that -- that

8  Judge Conway was --

9          MR. SCHALK:  In Re Badyrka.

10          MR. JONES:  Oh, Badyrka, I'm sorry.  No, that was a

11  sua sponte objection raised by Judge Conway.

12          THE COURT:  Okay.  I am familiar with that case; I

13  had that case.  I actually had that case for a while before it

14  went up to him, I do know of the case that you mentioned.

15          So under In Re Busy Beaver, I take that pretty

16  seriously.  My staff looks at everything that is filed.

17          And, Mr. Imblum, you are the most prolific lodestar

18  filer in our District, so we look at a lot of your time.

19          MR. IMBLUM:  And I understand that's -- I think

20  that's why I'm here today.

21          THE COURT:  I think probably, too.

22          MR. IMBLUM:  Yes.

23          THE COURT:  I would note there are others who are

24  filing lodestar who might have been initially an easier initial

25  objection to make because I have routinely approved Mr.

1   Imblum's fee applications after reviewing them, and I think
2   that sort of speaks to my position about his billing practices.
3   And I'll go so far as to state that when it comes to lodestar,
4   he's an exemplary example of how to track your time.  He does
5   so, and oftentimes I find that he asks his paralegal and
6   paraprofessionals to do as much as possible to avoid charging
7   at the hourly rate.
8            I've looked at his time a lot.  And that's not to say
9   it's perfect, okay, because reasonable minds can differ.  And,
10  you know, I've had to look at his time sheets more than once,
11  and wonder if it's something I should take issue with or not,
12  and I think you could do that with really anybody's time.  If
13  you go back ten years and look at my lodestars, I might quibble
14  with some of my own now -- some of the ones I said.  In other
15  words, reasonable minds can differ.  This is a discretionary
16  area, there is no bright line.
17           In Re Busy Beaver gives us some very good guidance,
18  so let me tell you what I think is the most important about
19  that guidance.  It's not the dollar amount that's charged
20  ultimately, I really think that has the smallest of impact.
21           I begin with was the time carefully tracked?  Does it
22  appear to have been tracked contemporaneous?  For example,
23  despite people's best efforts, and maybe misconceptions, having
24  tracked time contemporaneous myself, I can tell when someone is
25  tracking it contemporaneous, and when they have reconstructed

1 it based upon review of the docket, I can tell.  Really,

2 anybody who's tracked time can tell.  So maybe I'm not perfect

3 at that, but sometimes it's pretty obvious.

4         It seems pretty obvious to me that Mr. Imblum tracks

5 it contemporaneous.  I have seen no evidence that he doesn't.

6 So to me, that's a really good start because you don't want to

7 be in a position where you've reconstructed it, and you're

8 standing in front of a judge, and the judge says, "Did you

9 track this contemporaneous?"  "Well, no."  "So you had to

10 reconstruct it; how'd you do that?"  "Well, I went back and I

11 did the best I could.  I went through my correspondence file, I

12 looked at the docket, I remembered what I could, but I probably

13 didn't capture it all.  And where I wasn't sure about anything,

14 then I didn't include it."  "Oh, so you're admitting that these

15 aren't accurate?"

16         That's not a good place to be in, right?  But Mr.

17 Imblum doesn't have to worry about that.  So the

18 contemporaneous thing, I think, is very important.

19         The second aspect is that I look at, the most

20 important thing, is what is the hourly rate, and what are the

21 services being provided.  Personally -- and, again, under In Re

22 Busy Beaver, I am allowed to use my own experience, so you will

23 hear me make reference to my own experience here.  As both of

24 you well know, I did a lot of consumer work, and I did a lot of

25 business work.  I did a lot of debtor work, and I did a lot of

1 creditor work.  I had different rates for all of them, and

2 that's because that's what the market would bear.  I charged a

3 lot more for my Chapter 11 work than I did for my simple

4 consumer work.

5          I charged a different rate to creditors.  Sometimes

6 they had a flat fee schedule, sometimes they had an hourly

7 rate.

8          For consumer bankruptcies, I had a lower rate than I

9 had for business bankruptcies because there's more work in a

10 business bankruptcy, and it's of a more specialized nature.

11 That's exactly what <u>Busy Beaver</u> wants.  They want your fee to

12 be rationally related to the value of your services.  And the

13 value of your services goes up with the greater need for

14 specialized knowledge.

