## No. 3:25-cv-01927-KM

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

**DOMINIC DECANTIS,**
*Appellant,*

v.

**JACK ZAHAROPOULOS.,**
*Appellee.*

_____

On Appeal from the United States Bankruptcy Court
for the Middle District of Pennsylvania
in Case No. 5:22-bk-01826-MJC

---

### APPELLANT'S BRIEF

---

Carlo Sabatini
SABATINI LAW FIRM, LLC
216 N. Blakely St.
Dunmore, PA 18512
(570) 341-9000
carlo@bankruptcypa.com

*Attorney for Appellant*
*Dominic DeCantis*

February 25, 2026

TABLE OF CONTENTS

Table of Contents ................................................................................. ii

Table of Authorities ............................................................................ iv

I.    Jurisdictional Statement ................................................................ 1

      A.    Basis for the Bankruptcy Court's Subject-Matter Jurisdiction ............... 1

      B.    Basis for the District Court's Jurisdiction .............................. 2

      C.    Timeliness of the Appeal ................................................ 2

      D.    Finality of the Underlying Judgment ..................................... 2

II.   Issues Presented and Concise Statement of Standard of Review ................... 4

III.  Concise Statement of the Case ............................................... 5

      A.    Facts Relevant to the Issues Submitted for Review and Relevant
            Procedural History ...................................................... 5

      B.    Ruling presented for review ............................................. 6

IV.   Summary of the Argument ..................................................... 6

V.    Argument ..................................................................... 8

      A.    Introduction ............................................................ 8

            1.    Generic overview of the fee application process .................. 9

            2.    The fee application at issue here ............................... 12

      B.    Applicable Standard ................................................... 14

      C.    The 40% percent reduction was arbitrary. .............................. 14

            1.    *In re 388 Route 22 Readington Holdings LLC* .................... 21

            2.    *In re Badyrka* ................................................. 22

            3.    *In re McKeeman v. Laughlin* .................................... 23

D.    It was error to tether the fee application to the PRF. .............................23

E.    The bankruptcy court erred by failing to explain why it did not credit credible, uncontroverted market evidence in the record.........................28

    1.    Applicant's clients pay less.................................................................30

    2.    Applicant's cases fail much less frequently. ....................................33

VI.    Conclusion ...............................................................................................35

VII.    Certificate of Compliance .......................................................................35

VIII. Certificate of Use of Generative AI .......................................................36

TABLE OF AUTHORITIES

## Cases

*Daubert v. NRA Grp., LLC,*
  861 F. 3d 382 (3d Cir. 2017) ...................................................................9

*DL Res., Inc. v. FirstEnergy Sols. Corp.,*
  506 F.3d 209 (3d Cir. 2007) ...................................................................3

*Evans v. Port Auth. of New York & New Jersey,*
  273 F.3d 346 (3d Cir. 2001) ........................................................... 18, 20

*Falling Creek Invs., Inc. v. Broncano-Damian,*
  2025 WL 2796768 (M.D. Pa. Sept 29, 2025)....................................4, 5

*Gunter v. Ridgewood Energy Corp.,*
  223 F.3d 190 (3d Cir. 2000) ........................................................... passim

*In re 388 Route 22 Readington Holdings LLC,*
  2023 WL 4249266 (3d Cir. 2023) ........................................................21

*In re Aquilino,*
  135 F.4th 119 (3d Cir. 2025) ..................................................................1

*In re Badyrka,*
  2022 WL 4656034 (Bankr. M.D. Pa. Sept. 30, 2022) ...................... 20, 21, 22, 24

*In re Busy Beaver Bldg. Centers, Inc.,*
  19 F.3d 833 (3d Cir. 1994) ........................................................... passim

*In re Carpenter,*
  665 B.R. 89 (Bankr. M.D. Pa. 2024) ....................................................24

*In re McKeeman v. Laughlin,*
  236 B.R. 667 (B.A.P. 8th Cir. 1999) ............................................... 21, 23

*In re Merriweather,*
  21-bk-00110-HWV (Bankr. M.D. Pa. Oct. 27, 2021) ..........................27

*In re Paul,*
  141 B.R. 299 (E.D. Pa. 1992) ..............................................................34

*In re S.S. Body Armor I Inc*,
 961 F.3d 216 (3d Cir. 2020) .................................................................14

*In re Stafford Pool & Fitness Ctr.*,
 252 B.R. 627 (Bankr. D.N.J. 2000) ........................................................9

*In re Valley Forge Plaza Assocs.*,
 119 B.R. 471 (E.D. Pa. 1990) .................................................................2

*In re Yermakov*,
 718 F.2d 1465 (9th Cir. 1983) ................................................................3

*Lindy Bros. Builders, Inc. v. American Radiator & Std. Sanitary Corp.*,
 540 F.2d 102 (3d Cir.1976) ..................................................................22

*Moreno v. City of Sacramento*,
 534 F.3d 1106 (9th Cir. 2008) ..............................................................15

*Perdue v. Kenny A. ex rel. Winn*,
 559 U.S. 542 (2010) ...............................................................................15

*Rode v. Dellarciprete*,
 892 F.2d 1177 (3d Cir. 1990) .................................................... 16, 17, 18

*Shaw v. Vetforce, Inc. Pennsylvania*,
 2025 WL 83511 (M.D. Pa. Jan. 13, 2025) ..............................................9

*Student Public Interest Research Group v. AT & T Bell Laboratories*,
 842 F.2d 1436 (3d Cir. 1988) ...............................................................14

**Statutes**

11 U.S.C. § 1302 ........................................................................................12

11 U.S.C. § 330 ............................................................................... passim

28 U.S.C. § 1334 ..........................................................................................1

28 U.S.C. § 157 ........................................................................................1, 2

28 U.S.C. § 158 ..........................................................................................2

**Rules**

Fed. R. Bankr. P. 8002 ..........................................................................................2, 3

Local Bankruptcy Rule 2016-2(a). ...................................................................... 9, 10

Local Bankruptcy Rule 2016-2(c) ...........................................................................24

Local Bankruptcy Rule 2016-2(c)(1)..........................................................................9

I.    **J**URISDICTIONAL **S**TATEMENT

A.  B**ASIS FOR THE** B**ANKRUPTCY** C**OURT'S** S**UBJECT-**M**ATTER** J**URISDICTION**

28 U.S.C. § 1334 (b) grants the district court original jurisdiction of all civil proceedings arising under Title 11.

A proceeding "'arises under' the Bankruptcy Code, . . . if it 'is based on a right or remedy expressly provided by the Bankruptcy Code.'" *In re Aquilino*, 135 F.4th 119, 130 (3d Cir. 2025). The order being appealed from here is a decision on a bankruptcy debtor's attorney's fee application. That application sought fees under 11 U.S.C. § 330 of the Bankruptcy Code, and therefore "arises under" the Code.