15          Chapter 11 bankruptcy practitioners are routinely

16 north of 400; not consumer, though.  Consumer is just as often

17 south of 300 as it is north of 300, and they're only in the

18 margins generally, so right around 300.  That's really to me

19 the most indicative thing is is the hourly rate marketable?

20          What's the hourly rate on this, Mr. Imblum?

21          MR. IMBLUM:  My rate's 295; Jeff Troutman in my

22 office bills at 235; and the paralegals bill either 135 or 145,

23 Your Honor, I'd have to check that.

24          THE COURT:  All right.  And, Mr. Jones, I didn't hear

25 a complaint about the hourly rate that was charged.

1          MR. JONES:  No, we did not object to the hourly rate.

2          THE COURT:  And I don't think there is any basis to

3  object to it.

4          Mr. Imblum, how long have you been doing bankruptcy

5  work?

6          MR. IMBLUM:  Since 1987.

7          THE COURT:  I don't want to do the math in front of

8  everybody because I'll get it wrong, but it's a long time,

9  right?

10          MR. IMBLUM:  44 years.

11          THE COURT:  So I just find the rate to be very

12  reasonable.

13          MR. IMBLUM:  No, I'm sorry, it can't be 44.  I'm

14  sorry, I'm not good at math.

15          THE COURT:  See, that's why I don't do math on the

16  record.

17          MR. IMBLUM:  Yes.

18  Lieutenant

19          MR. JONES:  Many years.

20          MR. IMBLUM:  Many years.

21          MR. JONES:  I will stipulate to many years.

22          THE COURT:  Yes.

23          MR. IMBLUM:  Many years.

24          THE COURT:  So I find -- you know, there's no

25  challenge to the rate, and I'm not going to sua sponte raise

14

1   it.

2         The other thing that I look at that I think is really

3   very important is what -- who is doing what, and that was

4   raised here.  And that is the issue that you can nibble around

5   the edges and quibble about, should an attorney be doing a

6   function, or should it be a paralegal function, or should it be

7   something that an assistant should do that shouldn't be billed

8   out to the client at all?  And I think that's where we ought to

9   focus in this matter, I think that's where your office focused,

10  Mr. Jones.

11        MR. JONES:  Most of the objections, correct, it would

12  be.

13        THE COURT:  Yeah, and those are reasonable objections

14  because here we get into a very, you know, discretionary area

15  where it's kind of tough.  And I'll give you an example:  I was

16  reviewing it, and on the one hand, I saw charges -- I won't

17  make any specific reference, but generally speaking, I saw

18  charges in there where the attorney reviewed a notice -- well,

19  I will make reference to one.  The attorney reviewed an entry

20  on the docket that Zaharopoulos had been appointed as the

21  Chapter 13 Trustee.  Gosh, I don't know about that, right, Mr.

22  Imblum?  Does that mean that that happened in all 300, or 400,

23  or 500 of your cases?  Didn't we all sort of know that Jack was

24  appointed?  And do you have to look at the docket and bill

25  point six for that?

1          On the other hand, it's a significant event in the

2    case, but that one troubled me a little, right?  I don't know

3    why you billed for that, and I think the objection there seems

4    to be well-founded.  But I have to give you the opportunity,

5    Mr. Imblum, to explore it further.

6          And here's the more tricky -- here's the trickier

7    one:  The attorney reviewed an order that was entered by the

8    Court that he knew was going to be entered, or was in court

9    while it was entered and approved.  On the one hand, you may

10   ask yourself, "Why is the attorney billing to review an order

11   that he knew was going to be entered?"

12          On the other hand, if I object to that, if I raise a

13   concern with it, I'm sending the message that I don't want

14   attorneys to read the orders that I'm entering.  That's a

15   problem, I can't send that message, and I won't.

16          But I will say this:  If that occurs, and it's not

17   inappropriate for an attorney to review an order to make sure

18   that it is properly entered.  Just yesterday, I had to admit to

19   an attorney that our chambers -- I entered the wrong order.  I

20   was supposed to enter an interim order, instead I entered the

21   final order.  That was a mistake, I had to undo that yesterday.

22          MR. IMBLUM:  And if --

23          THE COURT:  So I have to have the attorney review the

24   order.

25          MR. IMBLUM:  If I can comment, Your Honor?

1          THE COURT:  Yeah.

2          MR. IMBLUM:  The reason I review the order is just to

3 make it's consistent with what happened in court, and what was

4 supposed to be entered, and that's why I review it.