By order of the district court entered on July 26, 1984 (Misc No. 84-0203, the "Referral Order") "all proceedings arising under Title 11" were referred to the bankruptcy court pursuant to 28 U.S.C. § 157.

On September 11, 2000, this Court issued Standing Order No. 00-3, which authorized the bankruptcy court "to perform the duties [in the Referral Order] to the full extent set forth in 28 U.S.C. § 157," with a limitation for cases that are "non-core." However, cases that "arise under" the Bankruptcy Code are "core" and can be determined without district court intervention. *In re Aquilino*, 135 F.4th at 130. Because this case arises under the Bankruptcy Code and is core rather than non-core, the bankruptcy court had subject-matter jurisdiction.

1

B. BASIS FOR THE DISTRICT COURT'S JURISDICTION

28 U.S.C. § 158 grants the district court jurisdiction to hear appeals from final judgments, orders, and decrees entered in cases referred to bankruptcy judges under 28 U.S.C. § 157.

C. TIMELINESS OF THE APPEAL

28 U.S.C. § 158(c)(2) provides that appeals must be taken in the time provided by Fed. R. Bankr. P. 8002, which requires a notice of appeal to be filed with the bankruptcy clerk within 14 days of the entry of the judgment or order being appealed. Here, the judgment being appealed from was entered on September 30, 2025, and the notice of appeal was timely filed on October 13, 2025.

D. FINALITY OF THE UNDERLYING JUDGMENT

The judgment appealed from was an order on an interim fee application. Interim applications are subject to final adjustment and are generally not considered final. *See e.g.*, *In re Valley Forge Plaza Assocs.,* 119 B.R. 471, 472 (E.D. Pa. 1990). Thus, the order appealed from was likely not final.

On November 12, 2025, Appellant filed a second fee application ("the Second Fee App") as a final rather than an interim fee application. In the Second Fee App, Appellant specifically waived any right to additional fees, other than those that were sought in the Second Fee App or which are the subject of the

2

present appeal. On November 21, 2025, this court stayed this matter to allow the bankruptcy court to rule on the Second Fee App. (Dkt. Entry 10.)

On January 20, 2026, the bankruptcy court approved the Second Fee App. There is no longer any possibility that Appellant can be granted additional fee requests, and therefore both fee applications are now final. *In re Yermakov*, 718 F.2d 1465, 1469 (9th Cir. 1983)(fee awards become final where there is no possibility that a party can be granted additional fee requests).

Because the order appealed from is now final, this Court may entertain the appeal, even though it was prematurely filed. "A notice of appeal filed after the bankruptcy court announces a decision or order--but before entry of the judgment, order, or decree--is treated as filed on the date of and after the entry." Fed. R. Bankr. P. 8002(a)(2); *see also DL Res., Inc. v. FirstEnergy Sols. Corp.*, 506 F.3d 209, 216 (3d Cir. 2007)(the appellate court "may entertain an appeal from a nonfinal order if an order which is final is subsequently entered before our adjudication on the merits")(non-bankruptcy case).

3

## II.  ISSUES PRESENTED AND CONCISE STATEMENT OF STANDARD OF REVIEW

A.    Whether the bankruptcy court abused its discretion when it imposed a 40% across-the-board reduction to a fee application without explaining how it selected the 40% figure, and without connecting that percentage to any articulated findings.

B.    Whether the bankruptcy court erred by evaluating the reasonableness of a fee request by reference to a flat fee that some bankruptcy practitioners elect to charge, rather than by analyzing the fee on a lodestar basis.

C.    Whether the bankruptcy court erred by failing to address material, uncontroverted market evidence that the fee applicant submitted in response to the court's concerns about the reasonableness of services performed and their benefit to the debtor.

This court reviews a bankruptcy court's "legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse thereof." *Falling Creek Invs., Inc. v. Broncano-Damian*, No. 3:24-CV-01462, 2025 WL 2796768, at *3 (M.D. Pa. Sept. 29, 2025)(quotations omitted). "[A] *de novo* review requires a 'fresh' review of the Bankruptcy Court's conclusions of law." *Id.* (quotations omitted). "A finding of fact is clearly erroneous when it is completely devoid of minimum evidentiary support displaying some hue of credibility or bears

4

no rational relationship to the supporting evidentiary data." *Id.* (quotations omitted).

## III.  CONCISE STATEMENT OF THE CASE

### A.  FACTS RELEVANT TO THE ISSUES SUBMITTED FOR REVIEW AND RELEVANT PROCEDURAL HISTORY

The fee application was filed on April 29, 2024. (Fee Application, AA 064-088.) The application sought fees of $11,869.25 and expenses of $449.85. (Id.) The trustee objected to the application on May 20, 2024. (Objection, AA 087-104.) The matter was called for a hearing on May 30, 2024, and was continued to allow the parties time to attempt to resolve the objection. (Proceeding Memo, AA 105-106; Transcript of May 30, 2024 hearing, at 3:3-6, AA 108.) The parties resolved the objection and filed a stipulation that "Applicant[1] will reduce his request by $3,354.50." (Stipulation, AA 111.) Thus, the net amount sought was $8,514.75 in fees and $449.85 in expenses.

The court scheduled a hearing on the application for August 7, 2024. Testimony was taken, and the court allowed Applicant additional time to conduct discovery and supplement the record. (Proceeding Memo, AA 113-114; Transcript of August 7, 2024 hearing at 29:22-25, AA 143 and 35:14, AA 149.) Discovery

---

[1] "Applicant" here, and as used throughout this brief, refers to Carlo Sabatini, the Appellant's bankruptcy attorney.

5

was conducted, and Applicant thereafter timely filed the allowed supplementation. (Debtor's Post-Hearing Brief, AA 152-197; Affidavit in Support of Fee Application, AA 198-203.)

B.  RULING PRESENTED FOR REVIEW

On September 30, 2025, the Court granted the application in part and denied it in part. (Order, AA 204-208.) The order awarded the requested expenses in full but reduced the fees to $7,121.55. (Id.)

IV.  SUMMARY OF THE ARGUMENT

This appeal presents three related legal errors in the bankruptcy court's reduction of the fee application.