5          THE COURT:  And so you should bill at the smallest

6 possible increment for that.

7          MR. IMBLUM:  And I believe I did.

8          THE COURT:  Which you did.

9          MR. IMBLUM:  Yes.

10          THE COURT:  But you see, that's a tricky one for me,

11 because on the one hand, gosh, I never billed for that.  I just

12 considered it part of my job, so I never billed for it.

13          But on the other hand, as I've said, if I tell you

14 not to look at those orders, and you're not going to get paid,

15 I'm sending a message that I'm not comfortable with, which is I

16 don't want the attorney reviewing the orders I enter when, in

17 fact, I do want them to do that.

18          And against all that, I measure, of course, we're all

19 assuming here that there is a fee agreement that's been

20 properly executed that the client is -- when they execute it,

21 understands what it means.  This is the rights and

22 responsibility thing, and that they have a written fee

23 agreement that complies with the professional rules of conduct

24 as applies in Pennsylvania.  That's all the baseline.  If you

25 don't have one of those, you're going to have a problem

1  collecting lodestar, but we assume that that is the case here.

2          So I would recommend in this instance that the

3  parties maybe talk about some of what I've talked about today

4  to provide some guidance.

5          In my thinking, the dollar amount doesn't bother me

6  if there are contemporaneous time entries that appear to be

7  accurate and contemporaneously kept.

8          I don't even care ultimately if the services -- well,

9  I mean, I care.  But it doesn't matter if the services

10  ultimately benefit the estate, as long as they were designed

11  to benefit the estate at the time they were incurred, and

12  they're reasonably necessary to defend the estate and the

13  debtor.  And I didn't see an objection on that either, Mr.

14  Jones.

15          MR. JONES:  No, Judge.  And obviously if it benefits

16  the debtor also in a Chapter 13, that's billable, and we

17  acknowledge that.

18          THE COURT:  Okay.

19          My main concern with this objection -- and I haven't

20  looked at any of the others -- is sort of outlined by what I

21  said.  There is a lot of point ones, some of which I might

22  agree probably shouldn't be there.  I'm not making any findings

23  of fact here, but you could probably take a close look based on

24  what I've said today and get a better idea of what those might

25  be.

18

1        And then there are some that, I think, maybe a
2   paralegal could have done, as opposed to the attorney.  Or
3   maybe in some cases you could argue are so clerical in nature
4   and administrative in nature that no one should be billing for
5   them.

6        Review of a pro memo that comes through on the
7   docket.  Gosh, does that have to be billed?  Isn't that
8   something that we all expect you to do?  Look at the time
9   stamped -- I imagine in my mind when I see these things that
10  involve the ECF entry, I remember the days when we pushed
11  papers across the counter right over here in the Clerk's
12  Office, you remember, you had someone down there competing with
13  our person to try to get the paper pushed over before 4:30 when
14  they closed.

15        MR. IMBLUM:  Yes.

16        THE COURT:  And you would get back -- we'd have to
17  have time stamped copies, get back.  You would just glance at
18  it to make sure the time stamp was on there, and you're done.
19  You don't bill for that.

20        And so, you know, glancing at an ECF to confirm that
21  the pro memo is what the judge said, gosh, I don't know, maybe
22  that shouldn't be billed at all either.  So you could quibble
23  about those things, and I think they're fair game for you to
24  defend, because maybe there's a good reason for it, right?  The
25  pro memo has to match, that's what the notice is that goes out

1  to people, you know?  But is it really something that's so
2  administrative that maybe that's not something that you need to
3  bill for?

4          Is that -- against all of this, my standard will
5  always be this:  What could you bill if you were not a
6  bankruptcy attorney, and you were doing regular construction
7  litigation or other work outside of bankruptcy?  What would the
8  client tolerate?  I think the client would call up -- because I
9  represented -- I did a lot of work outside of bankruptcy, and
10 they would question those charges.  The reason the debtor may
11 not do it here is precisely the reason that I am to get
12 involved, which is debtors, they're vulnerable, they don't want
13 to complain to their bankruptcy attorney.  They want their
14 bankruptcy attorney to like them, and to continue to represent
15 them, and help them, because they're desperate; that's why I'm
16 doing this.