First, the bankruptcy court imposed a 40% across-the-board reduction to the requested fees without explaining how it selected the 40% figure, and without connecting that percentage to any articulated findings. Binding precedent prohibits percentage reductions imposed in an arbitrary or indiscriminate fashion. Where a court decides to reduce a bill, it must analyze the deficiencies warranting the reductions and explain the relationship between those deficiencies and the amount reduced. Here, the opinion below provides no explanation for why 40%—rather than 10%, 20%, or 50%—was appropriate. That absence of reasoning prevents meaningful appellate review and constitutes an abuse of discretion.

6

Second, the bankruptcy court improperly evaluated the lodestar request by measuring it against the district's "Presumptively Reasonable Fee" ("PRF") for Chapter 13 cases. The PRF is an elective flat-fee alternative to the lodestar; it is not a benchmark for determining the reasonableness of a lodestar application. Section 330(a)(3)(F) of the Bankruptcy Code expressly directs courts to consider whether compensation is reasonable in light of customary compensation charged in **non-bankruptcy** matters. By instead requiring Appellant to justify why this case warranted fees above the PRF, the court inverted the framework and treated the PRF (rather than the lodestar) as establishing the fee that is presumed to be reasonable. That approach conflicts with the statutory text and with controlling Third Circuit authority governing bankruptcy compensation.

Third, after asking Applicant to provide information as to how the work performed benefited the debtor, the bankruptcy court failed to address material, uncontroverted market evidence submitted in response. Once a court identifies concerns, it must consider relevant, competent evidence offered to demonstrate that the market would recompense the challenged work, and must explain any decision to discount that evidence. Appellant submitted statistical and comparative data bearing directly on market value and client benefit. The opinion below does

7

not discuss that evidence or explain why it was rejected. That omission independently warrants vacatur and remand.

Because the court applied an improper analytical framework, imposed an unexplained percentage reduction, and failed to address material record evidence, the fee award should be vacated and the matter remanded for reconsideration under the correct legal standards.

## V.   ARGUMENT

### A.   INTRODUCTION

This appeal seeks a determination as to the correct legal standards that are to be considered when awarding fees to a bankruptcy professional under 11 U.S.C. § 330. Applicant submits that the standards that the bankruptcy court used here – and which it frequently uses when deciding fee applications – conflict with Third Circuit authority.

Three legal standards are at issue. The first is the extent to which the bankruptcy court must articulate its reasons for a lump discount off the entire bill, including whether a line-by-line analysis is appropriate. The second is the relevance of the PRF when an attorney elects to be compensated on a lodestar basis. The two bankruptcy judges in this district have diametrically opposed views

8

on this point, and it is appropriate for this Court to address that split.[2] The

Honorable Mark Conway evaluates lodestar fee applications by reference to the

PRF;[3] the Honorable Henry Van Eck does not.[4] The third standard at issue is the

extent to which the bankruptcy court must describe its decision to discount

credible, uncontroverted market evidence in the record.

### 1.  *Generic overview of the fee application process*

The local rules allow an attorney representing a debtor in a Chapter 13 case

to elect from two compensation structures: lodestar and the PRF. See L.B.R. 2016-

2(a). "The lodestar is the product of the number of hours reasonably expended by

litigation, and the reasonable hourly rate." *Shaw v. Vetforce, Inc. Pennsylvania*,

2025 WL 83511, at *5 (M.D. Pa. Jan. 13, 2025). The PRF, on the other hand, is a

flat fee "that includes all legal services rendered by the attorney through the

conclusion of the case." L.B.R. 2016-2(c)(1). The PRF in effect at the time this

case was filed was $4,500, though it was subsequently increased to $5,000. (Order,

AA 213 n.5.)

---

[2] It would be an overstatement to say that this Court's decision would *resolve* the split, because there is no such thing as "law of the district." *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 395 (3d Cir. 2017). Though persuasive, district court decisions do not bind bankruptcy courts. *In re Stafford Pool & Fitness Ctr.*, 252 B.R. 627, 631 (Bankr. D.N.J. 2000).

[3] Order at AA 213 describing the PRF "as a 'starting point' to what should be considered a 'reasonable' fee in a routine Chapter 13 case."

[4] *See infra* at 18.

Under either choice, the fees charged after the case has been filed are generally not paid directly to the attorney by the Debtor, but rather through the Chapter 13 trustee's office. See L.B.R. 2016-2(a) (fees must be paid *only* "through the chapter 13 plan, unless payment is otherwise approved by the Court.") Almost all Chapter 13 plans in this district provide for the debtor to make monthly payments to the trustee, and for the trustee to then disburse those funds to the debtor's creditors, after retaining a commission for himself on the amounts disbursed. See Model Plan at L.B.F. 3015-1. The instant plan followed that norm. Thus, the fee application at issue sought an order requiring the trustee to pay Applicant from the funds that Debtor had paid to the trustee's office.

Although nominally paid by the debtor, the fees that a debtor's attorney receives are often at the expense of the *creditors*. This dynamic exists because the attorneys' fees receive a priority level payment from a pool of funds tendered by the debtor, which is used to pay the debtor's obligations. The unsecured creditors – whose debts are typically discharged at the conclusion of the case – receive payment from the funds that remain in that pool only after the debtor's attorney has been paid. Those creditors' claims are discharged at the end of the case, regardless of whether they have received any payment. Thus, to the extent that an attorney's

10

fee takes funds from that pool, it is often at the expense of the creditors who would have otherwise received the funds.[5] That is the case here.

Of course, those creditors are entitled to due process before funds that would have been paid to them are instead used to pay a debtor's attorney. Thus, they receive notice of the fee application when it is filed and have an opportunity to object to the reasonableness of the amount sought before it is paid. But, in the typical Chapter 13 consumer bankruptcy case, the cost to a creditor of objecting to the application could easily exceed the net benefit that the creditor might hope to achieve from that exercise. Therefore, the bankruptcy code charges the bankruptcy judge with reviewing fee applications for reasonableness to, *inter alia,* protect

---

[5] Sometimes, however, an additional attorney's fee *is* actually at the Debtor's expense. If the pool of funds that the debtor has already committed is insufficient to pay the attorney's fee, then the attorney may ask the court to require the debtor to pay more. In this case, the $11,869.25 that the Applicant initially sought would have created such an "underfunding" issue. However, the fee application affirmatively waived a portion of the fee so that the Debtor would not have to increase his payment to the trustee. (Fee Application, AA 065)("To the extent that the trustee does not have sufficient funds to pay the amount requested, then Applicant waives the remaining fees. Applicant estimates that the total amount actually received from the trustee's office will be less than $7,068.77.")

those disincentivized creditors. In conducting that review, the judge may be aided by the Chapter 13 trustee.[6]

### 2. *The fee application at issue here*

Applicant's gross bill was $13,169.00 plus costs. In exercising billing judgment, Applicant wrote down almost 10% of the fee and then filed an application requesting $11,869.25. The trustee objected to about 80 specific line-item entries. If the trustee's objections had been allowed in full, they would have reduced the application by $5,886.00 and allowed $5,983.25 to be paid. Applicant and the trustee discussed each of the trustee's objections and reached an agreement as to which of those entries should be disallowed. The result was an additional discount of $3,354.50 off the application, and a total net proposed reasonable fee of $8,514.75. Of this fee, Applicant had taken $500 as a pre-bankruptcy retainer. Thus, the trustee would have been authorized to pay an additional $8,014.75.[7]

---

[6] The court characterizes the trustee's review here as an "obligation." (Order, AA 204 at n.2.) 11 U.S.C. § 1302(b) describes the trustee's duties and does not explicitly list a duty to review and object to fee applications. Nevertheless, the trustee certainly has standing as a party-in-interest who may object to the application under 11 U.S.C. § 330(a).