17         Busy Beaver recognizes that the debtor class is a
18 vulnerable class.  And when they're in a desperate situation
19 because they're going to lose their home, or they've been sued
20 by credit card companies, I've sat across the table with moms
21 and pops, grandmoms, granddads, young married couples, single
22 people desperate for help.  And when you have that initial
23 conference with them, and you explain to them what bankruptcy
24 can do for them, you can see the tension leaving their body,
25 and they become extremely vulnerable.  They'll sign anything in

1  that moment.

2          And this is not to suggest, Mr. Imblum, that you take

3  advantage of that, because most of us, as good practitioners,

4  never took advantage of that.  But we must recognize that they

5  are vulnerable, they'll agree to anything, they'll sign

6  anything.

7          And that's why I have to make sure that what they

8  sign is fair, and what they're billed ultimately is fair,

9  because that feeling continues throughout the case.  So I'm

10 here to make sure that those feelings don't overwhelm what

11 would otherwise be a very reasonable decision to pick up the

12 phone, and call their attorney, and challenge some of these.

13         That's my thinking.  I've laid it all out for you, I

14 hope that provides some guidance.

15         MR. JONES:  Your Honor, that's exactly what we were

16 looking for, just some guidance --

17         THE COURT:  Okay.

18         MR. JONES:  -- in light of everything.

19         THE COURT:  So I think maybe 30 days for the parties

20 to go over this case, and maybe the others, as well, if you

21 want to file a request to continue the other hearings.  Or if

22 you want to have those hearings or status conferences, or

23 whatever, it's up -- I'll leave it up to you.

24         MR. IMBLUM:  I think at this point, Your Honor, we'll

25 talk and see if we can work it out.

1           MR. JONES:  Yeah.

2           MR. IMBLUM:  And if not, I'll ask for a hearing -- or

3   we'll ask for a hearing.

4           THE COURT:  Right.  And then I'll be prepared to tell

5   you the charges that I think really ought to be defended, and

6   we'll follow the process.

7           Okay, so 30 days?

8           MR. JONES:  That's fine.

9           MR. IMBLUM:  That's fine, Your Honor.

10          MR. JONES:  The 22nd, I believe.

11          THE COURT:  That will put us November --

12          MR. IMBLUM:  Oh, the --

13          MR. JONES:  Don't rely on me, though.

14          THE COURT:  What's that?

15          MR. JONES:  I said I think it's the 22nd, but don't

16  rely on me today.

17          THE COURT:  The 24th?

18          MR. JONES:  24th, I'm sorry.

19          MR. IMBLUM:  24th.

20          MR. JONES:  It's the 24th.

21          THE COURT:  Just before Thanksgiving.

22          MR. IMBLUM:  Yeah.

23          MR. JONES:  I was close.

24          THE COURT:  So the 24th at 9:30 -- we'll maybe make

25  it 10 o'clock.

1            MR. JONES:  10 o'clock is fine.

2            MR. IMBLUM:  Okay, yes.

3            THE COURT:  Because I'm not going to do this --

4            MR. JONES:  That's fine, yeah.

5            THE COURT:  -- while we're going through regular

6   confirmations.

7            MR. JONES:  Right.

8            THE COURT:  It will delay things too much.

9            MR. IMBLUM:  Understood.

10           THE COURT:  So if it's okay, 10 o'clock.

11           MR. IMBLUM:  Yes.

12           THE COURT:  And to the extent that you want to

13  combine any of the others, I'm generally reluctant to combine

14  records, but this seems like it's going to be administrative

15  enough that if you're willing to put others on with it, I would

16  be okay with that, as long as it doesn't get too confusing.

17           MR. JONES:  Right.

18           MR. IMBLUM:  Yes.

19           MR. JONES:  Yeah, I think the issues are set out, we

20  just need to see if we agree or if we disagree, and proceed

21  from there.

22           THE COURT:  Right.

23           MR. IMBLUM:  Yeah, we've discussed this, and I think

24  there are certain categories of objections that can be

25  addressed, if we need to do that.  And I think we can

1   categorize them, and they apply to all the fee apps.

2         THE COURT:  And that's, I think, a wise approach;

3   okay.

4         MR. JONES:  The latter objections, I think, were a

5   little more organized than the Merriweather one was.

6   Merriweather was -- just went right through.

7         THE COURT:  I thought Merriweather was actually

8   pretty well organized, compared to what I --

9         MR. JONES:  Yeah, but I think the other one -- at

10  least they grouped them as far as the types of objections.

11        THE COURT:  Yeah.

12        MR. JONES:  There are two others that are scheduled

13  for the 10th, I suppose we should just request a continuance in

14  regard to those also.