[7] Note that this settlement would not change what the Applicant would actually receive. Applicant had already voluntarily waived fees to the extent that the trustee would not have sufficient funds available to pay them and had estimated that the trustee would not have funds available to pay a fee of more than $7,068.77. *See fn 5 supra.* Thus, whether the requested amount of over $11,800 was awarded, or the

The bankruptcy court then conducted a hearing on the application. The Court praised the trustee's work, stating that she "did an excellent job in her objections, and really identified pretty much what the Court looks at, as well, as to what just does not appear to be reasonable." (Transcript of August 7, 2024 hearing at 10:24-25, AA 124 and 11:1-2, AA 125.) However, as was its right, the court did not accept that recommendation. During that hearing, the Court, *inter alia*, questioned three discrete entries on the bill. As Applicant was not previously aware that the court was concerned with those particular entries, he was not prepared to address them at the hearing. The court allowed additional time for Applicant to submit additional evidence to describe those entries in more detail. (Transcript of August 7, 2024 hearing at 29:11-13, 29:22-25, AA 143.) The court also allowed Applicant to conduct discovery and submit evidence comparing his cases to those of other attorneys. Applicant timely supplemented the record (Debtor's Post-Hearing Brief, AA 152-197; Affidavit in Support of Fee Application, AA 198-203.) The court then entered an order allowing total fees of $7,121.55 and expenses of $449.85. The trustee has since paid these undisputed amounts to the Applicant.

---

negotiated amount of over $8,500 was awarded, Applicant would still be paid no more than about $7,600 total – the $500 retainer, plus about $7,100 from the trustee's office.

The principal error in the Court's order is the standard that it applied. First, the Court applied a 40% reduction to the fee without explaining how it arrived at that percentage. Second, the Court improperly tethered the fee request to the PRF and required the Applicant to show that this case was sufficiently complex so as to warrant a deviation from that separate standard.

B.  APPLICABLE STANDARD

The bankruptcy court enjoys broad discretion in awarding attorney's fees. On appeal, those rulings are reviewed with two separate standards. With respect to whether the court applied the correct procedures and standards, the review is plenary. *Student Public Interest Research Group v. AT & T Bell Laboratories,* 842 F.2d 1436, 1442 n. 3 (3d Cir. 1988). An abuse of discretion occurs if, in setting a fee, the court fails to follow proper procedures. *In re S.S. Body Armor I Inc*, 961 F.3d 216, 225 (3d Cir. 2020). Here, the court applied incorrect procedures.

C.  THE 40% PERCENT REDUCTION WAS ARBITRARY.

The court's arbitrary decision to reduce the entries by 40% without explaining how it arrived at that percentage is an abuse of discretion. In *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000), the Circuit explained that a court abuses its discretion where it

> reduce[s] an award by a particular percentage or amount
> (albeit for justifiable reasons) in an arbitrary or
> indiscriminate fashion. If the court believes that a fee

14

> reduction . . . is indicated, *it must analyze the circumstances requiring the reduction and its relation to the fee, and it must make specific findings to support its action.*

*Id.* at 196 (emphasis in original, citations omitted).

However, the selection of 40% - rather than, say, 20% or 50% - is arbitrary and indiscriminate. In *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010), the Supreme Court reversed a district court's decision to enhance a lodestar in a fee-shifting case by 75%, where the district court failed to explain why that particular percentage was chosen.

> [T]he District Court did not provide proper justification for the large enhancement that it awarded. The court increased the lodestar award by 75% but, as far as the court's opinion reveals, this figure appears to have been essentially arbitrary. Why, for example, did the court grant a 75% enhancement instead of the 100% increase that respondents sought? And why 75% rather than 50% or 25% or 10%?

*Id.* at 557.

Although the court might be permitted to make a relatively small cut without a specific explanation, the court should not impose such a severe cut without describing its rationale in detail. *See e.g., Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008)("the district court can impose a small reduction, no greater than 10 percent—a 'haircut'—based on its exercise of discretion and

without a more specific explanation.")(civil rights case). Here, the court did not

explain how it landed at 40%. This silence is an abuse of discretion under *Gunter.*

The court said little other than that the three time entries that it explicitly

questioned "appeared to be excessive, non-billable administrative or overhead."

However, the Third Circuit has said that this is an insufficient explanation. "We

need more reasoning than 'they are excessive' to review the district court's

decision. The district court should explain why it concludes that hours expended on

a task are excessive." *Rode v. Dellarciprete*, 892 F.2d 1177, 1187 (3d Cir. 1990).

In *Rode*, the district court had found that a fee petition failed to include

"adequate and specific descriptions of services and the time devoted to those

services." *Id.* at 1190. The Circuit reversed, finding that the information provided

was "very specific. . . ." *Id.* at 1191. The Circuit listed the following sample entries

to support its holding that the entries were very specific, and that the information

was enough for the district court to determine if the fees claimed were reasonable:

> 1. Time of Laurence W. Dague, Esquire: Settlement: 12.9 hours; Application for Attorney's Fees: 4.1 hours; and miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses: 1.3 hours. Total hours: 18.3.

> 2. Time of Dianne E. Dusman, Esquire: Settlement: 1.8 hours; Trial Brief: 5.2 hours; and miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses: .2 hours. Total hours: 7.2.

16

3. Time of Carol L. Karl, law clerk/paralegal: Settlement: 1.9 hours; and miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses: 1.8 hours. Total hours: 3.7.

4. Time of Michael Fenten, law clerk: miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses: .2 hours. Total hours: .2.

Id. at n. 13.