15        THE COURT:  Are all the parties here for those?

16        MR. IMBLUM:  It's just --

17        THE COURT:  Just the -- the --

18        MR. IMBLUM:  Yeah, it's on my fee apps.

19        THE COURT:  So which ones are those?  I'll sua sponte

20  continue them, if you want me to, to the same date?

21        MR. IMBLUM:  That's okay, because I think in the

22  meantime, we'll talk, and either we'll need a hearing, or we'll

23  be able to resolve this.  So that -- yeah, that's fine to

24  continue them.

25        THE COURT:  So which two are those?

1          MR. IMBLUM:  I don't know --

2          MR. JONES:  I'm trying to remember which two.

3          MR. SCHALK:  Your Honor, I think I have the list.

4          THE COURT:  Mr. Schalk, I forgot about you; I'm so

5  sorry.  What's --

6          MR. SCHALK:  That's all right, I get ignored often.

7  It's all right.

8                         (Laughter)

9          MR. SCHALK:  Your Honor, those two cases are Cohan,

10  19-00398, and Silks, S I L K S, 17-04205.

11          THE COURT:  Thank you.

12          MR. SCHALK:  Yup.

13          THE COURT:  The first one was Cohan?

14          MR. SCHALK:  Cohen, C O H A N.

15          THE COURT:  Okay.  So, Joan, let's go ahead and sua

16  sponte continue those to the same date since all the parties

17  are here.

18          But, Mr. Schalk, I should hear from the UST.  Do you

19  have a position on this?

20          MR. SCHALK:  Your Honor, we were ordered by Judge

21  Conway to appear in the Badyrka matter; we are interested in

22  this issue.  We expressed similar concerns with the Standing

23  Chapter 13 Trustee.  I think Your Honor hit on the key issue

24  here, and I think it really is the issue of both duplication of

25  service, whether that's happened here or not; and then the

1  delegation of service, and what level that service should be

2  provided at.  Whether that's attorney time, paralegal time, or

3  administrative, or overhead time.

4         We will note, Your Honor, that we do feel and believe

5  that the Court should pay attention to whether or not the

6  services are reasonably likely to benefit the debtor's estate,

7  as provided under 330(a)(4)(A).

8         I think that's an issue with the United States

9  Trustee that we see perhaps more so in post confirmation fee

10 applications and not necessarily in first or initial fee

11 applications filed with respect to getting a case started.  So

12 I'll withhold comment on that concern to the other matters.

13 You'll --

14        THE COURT:  So that's interesting.  I would like to

15 hear more on that because -- well, there's Baker Botts, I hope

16 people aren't trying to collect for their defense of their fee

17 applications.

18        MR. SCHALK:  No, I don't think Mr. -- I'm 100 percent

19 certain Mr. Imblum has never done that.

20        THE COURT:  Yeah, I don't think so either.

21        MR. IMBLUM:  No, I -- I'm aware that that's improper.

22 I -- no, I haven't billed for that.

23        THE COURT:  Yeah.

24        MR. SCHALK:  That's a pretty clear one.

25        MR. IMBLUM:  Yeah.

1          THE COURT:  Yeah.  So but --

2          MR. SCHALK:  No, Your Honor --

3          THE COURT:  But you -- you did --

4          MR. SCHALK:  But I think that's better saved for

5 later applications, because I think what you're seeing, Your

6 Honor -- and I don't think Mr. Imblum would contest this with

7 me -- Mr. Imblum, as you noted, is a prolific fee application

8 filer.  We often see fifth, sixth, seventh, eighth applications

9 in cases that really do total up, Your Honor, and impact

10 distribution to unsecured creditors.  And I think there are

11 certain things that may concern the Office of the United States

12 Trustee that perhaps didn't concern the prior standing Chapter

13 13 Trustee, and that this standing Chapter 13 Trustee may want

14 some clarification from the Court as to whether certain items

15 really do benefit the estate or are necessary to the estate

16 post confirmation.

17          Beyond that, Your Honor, we state no position on the

18 reasonableness of the fees that have been sought as to the

19 hourly rate.  But, again, Your Honor, we are -- there is a

20 general concern when it comes to the fact that we do have a

21 presumptively reasonable rate to get a case to confirmation of

22 forty-five hundred dollars, and we're seeing applications to

23 get a fairly standard case to confirmation that's double that.