Here, the three time entries identified by the bankruptcy court here provide much more specificity than in *Rode*. Those entries are as follows:

6/23/2022    Work with [Schedule] I, [Schedule] J and [the Means Test]. Prepare [Chapter 13] Plan. 1.7 hours

6/29/2022    Meet with paralegal to go over schedules, work on plan calculations, and address issues that she had flagged for me. .6 hours.

7/1/2022    Draft post-filing instructions for client, draft plan attachment and complete my review of petition and schedules. 1.7 hours.

In the first entry, Applicant worked with Schedule I, Schedule J, the Means Test, and the Plan.[8] In the second entry, Applicant was working to answer

---

[8] Schedule I is a debtor's actual projected income, Schedule J is his actual projected expenses, the Means Test calculates the amount that must be paid to unsecured creditors in a case where the debtor's household income is above the

questions that had been specifically flagged for him by the paralegal who was

handling the bulk of the work preparing the bankruptcy filing. And in the final

entry, Applicant drafted instructions for the client, drafted the attachment for the

plan, and completed a review of the petition and the schedules. This level of detail

is substantially more than the descriptions that the Circuit characterized as "very

specific" in *Rode*. The bankruptcy court abused its discretion by requiring more

detail. *See also*, *Evans v. Port Auth. of New York & New Jersey*, 273 F.3d 346, 361

(3d Cir. 2001)(civil rights)("the petitioning attorney must include fairly definite

information as to hours devoted to various general activities, e.g., partial discovery,

settlement negotiations, and the hours spent by various classes of attorneys. . . .

The billing records submitted by Evans' attorneys were specific enough to meet

this standard.")

   The court's opinion observes that Applicant indicated that he was not

meeting his burden of showing where the time was spent. (Order, AA 214 at n. 7.)

However, some context is appropriate. Applicant never said: "The appropriate

burden of proof in this matter is X, and I am not meeting that burden." Instead, the

record is clear that Applicant was referring to the burden that the court had chosen

---

state median, and the Plan is what describes the amounts that will be paid to the
Chapter 13 trustee. These four inter-related documents usually determine what a
bankruptcy debtor will have to pay.

to apply. In other words, Applicant was recognizing that the bankruptcy court

expected substantially more detail than what was set forth in the bills:

> MR. SABATINI: [M]ost of the time that was spent preparing the schedules was written off. . . . [T]his case is older . . . . [T]hese schedules were prepared over two years ago. And since that time, because of . . . what I've learned about the Court's concerns about how much time I've been spending, I've put in new programming and procedures that will provide a lot more detail about exactly what's happening when we're preparing the schedules, and how much time is being spent on various tasks.
>
> . . . [I]n one of your opinions on one of my fee applications, . . . .you questioned whether that level of detail was necessary. . . . [P]art of my goal here is . . . [i]f you think that . . . the cost benefit analysis of that effort is not worth it, then I'll stop doing that. . . . [S]o, part of the reason why in this case I agreed to take off most of the time spent preparing the schedules is because I recognize that in prior cases, without me being able to provide you with a more specific breakdown as to what's happening in each step of that process, . . . I'm not carrying my burden of showing where the time is being spent preparing the schedules. So, the future cases, . . . will have that additional detail. And that's where, . . . hopefully I could, . . . make further adjustments to my process to eliminate the things that you think aren't necessary.

(Transcript of August 7, 2024 hearing at 8:18-25, 9:1-25, 10:1-6, AA 122-124.)

Thus, Applicant did not concede that he failed to meet the *correct* burden. Instead,

19

he merely acknowledged that time entries did not provide the heightened detail that the court demanded.[9]

Finally, the four hours that the court questioned had *already* been cut in half by agreement with the trustee. (AA 216-217.) In other words, the 40% discount the court applied to the entire gross bill (before factoring in the settlement with the trustee) was less than the 50% discount the Applicant had already agreed to accept on the three entries the court questioned. There is no explanation as to how Applicant's agreement to allow a 50% discount on those three time entries warrants a reduction of 40% on the other, non-discounted entries.

The bankruptcy court did not identify any other specific entries it considered inappropriate. Instead, it explicitly held that "it is not required to make a line by line analysis of the fee application." (Order, AA 206.) However, the Third Circuit has held that "fee requests be subjected to a thorough and searching analysis. Contrary to the suggestion of the District Court, it *is* necessary that the Court 'go line, by line, by line' through the billing records supporting the fee request." *Evans,* 273 F.3d at 362. And, though *Evans* stated a rule outside bankruptcy, Busy

---

[9] Judge Conway's first opinion regarding one of Applicant's fee applications was *In re Badyrka*, 2022 WL 4656034 (Bankr. M.D. Pa. Sept. 30, 2022). That opinion appears to be the first opinion that he ever wrote on fees. The three time entries that are at issue here were incurred before that opinion was written.

Beaver explains that a bankruptcy court applies principles of fee-shifting jurisprudence to bankruptcy cases. It does so by explaining how the bankruptcy court fills the role normally occupied by the adversary in fee-shifting litigation. 19 F.3d at 846 ("the court should first apprise the applicant of the particular questions and objections it harbors, a role which the adversary in a statutory fee case would typically play.")

To support its holding that no line-by-line review is required, the bankruptcy court cited three authorities: (1) *In re 388 Route 22 Readington Holdings LLC*, 2023 WL 4249266, at *3 (3d Cir. 2023), (2) its own prior holding in *In re Badyrka*, and (3) *In re McKeeman v. Laughlin*, 236 B.R. 667, 672 (B.A.P. 8th Cir. 1999). (Order, AA 206.)

### 1.  *In re 388 Route 22 Readington Holdings LLC*

In this unpublished opinion, a party submitted hundreds of line-by-line objections to billing entries. *Id.* The bankruptcy court's opinion "noted that it reviewed each entry. . . and then went on to rule on the objections and explain its reasoning." *Id.* The Circuit found that this review was sufficient, and rejected a party's position that the bankruptcy court must provide "a line-by-line response to its line-by-line objections." 2023 WL 4249266 at *3. Of course, in *In re 388* a line-by-line review *was* conducted, and the court explained its reasoning. Therefore, the case does not stand for the proposition that no line-by-line *review* is required. It

21

simply states the uncontroversial rule that the court's opinion does not need to *respond* line-by-line to every objection raised by a party.