24 And --

25          THE COURT:  Well, you see, I think that's a mistake.

27

1  I don't think that one has anything to do with the other, and

2  I've heard that before, and I just want to say that it doesn't

3  matter to me.

4           MR. SCHALK:  I under --

5           THE COURT:  What matters is whether or not there is a

6  fee agreement that was properly disclosed; the client agreed to

7  it; the rate is reasonable; the services provided are being

8  provided by the appropriate party; they're appropriately

9  delegated, when necessary.

10          And although I didn't mention it, you're exactly

11 right, Mr. Schalk, duplication of services is another concern I

12 have, not on these fee applications that I've seen so far, but

13 in others that I am very close to, and will likely now, sua

14 sponte schedule hearings on.  I have seen excessive duplication

15 of services in other fee applications, and it bothers me quite

16 a bit, so I think that's also fair game.

17          MR. SCHALK:  Yeah.  Your Honor, and I understand that

18 Your Honor may think it -- and here's why I bring that up, Your

19 Honor.  That's part of Judge Conway's concern, so that may be a

20 difference between Your Honor's.

21          THE COURT:  It could be, but to me, it doesn't --

22 what matter is is In Re Busy Beaver adhered to, which is all

23 about market rate.  Did the client agree to this; is it a

24 reasonable agreement?  Hey listen, billing in six-minute

25 increments at 295 an hour, for example, the case in front of

28

1  me, I think is eminently reasonable.  It's eminently marketable

2  in any area of the law, so no one has a challenge there.

3        To the comment of "death by a thousand cuts," I think

4  that's what's at issue here.  Is it excessive billing in the

5  sense that there are things that really are so administrative,

6  they probably shouldn't be billed for, even though they're

7  being billed in the smallest possible increment.  Again, I

8  think about what would a regularly sophisticated client in

9  another area of the law outside of bankruptcy find

10 objectionable.  And perhaps glancing at a time stamp on a

11 document or glancing at a docket entry, yeah, that might be

12 something that would cause me as a normal client to pick up the

13 phone and call my attorney and go, "Really?  You're going to

14 bill me for that?  Come on, man."

15        MR. SCHALK:  I understand that, Your Honor.

16        THE COURT:  So I get that.

17        MR. SCHALK:  I understand.

18        THE COURT:  But if everything else adds up, I don't

19 really care how much it is as long as it's -- the services were

20 necessary at the time they were performed; they were reasonably

21 calculated to help the estate; they weren't excessive in that

22 you spent four hours on preparing an answer to a motion for

23 relief.  Look, that's too much, right, unless there's really

24 good reason for it.

25        But if all the charges add up to an amount that's

1  twice what the normal no-look fee is, I don't care, that

2  doesn't bother me a bit.

3        MR. SCHALK:  Understood.  I understand, Your Honor.

4  And all I would say is I think you did hit on a key point

5  there: what's the reasonable customer or the reasonable client

6  going to do?

7        THE COURT:  That's right.

8        MR. SCHALK:  When the answer is, "Well, it's just

9  coming out of your unsecured creditor's pocket," that's a

10 concern for the United States Trustee, right?  We also need to

11 also look out for unsecured creditors that often are not coming

12 in before this Court that are having -- you know, that's a

13 question, are we seeing things that maybe take money away from

14 creditors that would otherwise get it?

15       THE COURT:  No, I totally -- I think we're on the

16 same page there, I agree with that.

17       MR. SCHALK:  Yup.

18       THE COURT:  So -- but --

19       MR. SCHALK:  That's all.

20       THE COURT:  So I think we've covered it.  I do have

21 very well-developed thoughts on the matter.  One of the very

22 first things I had to adjust to when I got this position was

23 this issue.  And I, quite frankly, didn't struggle with it that

24 much because I practiced for 18 years.  I spent the first five

25 of it doing the no-look fee, and then I spent the remaining 13

1   doing a lodestar.  And I can tell you, I have very clear

2   opinions about which approach is better for both the client and

3   the attorney.  Personally I think clients get a much better

4   representation from a lodestar approach because I have seen

5   attorneys, and it has affected my own decision-making process.

6   When I was no-look fee and nothing more, and I had 55 messages

7   to return, phone calls to return, guess who got on the top of

8   that pile?  The clients with lodestar who would pay me for the

9   time it took to call me back.  And the first words out of my

10  mouth were always, "Hey, Bill, how are you doing?  I got to

11  remind you, I've got to bill you for this call, so we'll try

12  and keep it short.  What's going on?"  As opposed to someone

13  where I've already got the plan confirmed, and they're calling

14  because something happened, and I might have enough time by the

15  end of the day to get through 55 messages and call them, but I

16  might not.