2.  *In re Badyrka*

*In re Badyrka* provides one authority for the statement that "the Court is not obligated to conduct a line-by-line review of the invoice." *Badyrka* at 6. That authority is *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 844-845 (3d Cir. 1994). *Id.* However, *Busy Beaver* does not explicitly disavow any requirement of a line-by-line review. It merely explains that absolute precision is not required:

> we "do not intend that a . . . bankruptcy court, in setting an attorney's fee, become enmeshed in a meticulous analysis of every detailed facet of the professional representation. It ... is not our intention that the inquiry into the adequacy of the fee assume massive proportions, perhaps even dwarfing the case in chief." Because its time is precious, the reviewing court need only correct reasonably discernible abuses, not pin down to the nearest dollar the precise fee to which the professional is ideally entitled.

*Id.* (quoting *Lindy Bros. Builders, Inc. v. American Radiator & Std. Sanitary Corp.,* 540 F.2d 102, 116 (3d Cir.1976)(antitrust case)). Notably, *Busy Beaver*'s language here does not state a special bankruptcy rule. Instead, it is simply quoting *Lindy* for standards for evaluating fee applications outside of bankruptcy. *Busy Beaver* should be read consistently with such non-bankruptcy fee jurisprudence, including with *Gunter's* prohibition on reducing "an award by a particular

22

percentage or amount (albeit for justifiable reasons) in an arbitrary or indiscriminate fashion." 223 F.3d at 196.

### 3. *In re McKeeman v. Laughlin*

The bankruptcy court accurately quotes this 8th Circuit Bankruptcy Appellate Panel holding: "When ... a case presents routine chapter 13 matters, the court may review the fees requested in light of fees typically charged, and may reduce the requested fee accordingly." (Order, AA 206)  However, *McKeeman* is directly contrary to Third Circuit authority that was not binding on the *McKeeman* court. As will be explained in the next section, *Busy Beaver* requires that bankruptcy fees be evaluated by reference to **non**-bankruptcy work. Because *McKeeman* does exactly the opposite, it is not persuasive here.

When imposing a substantial percentage reduction, the court must identify the categories of hours deemed unreasonable and explain their relationship to the reduction imposed. The court's explanation for the 40% reduction was simply that the time spent was excessive. That explanation is terse and conclusory, is insufficient to support the reduction, and warrants vacating the order and remanding.

### D.  It was error to tether the fee application to the PRF.

The bankruptcy court erred by evaluating the reasonableness of the fee application by the extent to which it was comparable to the PRF. That the

bankruptcy court *did* create such a requirement is clear. See Transcript of August 7, 2024 hearing at 7:24-25, 8:1-3, AA 121-122. ("And maybe I guess what I'm asking you is can you identify what in particular makes this case so unique, or complicated, or complex to be almost double or more than double, perhaps almost triple what is the $4,500 PRF in this district."); Transcript of August 7, 2024 Hearing at 20:1-6, AA 134. ("Again, when the PRF for an entire chapter 13 case in this district is 4,500 or 5,000 or 5,500 . . . it's just it's hard for the Court to determine or to find exactly what work . . . or services that you provided to generate $5,000 in fees."); and Order, AA 206, ("AND, this District having set a [PRF] for routine Chapter 13 cases of $4,500, L.B.R. 2016-2 (c), which Courts have used as a 'starting point' to what should be considered a 'reasonable' fee in a routine Chapter 13 case.")[10]

In so doing, the court improperly calculated Applicant's compensation by reference to the PRF, which has applicability only in a bankruptcy case. However, the Third Circuit has explained that attorney compensation in bankruptcy cases must be determined by reference to **non**-bankruptcy cases. The landmark Third

_____

[10] See also Judge Conway's prior opinions in *In re Carpenter*, 665 B.R. 89, 93 (Bankr. M.D. Pa. 2024)("it is Counsel's burden to support the 'reasonableness' of billing over ten (10) times the PRF in this case."); and *In re Badyrka,* 2022 WL at * 11 ("This Court considers the PRF as a guide or 'starting point' to what should be considered a 'reasonable' fee in a routine Chapter 13 case in this district.").

Circuit opinion on attorney compensation in bankruptcy cases is *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833 (3d Cir. 1994). There, the Circuit observed that the Bankruptcy Code specifically instructs courts to consider "whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases ***other than cases under this title.***" 11 U.S.C. § 330(a)(3)(F)(emphasis added).

The Circuit explained why the Code requires bankruptcy compensation to be compared to the billing practices of **non**-bankruptcy attorneys. "The unambiguous policy inspiring § 330(a), expressed most clearly in the House Report accompanying House Bill 8200, H.R. 8200, 95th Cong., 1st Sess. (1977), is that professionals and paraprofessionals in bankruptcy cases should earn the same income as their non-bankruptcy counterparts." *Id.* at 849. "Congress rather clearly intended to provide sufficient economic incentive to lure competent bankruptcy specialists to practice in the bankruptcy courts." *Id.* at 850, cleaned up.

One of the bankruptcy court's stated concerns here was that the original amount requested of $11,869.25 "would leave no funds available for distribution to

creditors."[11] (Op. at 2.) However, *Busy Beaver* expressly rejects the position that creditor payments are a reason to deny full attorney compensation:

> Some bankruptcy courts have justified departures from the statute's transparent mandate on the ground that preserving the debtor's estate is of greater import than compensating attorneys for their paralegals' fees. Were the statute's meaning and purpose ambiguous, we might find room to agree with them. But here Congress has unmistakably and expressly made a policy choice *favoring full compensation for debtors' attorneys over greater proportionate compensation to the debtors' creditors*, and when in our constitutional republic a statute is constitutional, courts are not at liberty to substitute their favored policies for those Congress enacts, no matter how unwise the court finds them to be.

*Busy Beaver,* 19 F.3d at 851 (emphasis added).

Thus, to ensure that bankruptcy attorneys are compensated similarly to non-bankruptcy attorneys for time spent on bankruptcy work, their compensation should not be evaluated by reference to what other bankruptcy attorneys charge. Instead, bankruptcy practitioners should be paid the same as non-bankruptcy lawyers.

---

[11] This finding is not correct. The fee application was not filed until *after* the primary creditor of concern had already been paid in full. The debtor's chapter 13 plan provided for full payment of a claim of $5,202 that was secured by Debtor's residence. So as to not underfund the plan, Applicant deliberately waited to file his fee application until after that claim had been paid in full. Thus, creditors had already received $5,202 as of the writing of the opinion.