17          The practice of law is a business, as well, and you

18  have to be mindful that attorneys are doing their job, and

19  selling their services.  And if they do so in accordance with

20  the well-defined fee agreement, and it's consistent with market

21  practices, they should be paid for that, that's my view.

22          But I also agree with you, Mr. Schalk.  If they're

23  duplicating services, they're not properly delegating, or the

24  services really aren't necessary or designed to protect the

25  estate, that money should not come out of the expense of the

1   unsecured.  So that message is resonating with me, as well.

2          MR. SCHALK:  Thank you, Your Honor; nothing else.

3          THE COURT:  Appreciate it; okay, enough said.

4          MR. IMBLUM:  Thank you.

5          THE COURT:  Thank you, both.  We'll see you on

6   November 24th.

7          MR. JONES:  Your Honor, there are two other cases

8   that I just checked that are scheduled for the 10th, if we

9   could continue those also to the 24th.

10          THE COURT:  Cohan and Silks.  There's two more

11  besides those?

12          MR. JONES:  Correct.  Teresa Marie Becker, docketed

13  to Number 18-02864.

14          THE COURT:  Okay.

15          MR. JONES:  And Robert Swan, docketed to 20-02797.

16  Those have all now been scheduled.

17          THE COURT:  Okay, very good.  Joan will add those to

18  the list, and we'll continue those sua sponte to the 24th.

19          MR. JONES:  Thank you.

20          THE COURT:  Thank you, both; appreciate it.

21          MR. SCHALK:  Thank you, Your Honor.

22          THE COURT:  Thank you, Mr. Schalk.

23       (Whereupon, at 10:32 a.m., the hearing was adjourned.)

24

25

32

<u>CERTIFICATE OF TRANSCRIBER</u>

I, KAREN HARTMANN, a certified Electronic Court Transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Karen Hartmann*

Karen Hartmann, AAERT CET 475   Date: November 17, 2021

TRANSCRIPTS PLUS, INC.

**Ashley Werner**

---

| | |
|---|---|
| **From:** | Carlo Sabatini |
| **Sent:** | Wednesday, July 3, 2024 2:42 PM |
| **To:** | Agatha McHale |
| **Cc:** | Ashley Werner |
| **Subject:** | Decantis; 5:22-bk-01826-MJC |
| **Attachments:** | Settlement Proposal.pdf |

I saved the two most-complicated cases for last. (The other, Pypiak, might come tomorrow. If not, next week.) These were the first two cases that were done, so it was before we had come to agreement on a number of issues. I've tried to work those later agreements into this proposal.

The attached .pdf shows the settlement proposal. In addition to our normal bill, this spreadsheet has two additional columns: "Aggie" and "Proposal."

"Aggie" shows what the bill would be if all of your objections are granted. For each entry where you objected, we lodged a discount in the Aggie column. That column also includes any time that we had already discounted. For you to be able to easily tell the difference, we assigned a fill color to each cell that contains a discount for one of your objections. In other words, the discounted amounts in that column which are just in a standard white cell are amounts that I had already discounted on the bill when the fee app was originally filed. The yellow cells in your column are the discounts that we think you would agree to based on subsequent agreements – e.g., the proof of claim review structure that we've been using. The orange cells in your column are the rest of your objections.

The "Proposal" column contains the discounts that I am proposing as settlement of the fee application. This column contains two additional colors. Blue means that we are not agreeable to the discount that you requested. Generally, blue means that we aren't discounting at all except that on the first page we did apply some discount to bring the time down to a lower rate. Grey in this column means that the time is for schedule prep. I've discounted all of the grey time except for 6 hours of paralegal and 2 hours of attorney time. Orange in that column means that I am accepting your objection. Yellow means that I'm agreeing to reduce the amount the same way that we have to similar entries in the past.

The totals at the bottom of the columns show that our original request was $11,869 and that we are willing to reduce that to $8,514.75. If all of your objections were allowed in full, the fees would be $5,983.25.

Please let me know if this works. If you me to explain this in person, let me know when is good for you. Thanks.

Carlo Sabatini
Sabatini Law Firm, LLC
216 N. Blakely St.
Dunmore, PA 18512
(570) 614-4444
carlo@bankruptcypa.com