26

The other bankruptcy judge in this district – Judge Henry Van Eck – rules consistently with *Busy Beaver* and expressly disavows any consideration of the PRF when evaluating a lodestar fee application. He stated those views at a fee hearing in *In re Merriweather* 21-bk-00110-HWV, (Bankr. M.D. Pa. Oct. 27, 2021) AA 190-191, when the U.S. Trustee attempted to use the PRF as a yardstick, and was quickly shot down:

> [ATTORNEY FOR U.S. TRUSTEE]:
>
> ***
>
> Beyond that, Your Honor, we state no position on the reasonableness of the fees that have been sought as to the hourly rate. But, again, Your Honor, we are -- there is a general concern when it comes to the fact that we do have a presumptively reasonable rate to get a case to confirmation of [$4,500], and we're seeing applications to get a fairly standard case to confirmation that's double that. And –
>
> THE COURT: Well, you see, I think that's a mistake. I don't think that one has anything to do with the other, and I've heard that before, and I just want to say that it doesn't matter to me.

*Merriweather* Transcript, AA 190-191.

And after some additional colloquy, the court reiterated emphatically that there is no connection between the PRF and the lodestar: **"But if all the charges**

27

**add up to an amount that's twice what the normal no-look fee is, I don't care,**

**that doesn't bother me a bit."**[12] *Merriweather* Transcript, AA 192-193.

Judge Van Eck's analysis is correct. *Busy Beaver* instructs that 11 U.S.C.

§ 330 requires that the relevant market by which a fee should be judged is *non*-

bankruptcy services. *Busy Beaver*, 19 F.3d at 849. Thus, the existence of the PRF –

which applies only in bankruptcy cases – is not a reason to reduce a fee.

E.  THE BANKRUPTCY COURT ERRED BY FAILING TO EXPLAIN WHY IT DID NOT
    CREDIT CREDIBLE, UNCONTROVERTED MARKET EVIDENCE IN THE RECORD.

*Busy Beaver* describes the framework that a bankruptcy court should use

when reviewing a fee application:

> [A] bankruptcy judge's experience with fee petitions and
> his or her expert judgment pertaining to appropriate billing
> practices, founded on an understanding of the legal
> profession, will be the *starting point* for any analysis. By
> starting point we mean to suggest that a bankruptcy judge
> should use his or her experience and expertise to locate the
> questionable charges and fees, and once having questioned
> a charge or fee may properly require the applicant to meet
> the burden to prove the market would recompense him or
> her for that charge.
>
> Then the court should carefully consider relevant,
> competent evidence submitted with the fee application,
> provided as a supplement to the fee application, or
> presented at a hearing, . . . even if the evidence directly
> contradicts the court's own judgment. Of course, **if the**

---

[12]  Judge Van Eck also has "very clear opinions about which approach is better for both the client and the attorney . . . . clients get a much better representation from a lodestar approach." (AA 194 at lines 1-4.)

> **bankruptcy court discounts any evidence presented by the fee applicant, the court should to the extent practicable make findings of fact and provide reasoned explanations in the record to facilitate review.**

*In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 854 (3d Cir. 1994)(italics in original; bold added; footnotes, citations, and quotations omitted).

In this case, there is no indication that the bankruptcy court considered certain "relevant, competent evidence . . . provided as a supplement to the fee application." And, if it did consider it, it certainly did not "provide reasoned explanations in the record to facilitate review." The evidence that the court does not discuss was submitted after the hearing when the bankruptcy court allowed Applicant additional time to conduct discovery and supplement the record. (Transcript of August 7, 2024 hearing at 29:22-25 and 35:13-14, AA 143, AA 149.) Applicant conducted that discovery and, on October 7, 2024, timely filed the allowed supplementation in the form of two documents titled Debtor's Brief in Support of Fee Application and Affidavit of Carlo Sabatini in Support of Fee Application. (AA 152-203.)

At least two pieces of "relevant, competent evidence" have not been discussed by the bankruptcy court with "reasoned explanations in the record to facilitate review." *Busy Beaver,* 19 F.3d at 854. Specifically: (1) compared to clients of other attorneys in the district, Applicant's clients pay less than **<u>one-half</u>**

29

as much towards attorney's fees and dischargeable debts, and (2) the failure rate for Applicant's Chapter 13 cases is a mere **one-ninth** of the district average.

### 1. *Applicant's clients pay less*

At the hearing, the Court questioned "what actual work was performed that was reasonable and necessary to move this case forward and that benefited the debtor and/or the estate." Applicant introduced statistical evidence demonstrating that the above-average amount of time that is spent in Applicant's cases benefits his typical debtor client who pays *less* overall, even after factoring in an attorney's fee that is higher than the presumptively reasonable fee. That result is a clear benefit to the debtor.[13]

Applicant used the discovery allowed by the bankruptcy court to obtain information from the Chapter 13 trustee's office. That information enabled a comparison of the amounts that Applicant's clients paid with those that other attorneys' clients paid. However, *gross* payment amounts would not be very illuminating, because those figures often include amounts that would generally need to be paid irrespective of the quality of representation. For example, in a

---

[13] Note that under Chapters 7 and 11, fees can be awarded only for services that are reasonably likely to benefit the bankruptcy *estate* (or that are necessary for the administration of the case). 11 U.S.C. § 330(a)(4)(A). However, in Chapter 13, a debtor's attorney can recover for services that do not benefit the estate, and instead are "based on a consideration of the benefit and necessity of such services to the **debtor**." 11 U.S.C. § 330(a)(4)(B)(emphasis added).

Chapter 13 case that is filed to halt a foreclosure, the debtor usually pays the mortgage payments that are behind through the Chapter 13 trustee's office. Those amounts need to be paid and usually cannot be reduced through an attorney's efforts.

On the other hand, general unsecured debt is discharged at the end of the bankruptcy case. As part of counsel's duty to zealously advocate for their client, an attorney should strive to have the Chapter 13 trustee pay as little as possible of that dischargeable debt. Thus, one metric of an attorney's performance is the extent to which the attorney can minimize that payment.

Of course, if a debtor has to pay tens of thousands of dollars of additional attorney's fees to save just a few thousand dollars towards debt payment, that result could hardly be considered a success. Thus, to effectively use these two figures to evaluate an attorney's performance, one should sum the attorney's fee and the amount paid towards the dischargeable debt, and then compare that figure to the total amount of dischargeable debt. Thus, the applicable formula is expressed as follows:



$$\frac{(\text{Total Unsecured Paid} + \text{Attorney Fees Paid})}{\text{Total Unsecured Debt}} = \text{Percentage paid}$$

(Affidavit of Carlo Sabatini in Support of Fee Application, ¶ 8, AA 199.)

Using this formula, Applicant demonstrated that the median amount the Trustee paid in Applicant's cases towards attorney fees and general unsecured debts was just 17.8%. (Affidavit of Carlo Sabatini in Support of Fee Application ¶ 10, AA 199.) Applicant then used the discovery provided by the trustee to repeat that exercise for the cases filed by the other attorneys in the district. (Affidavit of Carlo Sabatini in Support of Fee Application ¶ 14, AA 199.) The median amount paid towards attorney fees and general unsecured debts by the Trustee in cases filed by attorneys other than Applicant during the same period was 36.43%. (Affidavit of Carlo Sabatini in Support of Fee Application ¶ 15, AA 199.) Thus, the percentage that the Trustee paid in the median case filed by other attorneys was more than *twice* as much as what was paid in the median Applicant case.

These statistics support that the time spent by Applicant is time *well* spent.[14] If, by spending extra hours reviewing a debtor's budget, re-running calculations, or

---

[14] Applicant spends this time because he believes that it is a benefit to the Client. And the office procedures requiring this time to be spent are followed in **every case that is filed**, *without regard to whether the plan actually has funding available to pay the for the time that such additional detail requires*. And in cases where the plan funding is inadequate, Applicant almost always waives fees to prevent underfunding, such as in this case. See Fee Application, AA 065 ("To the extent that the Trustee does not have sufficient funds to pay the amount requested, then Applicant waives the remaining fees. Applicant estimates that the total amount actually received from the Trustee's office will be less than $7,068.77.")

testing alternative plan formulations, an attorney can save a debtor even just $100 or $200 a month, then that difference can amount to a savings of $3,600 - $12,000 over the course of a three-to-five-year plan.

All of this evidence and argument were provided to the bankruptcy court. It is "relevant, competent evidence." The bankruptcy court was required to consider it. *Busy Beaver,* 19 F.3d at 854. And the court should have provided "reasoned explanations in the record to facilitate review." In failing to do so, it erred.

### 2. *Applicant's cases fail much less frequently.*

The second piece of evidence that the bankruptcy did not discuss is the failure rate of Applicant's cases as compared to the rest of the district. If, because of Applicant's expertise or additional efforts, his cases succeed at a substantially greater rate than the district average, then it is reasonable for Applicant to charge more.

> Section 330 of the Bankruptcy Code also provides for the Bankruptcy Court to award a debtor's counsel "reasonable compensation." The Court below erred not only in failing to hold a hearing but in using a "market rate" test, as if there is one such rate applicable to all attorneys. As the Court of Appeals noted in *Cunningham,* "Attorneys are not fungible. Some, shortly out of law school, may command in the marketplace charges for their time that others do not command after a lifetime of pedestrian practice."

33

*In re Paul*, 141 B.R. 299, 301–02 (E.D. Pa. 1992)(citing *Cunningham v. City of McKeesport*, 753 F.2d 262, 268 (3d Cir. 1985), *cert. granted, judgment vacated,* 478 U.S. 1015, (1986)).

Applicant introduced evidence to show that for his Chapter 13 cases that closed during the 5-year period ending on December 31, 2020, only 5% ended with a dismissal instead of a discharge.[15] (Affidavit of Carlo Sabatini in Support of Fee Application ¶ 20, AA 200.) The district-wide statistic for the same period is very different: 45% of cases were closed with a dismissal rather than a discharge. (Affidavit of Carlo Sabatini in Support of Fee Application ¶ 23, AA 200.)[16] Thus, cases filed without Applicant were **nine times more likely to fail** than cases that he filed. Again, the bankruptcy court's opinion is completely silent regarding this

---

[15] This statistic was calculated using a report that Applicant believes was obtained from the Clerk in 2021. (Affidavit of Carlo Sabatini in Support of Fee Application ¶ 21, AA 200.) Rather than burdening the Clerk with a separate request for an updated report, Applicant did not update the statistic. However, from Applicant's review of his own records, it appears that none of the cases that closed in 2021, 2022 or 2023 were dismissed rather than discharged. (Affidavit of Carlo Sabatini in Support of Fee Application ¶ 22, AA 200.) Thus, if the 5-year figure were updated to an 8-year period ending on December 31, 2023, it would be even smaller – i.e., less than 5%.

[16] Of course, it is possible that a substantial reason that Applicant's cases succeed much more often than cases filed by other attorneys is because, as explained infra at 26, Applicant's clients pay much less to their lawyer and unsecured creditors, which in turn, translates into a smaller total plan payment which is easier to make.

34

evidence, and if it did consider it but discounted it, it erred by failing to explain why.

## VI.    CONCLUSION

The order below should be vacated and remanded for three independent reasons. First, the bankruptcy court imposed a 40% across-the-board reduction without identifying the specific deficiencies warranting that reduction or explaining how the percentage was selected. Second, the court evaluated a lodestar application by reference to the district's presumptively reasonable fee, effectively treating that elective flat-fee alternative as a benchmark for reasonableness contrary to 11 U.S.C. § 330(a)(3)(F) and controlling Third Circuit authority. Third, after allowing supplemental evidence addressing benefit to the debtor, the court did not address that material, uncontroverted evidence or explain why it was discounted.

Appellant respectfully requests that this Court vacate the fee order and remand the matter to the bankruptcy court for reconsideration under the correct legal standards.

## VII.    CERTIFICATE OF COMPLIANCE

1. This document complies with the 13,000 word type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g) this document contains 8,217 words.

2. This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO Version 2601 in 14-point Times New Roman Font.

## VIII. CERTIFICATE OF USE OF GENERATIVE AI

Claude.ai; ChatGPT; Westlaw AI Deep Research, and Grammarly were used to assist in the preparation of this brief.

Westlaw AI Deep Research was used extensively while conducting research to find the authorities that are in Section V. However, other than identifying authorities, Westlaw AI Deep Research did not generate any of the prose that is in Section V. After Section V was written, I pasted it into Claude.ai and ChatGPT for suggestions. I made some modifications based on those suggestions (primarily deletions) and would estimate that over 98% of Section V was my own at that point. I did not to this section add any citations or authorities suggested by Claude.ai or ChatGPT.

I then pasted Section V into ChatGPT and asked it to write Section IV and Section VI. I then asked Claude.ai to critique that writing and accepted some of its input. I made substantial edits of my own to both Section IV and Section VI, but would estimate that more than 50% of the content in these sections is from

ChatGPT and Claude.ai. Though I wrote Section II of the brief, it was largely based on Section IV and Section VI. I then turned on Grammarly and adopted many of its grammatical suggestions throughout the entire brief.

I verify that I have checked the accuracy of each portion of the document generated by AI, including all citations and legal authority. The only citation or legal authority that was *written* by AI, rather than merely identified by Westlaw AI Deep Research, is the citation to 11 U.S.C. § 330(a)(3)(F) in Section IV and Section VI. That citation is accurate.

Date: February 25, 2026                    s/ Carlo Sabatini
                                           Carlo Sabatini