# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DOMINIC DECANTIS, | : | |
|     Appellant | : | |
|  | : | |
|     vs. | : | |
|  | : | |
| JACK N. ZAHAROPOULOS, | : | |
| STANDING CHAPTER 13 | : | |
| TRUSTEE | : | |
|     Appellee | : | CASE NO. 3:25-cv-01927-KM |

## APPENDIX

## (Volume 1)

# **TABLE OF CONTENTS**

EXHIBIT A: ATTORNEY APPLICATION FOR ALLOWANCE OF EXPENSES
AND COMPENSATION:

  Dkt. 48.................................................................................................1

EXHIBIT B: TRUSTEE OBJECTION TO FEE APPLICATION:

  Dkt. 49.................................................................................................4

EXHIBIT C: STIPULATION:

  Dkt. 52...............................................................................................22

EXHIBIT D: ATTORNEY BRIEF IN SUPPORT OF FEE APPLICATION:

  Dkt. 60...............................................................................................24

EXHIBIT E: BANKRUPTCY COURT ORDER:

  Dkt. 63...............................................................................................71

EXHIBIT F: ATTORNEY FEE STATEMENT:

  Dkt. 48, ex. B.....................................................................................77

EXHIBIT G: TRANSCRIPT AUGUST 7, 2025 HEARING:

  Dkt. 62…............................................................................................87

EXHIBIT A

1

Rev. May 1, 2022

**LOCAL BANKRUPTCY FORM 2016-2(b)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

IN RE: Dominic Joseph DeCantis

**CHAPTER 13**

**Debtor(s)** | **CASE NO.** 5:22-bk-01826-MJC

**APPLICATION OF ATTORNEY FOR CHAPTER 13 DEBTOR
FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES**

*(Name of applicant)* Carlo Sabatini applies for approval of compensation as Chapter 13 Debtor(s)' counsel and for reimbursement of expenses pursuant to 11 U.S.C. § 330 as follows:

1.    Applicant is counsel for Debtor(s)

2.    Debtor(s) filed a petition for bankruptcy relief on 9/22/2022 *(date)*.

3.    Applicant previously filed a Disclosure of Compensation of Attorney for Debtor(s) pursuant to Fed. R. Bankr. P. 2016(b), which is attached as Exhibit "A" to this Application.

4.    This Application is interim *(state whether an interim or final application)*.

5.    *(Check all applicable items)*
      ☑   a.    Debtor(s)' Chapter 13 Plan was confirmed on 1/06/2023 *(date)*.

      ☐   b.    The order approving the last post-confirmation modification on Debtor(s)' confirmed Chapter 13 plan was entered on _____ *(date)*.

      ☐   c.    Debtor(s) have not confirmed a Plan.

6.    The dates and amounts of previous compensation paid are:
      a.   as a retainer $500.00 on 6/13/2022 *(list dates and amounts)*;

      b.   paid by the Chapter 13 Trustee through a confirmed Plan *(list dates and amounts)*;

      c.   other Debtor paid $313.00 on 6/13/2022 as advanced cost for filing fee.
           *(describe source, amount and date paid)*.

7.    Compensation previously approved by the Court following the filing of an interim Application are: *(dates and amounts)*
      N/A

2

Rev. May 1, 2022

8.    If Applicant has not agreed with Debtor(s) to accept the Presumptively Reasonable Fee ("PRF"), or is filing a supplemental fee application, Applicant requests compensation in the amount of $ 11,869.25*        and reimbursement of expenses in the amount of $ 449.85        for the period of 6/13/2022        to 12/01/2023        . A chronological listing of services performed and itemization of expenses for which reimbursement is requested for this time is attached as Exhibit "B" to this Application.

9.    Legal services were performed by all professionals at the hourly rates set forth at the beginning of the chronological listing of services provided on Exhibit "B."

10.    *(Check one)*

☑    Debtor(s) have reviewed this Application prior to its filing and have approved the requested amounts.

☐    Debtor(s) have reviewed this Application prior to its filing and have not approved the requested amounts.

☐    Debtor(s) have not reviewed this Application prior to its filing.

☐    Debtor(s) have not approved the requested amounts.

11.    Objections are pending to the following prior fee applications: (*list date application was filed and name of objector, if no objections pending state "none"*).

WHEREFORE, your Applicant respectfully requests this Honorable Court to approve the requested compensation in the amount of $ 11,869.25     and reimbursement of expenses in the amount of $ 449.85        pursuant to 11 U.S.C. § 330, and if this is a Final Fee Application, to determine that all prior interim orders are final.

Dated:  April 29, 2024                                            s/Carlo Sabatini
                                                                    _____
                                                                    Applicant's Signature

\* To the extent that the trustee does not have sufficient funds to pay the amount requested, then Applicant waives the remaining fees. Applicant estimates that the total amount actually received from the trustee's office will be less than $7,068.77.

3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DOMINIC JOSEPH DECANTIS; AKA DOMINIC DECANTIS; AKA DOMINIC J. DECANTIS, Debtor | : | CHAPTER 13 |
| | : | |
| | : | |
| | : | |
| | : | |
| JACK N. ZAHAROPOULOS STANDING CHAPTER 13 TRUSTEE, Objectant | : | |
| | : | |
| | : | CASE NO. 5:22-bk-01826-MJC |
| vs. | : | |
| | : | |
| CARLO SABATINI, ESQUIRE, Applicant | : | |
| | : | |

**TRUSTEE'S OBJECTION TO INTERIM
APPLICATION OF ATTORNEY FOR CHAPTER 13 DEBTOR
FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES**

AND NOW, this 20th day of May, 2024, comes Jack N. Zaharopoulos, Standing Chapter 13 Trustee, by and through his attorney Agatha R. McHale, Esquire, who objects, pursuant to 11 U.S.C. §330(a)(2), to the Interim Application of Attorney for Chapter 13 Debtor for Compensation and Reimbursement of Expenses filed on April 29, 2024, and states as follows:

**Facts**

1.      Objectant, Jack N. Zaharopoulos, is the duly appointed Trustee in this case and, therefore, the representative of the Estate under § 323(a).

2.      On September 22, 2022, Debtor filed a Petition under Chapter 13 of the Bankruptcy Code.

3.      On April 29, 2024, Applicant filed his Interim Application for Compensation and Reimbursement of Expenses.

4.      The District has determined that $4,500.00 is a presumptively reasonable fee

5

("PRF") for an attorney representing a debtor in a Chapter 13 Bankruptcy filed in this District throughout the conclusion of the case.  L.R. 2016-2 (c)

5.    Applicant's Interim Fee Application requests $11,506.10 in compensation and reimbursement of expenses to be paid through the Chapter 13 Plan, but only to the extent that funds are available to pay it.

6.    Applicant's fees and expenses in the present case total approximately $12,319.10 including the amount of $813.00 taken prior to the Interim Fee Application.

7.    General unsecured creditors have been paid a total of $2,131.18.

**Applicable Law**

8.    The PRF should be used "as a guide or 'starting point' to what should be considered a 'reasonable fee in a routine Chapter 13 case in this District.'" *In re Thomas,* No. 5:18-03265-MJC (Bankr. M.D. Pa. Oct. 18, 2023); *In re Badyrka*, No. 5:20-20-03618-MJC, 2022 WL 4656034 at *6 (Bankr. M.D. Pa. Sept. 30, 2022) (citation omitted).

9.    Under Bankruptcy Rule 2017(b), the Court "may determine whether any payment of money or any transfer of property, or any agreement therefor, by the debtor to an attorney after entry of an order for relief in a case under the Code is excessive . . .." Fed. R. Bankr. P. 2017(b). "Excessive attorney's fees should not be awarded where such award contravenes the purposes of Chapter 13." *In re Tcherneva*, 638 B.R. 676 (Bankr. E.D.N.Y. 2022).

10.    The applicant bears the burden of proving that the fees and expenses sought are reasonable and necessary.  *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 253, 261 (3rd Cir. 1995).  "When the issues are not complex and the process is straightforward, an attorney is expected to exercise 'billing judgment' and is encouraged to reduce its customary fees in appropriate circumstances to reflect a less substantial expenditure of the attorney's time." *In re*

6

*Parilla*, 530 B.R. 1, 13 (Bankr. D.P.R. 2015) (quoting *In re Thorn*, 192 B.R. 52, 56 (Bankr. N.D.N.Y. 1984).

11.      Under § 330(a), the Court may award reasonable compensation for actual, necessary services rendered by the attorney and paraprofessionals employed by the attorney, the reasonableness to be based on (i) the nature of the services; (ii) the extent of the services; (iii) the value of the services; (iv) the time spent on the services; and (v) the cost of comparable services in non-bankruptcy cases. *See In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 840 (3rd Cir. 1994).

12.      Chapter 13 debtors' attorneys may be awarded fees pursuant to § 330(a)(4)(B), which allows reasonable fees for representing the interests of Chapter 13 debtors in connection with the bankruptcy case "based on consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section." Attorney fees are subject to Court review for reasonableness irrespective of whether the debtor is in agreement with the fee amount. § 329(b); *In re Parilla*, 530 B.R. 1, 10 (Bankr. D.P.R. 2015).

13.      The Third Circuit has noted that "[d]isagreeable as the chore may be, the bankruptcy court must protect the estate, lest overreaching attorneys or other professionals drain it of wealth which by right should inure to the benefit of unsecured creditors." *Busy Beaver,* 19 F.3d at 844 (citation omitted).

14.      The "court shall not allow compensation for (i) unnecessary duplication of services; or (ii) services that were not (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case." § 330(a)(4)(A).

15.      The Court must conduct an objective inquiry based upon what services a reasonable lawyer or law firm would have performed in the same circumstances. *In re Fleming Companies, Inc.*, 304 B.R. 85, 89-90 (Bankr. D. Del. 2003). A "judge's experience with fee petitions and his

7

or her expert judgment pertaining to appropriate billing practices, bounded on an understanding of the legal profession, will be the starting point for any analysis." *Id.* (citing *Busy Beaver*, 19 F.3d at 854). When making its consideration, the Court is not required to make a line-by-line analysis of the fee application, and a sampling will suffice. *See*, e.g., *In re Maruko, Inc.*, 160 B.R. 633, 642 (Bankr. S.D. Cal. 1993). Since "it's time is precious, the reviewing Court need only correct reasonable discernible abuses, not pin down to the nearest dollar the precise fee to which the professional is ideally entitled." *Busy Beaver*, 19 F.3d 833 at 844-845; *see* also *In re Strauss*, No. 21-00995-MJC (Bankr. M.D. Pa. Mar. 31, 2023).

16.    The Court may use a percentage deduction as a practical means of "trimming fat from a fee application" if the Court determines that some of the time claimed by a party should be excluded. *In re Nicholas*, 496 B.R 69, 76 (Bankr. E.D.N.Y. 2011). *See* also *In re Old Summit Mfg., LLC*, 323 BR. 154, 162-163 (Banr. MD. Pa. 2004) (50% reduction); *In re Sullivan,* 674 F.3d 65 (1st Cir. 2012); *In re Claudio*, 459 B.R. 500 (Bankr. D. Mass. 2011); *In re Spillman Dev. Grp., Ltd.,* 376 B.R. 543 (Bankr. W.D. Tex. 2007).

17.    Judge France previously stated "[a] bankruptcy court must balance adequately compensating attorneys in order to encourage competent counsel to represent bankruptcy debtors with insuring that the costs of administration do not consume assets that otherwise would be available to creditors. In making a fee determination, the court must take into consideration whether the professional exercised "reasonable billing judgment." *In re Fontaine*, 2015 WL 5162557, at *3 (Bankr. M.D Pa. 2015).

18.    Under § 1325(a)(6), a debtor must be able to make all payments under the plan and comply with the plan. Moreover, LR 2016-2(a) states that "[a]fter the petition is filed, an attorney may not receive payment of fees except through the chapter 13 plan, unless payment is otherwise

8

approved by the Court."

19.     As stated in *In re Roberson*, "at [a] minimum, the time records must be specific enough to allow a court to determine whether the hours claimed are reasonable for the work performed."  No. 22-02242-MJC, n.3 (Bankr. MD. Pa. Mar. 27, 2024); *citing In re Topa,* 2023 WL 2657095 at *2 (Bankr. N.D. Ohio 2023)*; In re Molina,* 632 B.R. 561, 573 (Bankr. S.D.N.Y. 2021).

### **<u>Analysis and Facts Specific to the Present Fee Application</u>**

20.     The Trustee avers the fees requested underfund the plan by approximately $4,664.60.

21.     This runs contrary to § 1325(a)(6), and LR 2016-2(a), which provides that the debtor must be able to make all payments in the plan, and comply with the plan, unless otherwise approved by the court.

22.     This case is a routine Chapter 13 case with no unique or complex issues.

23.     The Trustee further avers that the Interim Fee Application is not reasonable for the following reasons:

    a.     The Trustee believes, and therefore avers, that the following services billed in Applicant's Interim Fee Application were performed in an inefficient manner, which resulted in excessive time billed relative to the complexity of the case. As such, the following entries should be reduced to a reasonable rate:

        (1)     On June 18, 2022, Applicant's staff charged 1.40 hours in the amount of $189.00 for "[r]eceive and review documentation needed to prepare schedules from client. Organize documentation and add to client's electronic file."

9

(2)    On June 19, 2022, Applicant's staff charged 1.80 hours in the amount of $243.00 for "[r]eceive and review documentation needed to prepare schedules from client. Organize documentation and add to client's electronic file."

(3)    On October 3, 2022, Applicant's staff charged 0.20 hours in the amount of $30.00 for "[a]nalyze proof of claim 1 filed on the docket."

(4)    On October 4, 2022, Applicant's staff charged 0.20 hours in the amount of $30.00 for "[a]nalyze proof of claim 2 filed on the docket."

(5)    On October 4, 2022, Applicant's staff charged 0.20 hours in the amount of $30.00 for "[a]nalyze proof of claim 3 filed on the docket. Prep new payment address letter to client."

(6)    On October 4, 2022, Applicant charged 0.20 hours in the amount of $83.00 for "[r]eview paralegal's analysis of claim 3. Mortgage looks current. They have unapplied funds. If those funds were applied, it would be current. They did a recalculation with the escrow analysis and I think that is the issue here."

(7)    On October 4, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eceive and review paralegal's analysis of claim 1 filed on the docket. No letter needed."

(8)    On October 4, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eceive and review paralegal's analysis of claim 2 filed

10

on the docket. No letter needed."

(9) On November 4, 2022, Applicant's staff charged 0.30 hours in the amount of $45.00 for "[a]nalyze claim 4 filed on the docket."

(10) On November 4, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eview paralegal's analysis of claim 4."

(11) On November 22, 2022, Applicant's staff charged 0.20 hours in the amount of $30.00 for "[a]nalyze proof of claim 5 filed on the docket."

(12) On November 23, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eview paralegal's analysis of claim 5."

(13) On December 2, 2022, Applicant's staff charged 0.20 hours in the amount of $30.00 for "[a]nalyze proof of claim 6 filed on the docket. Email analysis to CS."

(14) On December 14, 2022, Applicant's staff charged 0.10 hours in the amount of $15.00 for "[r]eceive and review withdrawal of claim 6 filed on the docket."

Applicant and Applicant's staff billed approximately 2 hours in the amount of $459.00 for reviewing and analyzing proofs of claim.

b. The Trustee believes, and therefore avers, that the following services billed in Applicant's Interim Fee Application are too vague to conclude how they benefited the Debtor's bankruptcy estate. The Trustee cannot discern if the services performed were administrative in nature, duplicative, or reasonably commensurate with the complexity of the task being performed. Because the entries lack sufficient

11

specificity for the Court to discern whether these fees are properly billable, the following fees should therefore be disallowed:

(1)     On June 19, 2022, Applicant's staff charged 1.90 hours in the amount of $256.50 for "[p]repare petition and schedules."

(2)     On June 20, 2022, Applicant's staff charged 0.70 hours in the amount of $94.50 for "[c]ontinue preparing schedules."

(3)     On June 21, 2022, Applicant's staff charged 1.20 hours in the amount of $180.00 for "[w]ork with I, J, MT, and Plan."

(4)     On June 21, 2022, Applicant's staff charged 1.10 hours in the amount of $148.50 for "[c]ontinue preparing schedules."

(5)     On June 22, 2022, Applicant's staff charged 0.40 hours in the amount of $54.00 for "[c]ontinue preparing schedules."

(6)     On June 23, 2022, Applicant charged 1.70 hours in the amount of $705.50 for "[w]ork with I, J, and MT. Prepare plan."

(7)     On June 23, 2022, Applicant's staff charged 0.40 hours in the amount of $54.00 for "[c]ontinue preparing schedules."

(8)     On June 24, 2022, Applicant's staff charged 0.50 hours in the amount of $75.00 for "[a]djust I and MT, and special provisions attachment in plan."

(9)     On June 25, 2022, Applicant's staff charged 1.20 hours in the amount of $162.00 for "[c]ontinue preparing schedules."

(10)    On June 26, 2022, Applicant's staff charged 1.80 hours in the amount of $243.00 for "[c]ontinue preparing schedules."

12

(11)    On June 26, 2022, Applicant's staff charged 1.50 hours in the amount of $202.50 for [c]ontinue preparing schedules."

(12)    On June 29, 2022, Applicant charged 0.60 hours in the amount of $249.00 for "[m]eet with paralegal to go over schedules, work on plan calculations, and address issues that she had flagged for me."

(13)    On June 29, 2022, Applicant's staff charged 1.70 hours in the amount of $229.50 for [c]ontinue preparing schedules."

(14)    On June 30, 2022, Applicant's staff charged 1.80 hours in the amount of $243.00 for "[c]ontinue preparing schedules."

(15)    On July 1, 2022, Applicant's staff charged 2.70 hours in the amount of $405.00 for [c]ontinue preparing schedules."

(16)    On July 1, 2022, Applicant charged 1.70 hours in the amount of $705.50 for "[d]raft post-filing instructions for client, draft plan attachment and complete my review of petition and schedules."

(17)    On July 1, 2022, Applicant's staff charged 0.30 hours in the amount of $40.50 for "[c]ontinue preparing schedules."

(18)    On July 2, 2022, Applicant's staff charged 0.40 hours in the amount of $54.00 for "[g]enerate, review, and revise schedules."

(19)    On September 21, 2022, Applicant's staff charged 1.00 hours in the amount of $135.00 for "[c]onference with CS and client regarding information to prepare case."

(20)    On September 21, 2022, Applicant charged 0.60 hours in the amount of $249.00 for "[m]eet with paralegal to finalize schedules and

13

plan."

(21)    On September 21, 2022, Applicant charged 0.60 hours in the amount of $249.00 for "[m]eeting with client to finalize bankruptcy documentation."

(22)    On September 22, 2022, Applicant's staff charged 1.90 hours in the amount of $256.50 for "[c]onference with CS and client to review petition."

Applicant and Applicant's staff billed approximately 25.70 hours in the amount of $4,991.50 for preparation of the petition, schedules, means test, and plan.

c.    The Trustee believes, and therefore avers, that the following services billed at an attorney rate in Applicant's Interim Fee Application are excessive and should be reduced to a paralegal rate:

(1)    On September 6, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[e]dit to schedule J and Plan."

(2)    On October 27, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[e]mail to Jones asking if he would accept service of 9011 motions."

(3)    On December 6, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[e]mail to Resurgent requesting documents upon which claim is based."

(4)    On October 11, 2023, Applicant charged 0.10 hours in the amount of $41.50 for "[e]mail to Jones. to follow up on escrow recalculation."

14

d.    The Trustee believes, and therefore avers, that the following services billed in Applicant's Interim Fee Application are duplicative in nature and should not be billable to the client:

(1)    On July 12, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eceive and review email from Dugan attaching breakdown of delinquencies and interest."

(2)    Also on July 12, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[e]mail to Dugan regarding delinquencies and interest accrued."

e.    The Trustee believes, and therefore avers, that the following services billed in Applicant's Interim Fee Application are administrative in nature and should not be billable:

(1)    On June 13, 2022, Applicant's staff charged 0.10 hours in the amount of $15.00 for "[r]eceive and review email from client attaching budget."

(2)    On July 5, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[e]mail to Schuman regarding deposition continuance."

(3)    On July 5, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eceive, review, and respond to email from Hannum regarding rescheduling deposition and allowing 30-day extension to respond."

(4)    On July 11, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eceive and review email from client with collection

15

letter."

(5)    On July 12, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eview message from client. Call to client. No answer, leave message regarding plan payment."

(6)    On July 20, 2022, Applicant's staff charged 0.10 hours in the amount of $15.00 for "[r]eceive and review email from client regarding Honda. He wants to call this company to find out if this is related to the deposition."

(7)    On July 27, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[e]mail to Dugan asking after response to two emails."

(8)    On August 1, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eceive and review phone message from client regarding magistrate's office records. Call to client. No answer, leave message."

(9)    On August 14, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[e]mail to Dugan to follow up on garbage debts."

(10)    On August 15, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eceive and review email from Dugan regarding waving interest on penalty amounts and concerning liens."

(11)    On August 23, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[r]ead statute. Email to ASW with instructions."

(12)    On September 23, 2022, Applicant's staff charged 0.10 hours in the amount of $15.00 for "[f]ile motion for wage attachment."

16

(13)  On September 30, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eceive and review email from Jones regarding the handling of mortgage claim in a previous case and attaching Decantis mortgage claim."

(14)  On September 30, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eceive and review email from client regarding paperwork they received from the mortgage company."

(15)  On October 3, 2022, Applicant's staff charged 0.10 hours in the amount of $15.00 for "[r]eceive and review letter from Select Portfolio Servicing regarding representation."

(16)  On October 5, 2022, Applicant's staff charged 0.10 hours in the amount of $15.00 for "[r]eceive and review email from client confirming she made mortgage changes."

(17)  On October 6, 2022, Applicant's staff charged 0.10 hours in the amount of $15.00 for "[r]eceive and review letter from Select Portfolio regarding lien subject to bankruptcy."

(18)  On October 25, 2022, Applicant's staff charged 0.90 hours in the amount of $135.00 for "[r]eview file and organize it in preparation for 341 meeting."

(19)  On October 31, 2022, Applicant's staff charged 0.10 hours in the amount of $41.50 for "[r]eceive and review email from Kim DeSanto, legal secretary for Attorney Wood, regarding my client's plan to include the debt owed to the city of Scranton."

17

(20)  On November 23, 2022, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eceive and review email from trustee's office regarding reaching out to attorney Jones and his return to office before the confirmation hearing."

(21)  On December 7, 2022, Applicant's staff charged 0.10 hours in the amount of $15.00 for "[r]eceive and review notice of rescheduled confirmation hearing."

(22)  On February 10, 2023, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eceive and review email from case administrator with certified orders avoiding liens."

(23)  On May 4, 2023, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eceive and review message from client asking about roof warranty and whether that was affected by the bankruptcy filing."

(24)  On October 11, 2023, Applicant charged 0.10 hours in the amount of $41.50 for "[r]eceive and review email from Jones regarding clients new policy."

(25)  On October 30, 2023, Applicant's staff charged 0.20 hours in the amount of $30.00 for "[r]eceive and review notice of mortgage payment change."

(26)  On December 1, 2023, Applicant's staff charged 0.20 hours in the amount of $30.00 for "[r]eview notice of mortgage payment change."

18

Applicant and Applicant's staff billed approximately 3.60 hours in the amount of $964.00 for administrative tasks.

f. The Trustee believes, and therefore avers, that the following services billed in Applicant's Interim Fee Application are excessive and should be reduced:

(1) On June 17, 2022, Applicant's staff charged 0.30 hours in the amount of $45.00 for "[c]all with client. She had questions concerning taxes. She said that she believes the tax information she gave us is incorrect. Provided correct tax information."

(2) On June 24, 2022, Applicant's staff charged 0.20 hours in the amount of $30.00 for "[c]all from client regarding UGI bill."

(3) On July 1, 2022, Applicant's staff charged 0.40 hours in the amount of $54.00 for "[c]all to client to ask for information regarding taxes, wage garnishment, and life insurance."

(4) On October 26, 2022, Applicant's staff charged 0.20 hours in the amount of $30.00 for "[p]repare 9011 motion for filing."

(5) On October 27, 2022, Applicant's staff charged 0.10 hours in the amount of $15.00 for "[f]inish prepping 9011 motions."

(6) On October 27, 2022, Applicant charged 0.30 hours in the amount of $124.50 for "[r]eview 9011 motion from ASW. Edit proposed orders."

(7) On December 20, 2022, Applicant charged 0.30 hours in the amount of $124.50 for "[r]eview lien avoidance motions."

(8) On December 22, 2022, Applicant's staff charged 0.30 hours in the

19

amount of $45.00 for "[f]ile and serve three motions to avoid liens."

(9)     On December 28, 2022, Applicant's staff charged 0.20 hours in the amount of $30.00 for "[s]econd call with client regarding missed plan payments."

(10)    On December 29, 2022, Applicant's staff charged 0.20 hours in the amount of $30.00 for "[c]all from client regarding missing trustee payment and check."

(11)    On January 13, 2023, Applicant's staff charged 0.30 hours in the amount of $45.00 for "[r]eceive and review electronic notice of filing: Order Confirming Plan. Update file to reflect same. Serve order (prepare mailing, certificate of service, file the same.)."

(12)    On July 20, 2023, Applicant's staff charged 0.50 hours in the amount of $75.00 for "[r]eview notice of mortgage payment change. Email to client regarding the same."

WHEREFORE, the Trustee respectfully requests this Honorable Court to set a hearing on the Application and, after hearing, appropriately adjust Applicant's request for compensation.

Respectfully submitted,

Jack N. Zaharopoulos
Standing Chapter 13 Trustee
8125 Adams Drive, Suite A
Hummelstown, PA 17036
(717) 566-6097

BY:    /s/ Agatha R. McHale
       Attorney for Trustee

20

## <u>CERTIFICATE OF SERVICE</u>

AND NOW, this 20th day of May, 2024, I, hereby certify that I served a copy of this

Objection either electronically or by depositing the same in the United States Mail, at

Hummelstown, Pennsylvania, postage prepaid, first class, addressed to the following:

Carlo Sabatini, Esquire
Sabatini Law Firm, LLC
216 North Blakely Street
Dunmore, PA 18512
Email: usbkct@bankruptcypa.com

/s/ Derek M. Strouphauer
Paralegal for Chapter 13 Trustee
8125 Adams Drive, Suite A
Hummelstown, PA 17036
(717) 566-6097

21

22

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:

DOMINIC JOSEPH DECANTIS; AKA
DOMINIC DECANTIS; AKA DOMINIC J
DECANTIS,

Debtor

CHAPTER 13

CASE NO. 5-22-bk-01826-MJC

**STIPULATION RESOLVING OBJECTION TO APPLICATION
FOR COMPENSATION AND EXPENSES FILED BY TRUSTEE**

1.      On April 29, 2024, Counsel for Debtor filed Application for Allowance of Compensation & Expenses.

2.      The Trustee filed an objection.

3.      The parties have agreed that to resolve the objection Applicant will reduce his request by $3,354.50.

4.      An amended proposed order reflecting this reduction is being contemporaneously filed with this stipulation.

5.      The parties request that the Court enter the amended proposed order.

s/Carlo Sabatini

Carlo Sabatini, PA 83831
Attorney for Debtor
Sabatini Law Firm, LLC
216 N. Blakely St.
Dunmore, PA 18512
Phone (570) 341-9000
Facsimile (570) 504-2769
Email: ecf@bankruptcypa.com

s/Agatha McHale (with consent)

Agatha McHale, PA 47613
Staff Attorney for Jack Zaharopoulos
Middle District of PA Chapter 13 Trustee
8125 Adams Dr., Ste. A
Hummelstown, PA 17036
Phone (717) 566-6097
Facsimile (717) 566-8313
Email amchale@pamd13trustee.com

23

24

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:

DOMINIC JOSEPH DECANTIS; AKA
DOMINIC DECANTIS; AKA DOMINIC J
DECANTIS,

Debtor

CHAPTER 13

CASE NO. 5-22-bk-01826-MJC

## DEBTOR'S BRIEF IN SUPPORT OF FEE APPLICATION

This brief and accompanying affidavit are being submitted as allowed by this Court at the August 7, 2024 hearing in this matter.

1. **In Counsel's cases, the median amount paid by debtors towards combined attorney's fees and unsecured debt is much less than the median amount paid in cases filed by other attorneys.**

At the hearing, the Court questioned "what actual work was performed that was reasonable and necessary to move this case forward and that benefited the debtor and/or the estate." N.T. at 10:45.[1] Counsel submits that the above-average amount of time that is spent in Counsel's cases results in the typical debtor paying *less* overall, even after factoring in a higher attorney's fee. That result is a clear benefit to the debtor.

Two reports that the Trustee provided to Counsel help demonstrate the effectiveness of Counsel's efforts. One report is titled "Legal Claims Paid to Debtor Attorney Carlo Sabatini" (hereinafter "the Sabatini Report")(Affidavit of Carlo Sabatini in Support of Fee Application ("Aff.") ¶ 1.) The Trustee describes the cases that populate the Sabatini Report as: "Legal claims of Debtor Attorney, and Plan was completed, and Petition date is after September 30, 2013 and

---

[1] The August 7, 2024 hearing was not transcribed; therefore, Notes of Testimony ("N.T.") will refer to the time of day for the hearing's audio recording.

1

25

through September 11, 2024 @ 9:49 am."[2] (Aff. ¶ 2.) The second report is titled "Legal Claims Paid to Debtor Attorney *Excluding* Carlo Sabatini" (hereinafter "the Other Attorney Report," emphasis added). (Aff. ¶ 4.) The description for the Other Attorney Report is the same as the Sabatini Report, except that the ending time is a few minutes later. (Aff. ¶ 5.) The two reports each provide four pieces of data for each case on the report: the case number; the total amount of *filed* unsecured claims; the total amount *paid* to unsecured claims; and the total amount of attorney fees paid through the Trustee. (Aff. ¶ 6.) Counsel used this information to calculate for each of his cases the amount of attorney fees and unsecured claims that the trustee paid in each case expressed as a percentage of the unsecured claims. (Aff. ¶ 7.) Thus, the applicable formula is expressed as follows:

$$\frac{\text{(Total Unsecured Paid + Attorney Fees Paid)}}{\text{Total Unsecured}} = \text{Percentage paid}$$

(Aff. ¶ 8.)

Take, for example, case number 20-02046. The Sabatini Report shows the following information for that case:

| Total Unsecured | Total Unsecured Paid | Attorney Fees Paid |
|---|---|---|
| $42,823.33 | $2,196.06 | $5,425.72 |

(Aff. ¶ 12.)

This information was entered into the above formula as follows:

$$\frac{\$2,196.06 + \$5,425.72}{\$42,823.33} = 17.8\%$$

---

[2] The report also contains this notation: "Note: 'Attorney Fees Paid' column shows only attorney fees paid through the Trustee.  Direct payments from the Debtor are excluded." (Aff. ¶ 3.)

(Aff. ¶ 13.)

Thus, in this sample case, the amount that the debtor paid through the plan for the combined amount of attorney's fees and unsecured claims was a figure that was equal to 17.8% of the total amount of filed unsecured claims.[3] After completing that calculation for each case, Counsel then determined the median amount the Trustee paid in his cases during the period for which data was provided. That median amount was 17.8%.[4] (Aff. ¶ 10.)

Counsel then repeated that exercise for the cases on the Other Attorney Report. (Aff. ¶ 14.) The median amount paid by the Trustee in cases filed by attorneys other than Sabatini during the same period was 36.43%. (Aff. ¶ 15.) Thus, the percentage that the Trustee paid in the median Other Attorney case was more than *twice* as much as what was paid in the median Sabatini case.[5]

Counsel submits that these statistics support that the time spent by Counsel is time *well* spent. If, by spending extra hours reviewing the budget, re-running calculations, or testing alternative plan formulations an attorney can save a debtor even just $100 or $200 a month, then

---

[3] The debtor actually paid only 5.13% of the unsecured claims that were filed.

[4] The fact that the median calculation is the same as the sample in the previous paragraph is no coincidence. That case was chosen for use as the sample *because* that case represents the median. (Aff. ¶ 11.)

[5] Note that the *median* is being used rather than the *mean* because the latter statistic is misleading as it is dramatically impacted by outliers. For example, the Other Attorney report includes a $10,000,000 unsecured claim that was filed in case 18-00593, (Aff. ¶ 16.) and which was actually entered in the Trustee's system as a $1,000,000,000 claim. (Aff. ¶ 17.) Because that claim is included in the Other Attorney Report, the "average" amount of unsecured claims filed per case during this period is $233,535. (Aff. ¶ 18.) Once that claim is removed, the case average drops to less than $50,000. (Aff. ¶ 19.) This case highlights the extreme effect that outliers can have on averages. The "median" statistic does not suffer from the same weakness, so that statistic is used here instead.

27

that difference can amount to a savings of $3,600 - $12,000 over the course of a three-to-five-year plan.

### 2. The Presumptively Reasonable Fee is not an appropriate benchmark.

Lawyers who charge the Presumptively Reasonable Fee have little *financial* motivation to spend numerous hours trying to save their clients a few hundred dollars a month. Of course, many scrupulous attorneys are well-motivated by their *professional* and *ethical* obligations to do the best job that they reasonably can for their client. However, there are limits on what a busy attorney can do. As this Court noted at the hearing, in its own experience with a busy practice, spending too much time was impossible: "Again, maybe you have the time in your practice to sit and look at these numbers and look at them again and look at them again. But I just know that I was a fairly busy practitioner, and I looked at it as best I did. I think I did a thorough job for my client, but I never ever spent that kind of time in a simple chapter 13 case."
N.T at 10:27.

Counsel here does limit the volume of his practice so that he has time to look at the numbers and, if there might be a benefit to be gained for the client, to look at them again and to look at them yet again. That approach generally yields dividends for the client – not only with a smaller overall payment to unsecured creditors and attorney's fees (as demonstrated above), but also with a much greater likelihood of success.

For Counsel's Chapter 13 cases that closed during the 5-year period ending on December 31, 2020, only 5% ended with a dismissal instead of a discharge.[6] (Aff. ¶ 20.) The district-wide

---

[6] This statistic was calculated using a report that Counsel believes was obtained from the Clerk in 2021. (Aff. ¶ 21.) Rather than burdening the Clerk with a separate request for an updated report, Counsel is refraining from updating the statistic. However, from Counsel's review of his own records, it appears that none of the cases that closed in 2021, 2022 or 2023 were dismissed rather

4

28

statistic for the same period is very different: 45% of the cases closed with a dismissal instead of a discharge. (Aff. ¶ 23.) Of course, it is likely that a substantial reason that Counsel's cases succeed much more often than cases filed by other attorneys is because Counsel's clients are paying so much less to their lawyer and unsecured creditors, which in turn, translates into a smaller plan payment which is easier to make.

However, this approach is not financially feasible if Counsel is hamstrung by the Presumptively Reasonable Fee. For example, Judge Van Eck spent the first five years of his practice using the no-look fee and then spent the remaining 13 years using the lodestar. He has "very clear opinions about which approach is better for both the client and the attorney . . . . clients get a much better representation from a lodestar approach." (*In re Merriweather* 21-bk-00110, Tr. of October 27, 2021 Hearing, Ex. A, 29:24-30:4.) Furthermore, Judge Van Eck believes that the Presumptively Reasonable Fee is **_irrelevant_** when evaluating a lodestar application, even where the total application might seem high. In *Merriweather*, the U.S. Trustee attempted to use the Presumptively Reasonable Fee as a yardstick, and was quickly shot down:

> MR. SCHALK:
> ***
> Beyond that, Your Honor, we state no position on the reasonableness of the fees that have been sought as to the hourly rate. But, again, Your Honor, we are -- there is a general concern when it comes to the fact that we do have a presumptively reasonable rate to get a case to confirmation of [$4,500], and we're seeing applications to get a fairly standard case to confirmation that's double that. And –
>
> THE COURT: Well, you see, I think that's a mistake. I don't think that one has anything to do with the other, and I've heard that before, and I just want to say that it doesn't matter to me.

---

than discharged. (Aff. ¶ 22.) Thus, if this figure were updated to an 8-year period ending on December 31, 2023, it should be less than 5%.

5

29

Ex. A at 26:17-27:3.

And after some additional colloquy, the court reiterated emphatically that there is no connection between the Presumptively Reasonable Fee and the lodestar: **"But if all the charges add up to an amount that's twice what the normal no-look fee is, I don't care, that doesn't bother me a bit."** (Ex. A at 28:25-29:2 (emphasis added).) Judge Van Eck's analysis is correct. *Busy Beaver* instructs that the relevant market by which a fee should be judged is *non-*bankruptcy services. *Busy Beaver*, 19 F.3d at 849. Thus, the existence of the Presumptively Reasonable Fee – which applies only in bankruptcy cases – is not a reason to reduce a fee.

However, here, the Court seems to be creating a requirement that an applicant seeking to be compensated on a lodestar basis must demonstrate why a case is complex enough to justify a substantial departure from the Presumptively Reasonable Fee. *See e.g.,* N.T. at 10:18 ("And maybe I guess what I'm asking you is can you identify what in particular makes this case so unique, or complicated, or complex to be almost double or more than double, perhaps almost triple what is the $4,500 PRF in this district." *See also,* N.T. at 10:38-10:39 ("Again, when the presumptive reasonable fee for an entire chapter 13 case in this district is 4,500 or 5,000 or 5,500 . . . it's just it's hard for the Court to determine or to find exactly what work . . . or services that you provided to generate $5,000 in fees.")

Extra time is being spent on these cases not because they are unusually complicated, but instead because the expectation is that the additional attention to detail will have a net benefit to the client. And, as demonstrated above, that expectation is borne out – the Trustee disburses less than half as much to Counsel and unsecured creditors as might be expected from a case filed by a different law firm. And the likelihood of the case failing is a mere one-ninth of the district average.

6

30

One example of the type of additional detail that Counsel spends is on Schedule J. At the hearing, the Court described the quantity of numbers that are on the typical set of bankruptcy schedules, and the amount of time that might be expected to work with those numbers:

> I mean, if you took Schedule I and in particular Schedule J out of it as far as the volume of numbers actually being entered, there's about 15 numbers, 20 numbers, 30 numbers don't hold me, but there's not thousands of numbers, not thousands of entries that could put into schedules. So, Mr. Sabatini, in all of these cases that we've been going around and around on, I'm at a loss as to how you spend 26 hours preparing schedules.

N.T at 10:17-10:18.

Part 2 of Schedule J is where a debtor is required to estimate ongoing monthly expenses. (Aff. ¶ 24.) That part has 35 separate lines for different categories of expenses. (Aff. ¶ 25.) By comparison, the budget that Mr. DeCantis completed for Counsel contained 161 lines for different categories of expenses. (Aff. ¶ 26.) That information was then used to prepare the 35 lines that are required for Schedule J. (Aff. ¶ 26.) In Counsel's experience, the more granular the information that is requested from a debtor, the more comprehensive it is likely to be. (Aff. ¶ 27.) For example, Line 12 of Schedule J asks for "Transportation. Include gas, maintenance, bus or train fare." (Dkt. Entry 1, p. 31.) A debtor tasked with that generic instruction could easily fail to include other transportation-related expenses that might simply be forgotten, such as for vehicle registration, vehicle inspections, and driver's license renewals. For Mr. DeCantis, those three categories summed to $131.63/year, (Aff. ¶ 28), which means that he will pay $394.89 less to the Trustee over the life of this case as compared to if those expenses had been missed.

Of course, some of the 35 lines on Schedule J specifically combine expenses that are listed separately on the 161-line budget that was completed by DeCantis. For example, Line 6c of Schedule J asks for "Telephone, cell phone, Internet, satellite, and cable services." Each of

7

31

those five categories is simply a separate entry on the 161-line budget. So, one might expect both budgets to fully capture the same information. However, by breaking the categories apart separately, it is more practical for the paralegal who is preparing the schedules to verify the accuracy of each claimed expense. Here, that verification process caused the amount budgeted for cable to be increased from Debtor's original estimate of $88/month to a documented amount of $93.25/month, and Debtor's internet expense to be increased from an estimated amount of $87/month to a documented amount of $110.79/month. (Aff. ¶ 29.) That combined monthly additional expense of $29.04 will translate to Mr. DeCantis saving $1,045.44 over the three-year plan.

Counsel follows the same detail-oriented procedures in every case, because he believes that the net result benefits the client. (Aff. ¶ 30.) These procedures are followed *even if the plan does not have enough funds to pay for the time that such additional detail requires*.[7] (Aff. ¶ 31.) And in cases such as this one where the plan funding is inadequate, the fee application almost always waives excess fees. (Aff. ¶ 32.) See Dkt. Entry 48, p. 2 ("To the extent that the Trustee

---

[7] At the hearing, the Court raised, and then dismissed, the specter of a possibility that Counsel's work is related to the amount of plan funding available:

> It seems as though, you know, if I looked at it. It's interesting, I guess if I wanted to be difficult or make this personal with you, I could say something like the plan and your invoice seems to be nicely situated so that you can get all of your fees. Now I know that's not the case here. I think the Trustee has indicated that your billing under funds the plan by four or five thousand dollars, which I guess means that out of your $11,000 bill, you may only get six or seven thousand dollars through the plan. So, I don't think your billing is tied to the plan. I'm not making that . . . finding in any way shape or form because I know these bills are pretty consistent over the last couple of years from what our hearings have shown.

N.T at 10:46 – 10:47.

8

32

does not have sufficient funds to pay the amount requested, then Applicant waives the remaining fees. Applicant estimates that the total amount actually received from the Trustee's office will be less than $7,068.77.")[8]

### 3. The settlement with the Trustee

In *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 845 (3d Cir. 1994), the Circuit held that

> Congress' grant of authority to the UST to challenge fee petitions merely bestows the UST with standing and/or encourages the UST to do so; it in no way signifies by negative implication that the bankruptcy court is without the power and duty to review fee applications independently ***when the UST does not object***. Unless the parties in interest or the bankruptcy courts take on this task, many if not most fee applications would receive no effective review.

*Id.* at 842, emphasis added.

Of course, this Court has the power to review a fee application *sua sponte* whether or not there is an objection. But, where the Chapter 13 Trustee has taken an active role in carefully reviewing and objecting to the application, the need for this Court to conduct a detailed secondary review is greatly diminished. "Because its time is precious, the reviewing court need only correct reasonably discernible abuses, not pin down to the nearest dollar the precise fee to which the professional is ideally entitled." *Id.* at 845. If the Court chooses to rely on the Trustee's investigation, the reasonableness of that decision would be readily apparent here, where the Court is already of the opinion that "the Trustee did an excellent job in her objections

---

[8] At the hearing, the Court also questioned why this case was filed under Chapter 13 rather than Chapter 7. One reason was to cure the $8,761.81 secured claim on Debtors' residence as described in § 2.C of the Plan. (See Dkt. Entry 5.)

9

33

and really identified pretty much what the Court looks at as well as to what just does not appear to be reasonable." N.T. at 10:23.

Here, the Trustee settled his objection to the application.[9] (Aff. ¶ 33.) As part of that settlement, the parties agreed that Counsel would charge for only six hours of paralegal time and two hours of attorney time for preparing the petition, schedules and plan. (Ex. B, ¶ 4; Aff. ¶ 34.) The additional discount represented on the settlement document to effectuate that compromise amounts to $2,753.00. (Dkt. Entry 57, pp. 1 – 3, grey cells in last column; Aff. ¶ 35.)[10]

Six hours of paralegal time and two hours of attorney time to prepare a petition and schedules is certainly not a "reasonably discernable abuse." Other judges in this district have approved far more. See, e.g., *In re Barker*, 5:20-bk-02896, Dkt. Entries 34-2 and 37, (Judge Henry Van Eck approving without reduction $18,437 in fees for pre-confirmation services, including 10.1 hours of paralegal time and 6.4 hours of attorney time preparing the budget, schedules, or the plan, and an additional 8.8 hours of time working on checklists, Aff. ¶ 40); *In re DeSanto*, 18-bk-01167, Dkt. Entries 30-2 and 31 (Judge Robert Opel, II approving without reduction $11,007.50 in fees for services through the day after confirmation, including 24.5 hours of paralegal time and 4.5 hours of attorney time preparing schedules or the plan, processing checklists, and preparing for and meeting with the client and filing the case, Aff.

---

[9] Per the Court's instruction at the hearing, Counsel has filed on the docket the adjusted bill that reflects the settlement. (See Dkt. Entry 57, Aff. ¶ 36) Also, as explained at that hearing, that document contains color coding which explains the resolutions of the various line items that the Trustee had objected to. (Aff. ¶ 37.) That color coding is described in the email from Sabatini to McHale which was sent on July 3, 2024, (Aff. ¶ 38), a copy of which is attached as Exhibit B.

[10] In preparing this brief, Counsel discovered that the paralegal time which was retained rather than discounted amounted to 6.5 hours rather than just 6 hours. (Aff. ¶ 39.) Counsel apologizes for this error. $75.00 should be removed from the bill, representing the additional .5 hours of paralegal time.

10

34

¶ 41); and *In re Sumski*,[11] 17-bk-02507, Dkt. Entries 39-2 and 40 (Judge John Thomas approving without reduction $20,517.59 in fees for services through the day after confirmation, including 44.2 hours of paralegal time and 2.6 hours of attorney time for work related to preparing schedules or the plan, meeting with the clients, and filing the case, Aff. ¶ 42).

At the hearing, the Court specifically questioned three entries of attorney time: 1.7 hours on June 23, 2022, .6 hours on June 29, 2022, and 1.7 hours on July 1, 2022.[12] Each of those entries was related to the preparation of the schedules and plan. Counsel, as promised, has reviewed his files but has been unable to determine precisely what aspect of schedule preparation or plan review was being conducted on those dates. (Aff. ¶¶ 43 - 44.) When these time entries were created, Counsel was unaware that the Court expected greater detail. (Aff. ¶ 45.) However, Counsel submits that the entries do provide more than sufficient detail to comply with the standards set by the Third Circuit.

In *Rode v. Dellarciprete*, 892 F.2d 1177 (3d Cir. 1990) the district court had found that a fee petition failed to include "adequate and specific descriptions of services and the time devoted to those services." *Id.* at 1190. The Circuit reversed, finding that the information provided was "very specific. . . ." *Id.* at 1191. The Circuit listed the following sample entries to support its holding that the entries were very specific, and that the information was enough for the district court to determine if the fees claimed were reasonable:

---

[11] This case is another example of the Counsel's practice of doing the work even when there is no prospect of being paid. (Aff. ¶ 39.) The *Sumski* fee application was filed less than six months into a five-year case where the total base plan was only $9,000.00. *Id.* Over $10,000 of the Court-ordered fees were written off after discharge. *Id.* Additionally, Counsel never filed an application to be paid for all of the additional work done during the last 54 months of the case. *Id.*

[12] Counsel is not suggesting that the Court has no other objection to the bill. Rather, the Court made it clear that it is questioning why the overall bill is so much greater than the Presumptively Reasonable Fee.

11

35

1. Time of Laurence W. Dague, Esquire: Settlement: 12.9 hours; Application for Attorney's Fees: 4.1 hours; and miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses: 1.3 hours. Total hours: 18.3.

2. Time of Dianne E. Dusman, Esquire: Settlement: 1.8 hours; Trial Brief: 5.2 hours; and miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses: .2 hours. Total hours: 7.2.

3. Time of Carol L. Karl, law clerk/paralegal: Settlement: 1.9 hours; and miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses: 1.8 hours. Total hours: 3.7.

4. Time of Michael Fenten, law clerk: miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses: .2 hours. Total hours: .2.

Id. at n. 13.

Counsel submits that the three time entries identified by the Court here provide substantially more specificity than what the Circuit found acceptable in *Rode*. In the first entry, Counsel worked with I, J, the Means Test and the Plan. In the second entry, Counsel was working to answer questions that had been specifically flagged for him by the paralegal who was doing the bulk of the work on the case. And in the final entry, Counsel drafted instructions for the client, drafted the attachment for the plan, and completed a review of the petition and the schedules. This level of detail is substantially more than the Circuit requires.

Counsel submits that it would be appropriate for the Court to credit the Trustee's decision to settle the objection, and for the Court to award the amounts agreed to by the parties.

Respectfully submitted,

s/ Carlo Sabatini
Carlo Sabatini, Attorney for Debtor
Sabatini Law Firm, LLC
216 N. Blakely St.
Dunmore, PA 18512

12

36

Phone (570) 341-9000
Facsimile (570) 504-2769
Email ecf@bankruptcypa.com
Bar Number PA 83831

13

37

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF PENNSYLVANIA
### HARRISBURG DIVISION

```
IN RE:                          )  Case No. 1:21-bk-00110-HWV
                                )  Chapter 13
                                )
PATSY MERRIWEATHER,             )  Bankruptcy Courtroom No. 1
f/k/a Patsy Corbett,            )  Ronald Reagan Federal Building
                                )  228 Walnut Street
                                )  Harrisburg, PA 17101
        Debtor.                 )
                                )  October 27, 2021
                                )  9:52 a.m.
```

TRANSCRIPT OF FIRST APPLICATION FOR ALLOWANCE OF COMPENSATION &
EXPENSES. NOTICE SERVED ON 9/16/2021. FILED BY GARY J. IMBLUM
OF IMBLUM LAW OFFICES, P.C. ON BEHALF OF PATSY MERRIWEATHER.
OBJECTIONS DUE BY 10/7/2021 (37);  OBJECTION TO FIRST
APPLICATION OF ATTORNEY FOR CHAPTER 13 DEBTOR FOR COMPENSATION
AND REIMBURSEMENT OF EXPENSES FILED BY TRUSTEE (RE: RELATED
DOCUMENT(S) (43)
BEFORE HONORABLE HENRY W. VAN ECK
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

APPEARANCES:

```
For the Debtor:          Imblum Law Offices, P.C.
                         By:  GARY J. IMBLUM, ESQ.
                         4615 Derry Street
                         Harrisburg, PA 17111

For Chapter 13 Trustee:  Standing Chapter 13 Trustee Office
                         By:  JAMES K. JONES, ESQ.
                         8125 Adams Drive, Suite A
                         Hummelstown, PA 17036

For U.S. Trustee:        U.S. Trustee's Office
                         By:  JOSEPH SCHALK, ESQ.
                         228 Walnut Street, Suite 1190
                         Harrisburg, Pennsylvania 17101

AUDIO OPERATOR:          KAREN DAVIS
```

**TRANSCRIPTION SERVICE:**     **TRANSCRIPTS PLUS, INC.**
**435 Riverview Circle**
**New Hope, Pennsylvania 18938**
**Telephone:  215-862-1115**
**e-mail CourtTranscripts@aol.com**

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

38

THE COURT:  I did pass over Merriweather, I know that that's a status conference at this point, but let's do the motions to dismiss, if you don't mind first, there's very few of them, it will be quick.

(Recess from Merriweather matter 9:52 a.m.)

(Recommence Merriweather matter 9:55 a.m.)

THE COURT:  I want to go back to the Merriweather matter now.

Mr. Jones, there aren't any -- is there anything else besides Merriweather?

MR. JONES:  Merriweather and Mintscheff, I believe.

THE COURT:  Well, that's not until 10, we've got a minute on that.

MR. JONES:  Okay, I'm sorry.

THE COURT:  So -- yeah, Mintscheff we'll be dealing with next.

Let's go with Patsy Merriweather, Number 14 on my list.  Begin with entry of appearances; is there anyone here for the Debtor?

MR. IMBLUM:  Gary Imblum for the Debtor, Your Honor.

THE COURT:  Good.  Can you make sure that microphone is close enough to you?

MR. IMBLUM:  Excuse me.

THE COURT:  Not too close, but close enough to hear.

MR. IMBLUM:  Is that good?

Case 5:22-bk-01826-MJC   Doc 60-1   Filed 10/07/24   Entered 10/07/24 22:31:51   Desc
Exhibit A - Merriweather Transcript   Page 2 of 32

3

THE COURT:  Yeah, that sounds good.  She'll let me know if it's not.

And, of course, Mr. Jones, you're on behalf of the Chapter 13 Office.

So there was an application --

MR. SCHALK:  Your Honor?

THE COURT:  Yeah?

MR. SCHALK:  Joseph Schalk on behalf of the Office of the United States Trustee.

THE COURT:  Oh, I wasn't aware that you were appearing in the matter, Mr. Schalk, I thought you were just here to keep us company.

MR. SCHALK:  Nope.

THE COURT:  Okay; good to know you're here.

MR. JONES:  Give his paralegal back there some work, uhm-hum, yeah.

THE COURT:  Yeah.  Yeah, an assistant.

First application for allowance of compensation with the Trustee objection.  So it's technically your application, Mr. Imblum, what's going on?

MR. IMBLUM:  Well, I discussed this with Mr. Jones, and I guess the procedure under Busy Beaver, if I'm not mistaken, is that the Court would issue an opinion on the objections, and then I could ask for a hearing if I disagreed, is that the correct procedure?

4

THE COURT:  The way I read Busy Beaver is I have an independent duty to review all applications, lodestar applications, and I apply the standard in In Re Busy Beaver if -- and I've called your office -- my chambers has called your office with questions about time entries.  I can remember one occasion where I think it was a two-hour entry for what appeared to be a very short phone call, and it was a typo.

MR. IMBLUM:  Right, and it was point two, yes.

THE COURT:  Right.  So that is sort of a microcosm of what I see the process is.

If I had more serious concerns, I would list it for hearing, and you would come in.  And under In Re Busy Beaver, I cannot really deduct anything until I've explained to you what my concerns are, and then given you an opportunity, after a reasonable period of time, 30 days or so, to come to the Court to defend your time entries, and that's when the hearing would take place.

MR. IMBLUM:  Okay.

THE COURT:  Now that's if I'm exercising my independent duty under In Re Busy Beaver.

Here, we have an objecting party who has also a commensurate obligation as the Chapter 13 Trustee's office to review these things, and where appropriate, object.

Now under that circumstance, I think the procedure would be slightly different in that I am to hear the objection;

TRANSCRIPTS PLUS, INC.
215-862-1115● CourtTranscripts@aol.com

41

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 4 of 32

5

decide if I agree or disagree with the objection.  If I disagree, I think I overrule the objection and grant the fee application.

If I agree with all or part of the objection, I would then have to provide you, Mr. Imblum, with the basis of that, and then provide you with an opportunity, 30 days or so, to come back to court and explain why I shouldn't be concerned about those entries.

MR. IMBLUM:  Okay.

THE COURT:  So that's how I see it.  Mr. Jones, do you agree?

MR. JONES:  That's how we see it, too, Your Honor.  I mean, basically this whole matter arose from Judge Conway objecting in the Badyrka case.  I'm not sure if you're familiar with that, it was an initial fee app, again, over $10,000 right after confirmation, and he just believed that that was just a bit outrageous for a District where normally cases are settled -- are completed with about a 45 hundred dollars attorney fee, but he raised that issue.

The Trustee wanted to raise the same issue in our District, again, to sort of get some direction as to where the Court sits as far as some of these fee apps that seem to be out of the normal, let's say, as far as the $4,500 presumptively reasonable fee that we have in the District.

So there were some objections that were made.  And,

**TRANSCRIPTS PLUS, INC.**
**215-862-1115●  CourtTranscripts@aol.com**

42

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 5 of 32

6

again, we're kind of looking at them both in a microcosm, as far as the individual entry, but we're also looking at the macro of the whole matter in that, you know, individually, they may not seem out of the ordinary.  But as has been indicated, you can die by a thousand paper cuts.  In other words, they're small, but when they accumulate, it becomes a situation where the fees are just out of line for a fairly ordinary case.

So as I indicated, the Trustee believed that there were certain billing methods that were excessive, wanted to raise them at a time when Judge Conway was, likewise, reviewing, and to determine whether the bench has changed, or just guidance as far as where we stood.

The reason we asked for a status conference was I don't believe it really would help any of us if I just sat here and read the objections to the Court.  Obviously under the --

THE COURT:  Oh, I read them.

MR. JONES:  You read them; yeah, that's what I mean.

THE COURT:  Yeah, I read them.

MR. JONES:  I mean, you read them.  For me to read them into the record, or whatever, and so we were unsure how exactly you wanted to proceed.

There are actually five -- there's the set of five objections, Merriweather was the first one that was set for today; there are two more set for Wednesday; there is one that

Case 5:22-bk-01826-MJC   Doc 60-1   Filed 10/07/24   Entered 10/07/24 22:31:51   Desc
Exhibit A - Merriweather Transcript    Page 6 of 32

7

I believe still has not been scheduled; and there's another case that's dismissed, but that may come back.  So there's five altogether, and we wanted to get an idea -- in light of Merriweather, in light of the others, how the Court wanted to proceed.

THE COURT:  Sure.

MR. IMBLUM:  Actually just for clarification, that case isn't dismissed.  It was -- you filed a certification of default; I filed an objection.

MR. JONES:  Oh, objection, okay.

MR. IMBLUM:  So the case was not actually dismissed.

MR. JONES:  Okay; I'm sorry.

MR. IMBLUM:  It was -- that's -- well --

MR. JONES:  I thought it was -- well, a reconsideration; I'm sorry.

MR. IMBLUM:  Yes.

MR. JONES:  Okay, yeah.

THE COURT:  So it's an important issue, and I can -- we also have a relatively new standing Chapter 13 Trustee who is trying to figure out with a new Judge -- and a still fairly new judge in four and a half years so, you know, I've been around for a little while, but not as long as some of my predecessors.

So I understand why the objections were filed; I read the objections; I understand them.  I think that your office

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 7 of 32

8

has followed the spirit of <u>In Re Busy Beaver</u>.  You can obviously quibble over the objections and their impact on the case examined, as you said, in isolation.  Some of those charges are point six, right, which is the smallest increment, Mr. Imblum, that you can bill at, correct?

MR. IMBLUM:  You mean point one for six minutes of time?

THE COURT:  I'm sorry; point one, yes, six minutes.

MR. IMBLUM:  I'm sorry, just to clarify, Your Honor, yes.

THE COURT:  No, you're correct, it's a six-minute increment, that's what I meant to say.

MR. IMBLUM:  Okay.

THE COURT:  Which is a point one.

MR. IMBLUM:  Yes.

THE COURT:  There's no smaller -- under your fee agreement, there's no smaller increment of time, right?

MR. IMBLUM:  No.

THE COURT:  So in isolation, it may look a bit like nitpicking, but actually it follows the spirit of <u>In Re Busy Beaver</u>.  One of the things in there is not just the total amount, which, frankly, I look at, but to me, it's not a starting point, nor is it an ending point.

The whole point of lodestar is that it is done on a contemporaneous basis with the activity itself, and that you're

tracking your time pursuant to a fee agreement, and that you're entitled to the fair market value of your services.

So the number one thing I look at -- and I'm not familiar with the case, Mr. Jones, that you referenced. I don't know, was there an objection in that case?

MR. JONES: I'm sorry, which case?

THE COURT: You referenced the case that -- that Judge Conway was --

MR. SCHALK: In Re Badyrka.

MR. JONES: Oh, Badyrka, I'm sorry. No, that was a sua sponte objection raised by Judge Conway.

THE COURT: Okay. I am familiar with that case; I had that case. I actually had that case for a while before it went up to him, I do know of the case that you mentioned.

So under In Re Busy Beaver, I take that pretty seriously. My staff looks at everything that is filed.

And, Mr. Imblum, you are the most prolific lodestar filer in our District, so we look at a lot of your time.

MR. IMBLUM: And I understand that's -- I think that's why I'm here today.

THE COURT: I think probably, too.

MR. IMBLUM: Yes.

THE COURT: I would note there are others who are filing lodestar who might have been initially an easier initial objection to make because I have routinely approved Mr.

10

Imblum's fee applications after reviewing them, and I think that sort of speaks to my position about his billing practices. And I'll go so far as to state that when it comes to lodestar, he's an exemplary example of how to track your time.  He does so, and oftentimes I find that he asks his paralegal and paraprofessionals to do as much as possible to avoid charging at the hourly rate.

I've looked at his time a lot.  And that's not to say it's perfect, okay, because reasonable minds can differ.  And, you know, I've had to look at his time sheets more than once, and wonder if it's something I should take issue with or not, and I think you could do that with really anybody's time.  If you go back ten years and look at my lodestars, I might quibble with some of my own now -- some of the ones I said.  In other words, reasonable minds can differ.  This is a discretionary area, there is no bright line.

In Re Busy Beaver gives us some very good guidance, so let me tell you what I think is the most important about that guidance.  It's not the dollar amount that's charged ultimately, I really think that has the smallest of impact.

I begin with was the time carefully tracked?  Does it appear to have been tracked contemporaneous?  For example, despite people's best efforts, and maybe misconceptions, having tracked time contemporaneous myself, I can tell when someone is tracking it contemporaneous, and when they have reconstructed

**TRANSCRIPTS PLUS, INC.**
**215-862-1115● CourtTranscripts@aol.com**

47

Case 5:22-bk-01826-MJC   Doc 60-1   Filed 10/07/24   Entered 10/07/24 22:31:51   Desc
Exhibit A - Merriweather Transcript   Page 10 of 32

11

it based upon review of the docket, I can tell.  Really, anybody who's tracked time can tell.  So maybe I'm not perfect at that, but sometimes it's pretty obvious.

It seems pretty obvious to me that Mr. Imblum tracks it contemporaneous.  I have seen no evidence that he doesn't.  So to me, that's a really good start because you don't want to be in a position where you've reconstructed it, and you're standing in front of a judge, and the judge says, "Did you track this contemporaneous?"  "Well, no."  "So you had to reconstruct it; how'd you do that?"  "Well, I went back and I did the best I could.  I went through my correspondence file, I looked at the docket, I remembered what I could, but I probably didn't capture it all.  And where I wasn't sure about anything, then I didn't include it."  "Oh, so you're admitting that these aren't accurate?"

That's not a good place to be in, right?  But Mr. Imblum doesn't have to worry about that.  So the contemporaneous thing, I think, is very important.

The second aspect is that I look at, the most important thing, is what is the hourly rate, and what are the services being provided.  Personally -- and, again, under In Re Busy Beaver, I am allowed to use my own experience, so you will hear me make reference to my own experience here.  As both of you well know, I did a lot of consumer work, and I did a lot of business work.  I did a lot of debtor work, and I did a lot of

TRANSCRIPTS PLUS, INC.
215-862-1115● CourtTranscripts@aol.com

48

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 11 of 32

12

creditor work.  I had different rates for all of them, and that's because that's what the market would bear.  I charged a lot more for my Chapter 11 work than I did for my simple consumer work.

I charged a different rate to creditors.  Sometimes they had a flat fee schedule, sometimes they had an hourly rate.

For consumer bankruptcies, I had a lower rate than I had for business bankruptcies because there's more work in a business bankruptcy, and it's of a more specialized nature.  That's exactly what <u>Busy Beaver</u> wants.  They want your fee to be rationally related to the value of your services.  And the value of your services goes up with the greater need for specialized knowledge.

Chapter 11 bankruptcy practitioners are routinely north of 400; not consumer, though.  Consumer is just as often south of 300 as it is north of 300, and they're only in the margins generally, so right around 300.  That's really to me the most indicative thing is is the hourly rate marketable?

What's the hourly rate on this, Mr. Imblum?

MR. IMBLUM:  My rate's 295; Jeff Troutman in my office bills at 235; and the paralegals bill either 135 or 145, Your Honor, I'd have to check that.

THE COURT:  All right.  And, Mr. Jones, I didn't hear a complaint about the hourly rate that was charged.

13

MR. JONES:  No, we did not object to the hourly rate.

THE COURT:  And I don't think there is any basis to object to it.

Mr. Imblum, how long have you been doing bankruptcy work?

MR. IMBLUM:  Since 1987.

THE COURT:  I don't want to do the math in front of everybody because I'll get it wrong, but it's a long time, right?

MR. IMBLUM:  44 years.

THE COURT:  So I just find the rate to be very reasonable.

MR. IMBLUM:  No, I'm sorry, it can't be 44.  I'm sorry, I'm not good at math.

THE COURT:  See, that's why I don't do math on the record.

MR. IMBLUM:  Yes.

Lieutenant

MR. JONES:  Many years.

MR. IMBLUM:  Many years.

MR. JONES:  I will stipulate to many years.

THE COURT:  Yes.

MR. IMBLUM:  Many years.

THE COURT:  So I find -- you know, there's no challenge to the rate, and I'm not going to sua sponte raise

TRANSCRIPTS PLUS, INC.
215-862-1115● CourtTranscripts@aol.com
50

Case 5:22-bk-01826-MJC   Doc 60-1   Filed 10/07/24   Entered 10/07/24 22:31:51   Desc
Exhibit A - Merriweather Transcript   Page 13 of 32

14

it.

The other thing that I look at that I think is really very important is what -- who is doing what, and that was raised here. And that is the issue that you can nibble around the edges and quibble about, should an attorney be doing a function, or should it be a paralegal function, or should it be something that an assistant should do that shouldn't be billed out to the client at all? And I think that's where we ought to focus in this matter, I think that's where your office focused, Mr. Jones.

MR. JONES: Most of the objections, correct, it would be.

THE COURT: Yeah, and those are reasonable objections because here we get into a very, you know, discretionary area where it's kind of tough. And I'll give you an example: I was reviewing it, and on the one hand, I saw charges -- I won't make any specific reference, but generally speaking, I saw charges in there where the attorney reviewed a notice -- well, I will make reference to one. The attorney reviewed an entry on the docket that Zaharopoulos had been appointed as the Chapter 13 Trustee. Gosh, I don't know about that, right, Mr. Imblum? Does that mean that that happened in all 300, or 400, or 500 of your cases? Didn't we all sort of know that Jack was appointed? And do you have to look at the docket and bill point six for that?

TRANSCRIPTS PLUS, INC.
215-862-1115• CourtTranscripts@aol.com

51

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 14 of 32

On the other hand, it's a significant event in the case, but that one troubled me a little, right? I don't know why you billed for that, and I think the objection there seems to be well-founded. But I have to give you the opportunity, Mr. Imblum, to explore it further.

And here's the more tricky -- here's the trickier one: The attorney reviewed an order that was entered by the Court that he knew was going to be entered, or was in court while it was entered and approved. On the one hand, you may ask yourself, "Why is the attorney billing to review an order that he knew was going to be entered?"

On the other hand, if I object to that, if I raise a concern with it, I'm sending the message that I don't want attorneys to read the orders that I'm entering. That's a problem, I can't send that message, and I won't.

But I will say this: If that occurs, and it's not inappropriate for an attorney to review an order to make sure that it is properly entered. Just yesterday, I had to admit to an attorney that our chambers -- I entered the wrong order. I was supposed to enter an interim order, instead I entered the final order. That was a mistake, I had to undo that yesterday.

MR. IMBLUM: And if --

THE COURT: So I have to have the attorney review the order.

MR. IMBLUM: If I can comment, Your Honor?

16

THE COURT: Yeah.

MR. IMBLUM: The reason I review the order is just to make it's consistent with what happened in court, and what was supposed to be entered, and that's why I review it.

THE COURT: And so you should bill at the smallest possible increment for that.

MR. IMBLUM: And I believe I did.

THE COURT: Which you did.

MR. IMBLUM: Yes.

THE COURT: But you see, that's a tricky one for me, because on the one hand, gosh, I never billed for that. I just considered it part of my job, so I never billed for it.

But on the other hand, as I've said, if I tell you not to look at those orders, and you're not going to get paid, I'm sending a message that I'm not comfortable with, which is I don't want the attorney reviewing the orders I enter when, in fact, I do want them to do that.

And against all that, I measure, of course, we're all assuming here that there is a fee agreement that's been properly executed that the client is -- when they execute it, understands what it means. This is the rights and responsibility thing, and that they have a written fee agreement that complies with the professional rules of conduct as applies in Pennsylvania. That's all the baseline. If you don't have one of those, you're going to have a problem

TRANSCRIPTS PLUS, INC.
215-862-1115• CourtTranscripts@aol.com

53

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 16 of 32

17

collecting lodestar, but we assume that that is the case here.

So I would recommend in this instance that the parties maybe talk about some of what I've talked about today to provide some guidance.

In my thinking, the dollar amount doesn't bother me if there are contemporaneous time entries that appear to be accurate and contemporaneously kept.

I don't even care ultimately if the services -- well, I mean, I care. But it doesn't matter if the services ultimately benefit the estate, as long as they were designed to benefit the estate at the time they were incurred, and they're reasonably necessary to defend the estate and the debtor. And I didn't see an objection on that either, Mr. Jones.

MR. JONES: No, Judge. And obviously if it benefits the debtor also in a Chapter 13, that's billable, and we acknowledge that.

THE COURT: Okay.

My main concern with this objection -- and I haven't looked at any of the others -- is sort of outlined by what I said. There is a lot of point ones, some of which I might agree probably shouldn't be there. I'm not making any findings of fact here, but you could probably take a close look based on what I've said today and get a better idea of what those might be.

TRANSCRIPTS PLUS, INC.
215-862-1115• CourtTranscripts@aol.com

54

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 17 of 32

18

And then there are some that, I think, maybe a paralegal could have done, as opposed to the attorney.  Or maybe in some cases you could argue are so clerical in nature and administrative in nature that no one should be billing for them.

Review of a pro memo that comes through on the docket.  Gosh, does that have to be billed?  Isn't that something that we all expect you to do?  Look at the time stamped -- I imagine in my mind when I see these things that involve the ECF entry, I remember the days when we pushed papers across the counter right over here in the Clerk's Office, you remember, you had someone down there competing with our person to try to get the paper pushed over before 4:30 when they closed.

MR. IMBLUM:  Yes.

THE COURT:  And you would get back -- we'd have to have time stamped copies, get back.  You would just glance at it to make sure the time stamp was on there, and you're done. You don't bill for that.

And so, you know, glancing at an ECF to confirm that the pro memo is what the judge said, gosh, I don't know, maybe that shouldn't be billed at all either.  So you could quibble about those things, and I think they're fair game for you to defend, because maybe there's a good reason for it, right?  The pro memo has to match, that's what the notice is that goes out

TRANSCRIPTS PLUS, INC.
215-862-1115● CourtTranscripts@aol.com

55

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 18 of 32

to people, you know?  But is it really something that's so administrative that maybe that's not something that you need to bill for?

Is that -- against all of this, my standard will always be this:  What could you bill if you were not a bankruptcy attorney, and you were doing regular construction litigation or other work outside of bankruptcy?  What would the client tolerate?  I think the client would call up -- because I represented -- I did a lot of work outside of bankruptcy, and they would question those charges.  The reason the debtor may not do it here is precisely the reason that I am to get involved, which is debtors, they're vulnerable, they don't want to complain to their bankruptcy attorney.  They want their bankruptcy attorney to like them, and to continue to represent them, and help them, because they're desperate; that's why I'm doing this.

Busy Beaver recognizes that the debtor class is a vulnerable class.  And when they're in a desperate situation because they're going to lose their home, or they've been sued by credit card companies, I've sat across the table with moms and pops, grandmoms, granddads, young married couples, single people desperate for help.  And when you have that initial conference with them, and you explain to them what bankruptcy can do for them, you can see the tension leaving their body, and they become extremely vulnerable.  They'll sign anything in

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 19 of 32

20

that moment.

And this is not to suggest, Mr. Imblum, that you take advantage of that, because most of us, as good practitioners, never took advantage of that.  But we must recognize that they are vulnerable, they'll agree to anything, they'll sign anything.

And that's why I have to make sure that what they sign is fair, and what they're billed ultimately is fair, because that feeling continues throughout the case.  So I'm here to make sure that those feelings don't overwhelm what would otherwise be a very reasonable decision to pick up the phone, and call their attorney, and challenge some of these.

That's my thinking.  I've laid it all out for you, I hope that provides some guidance.

MR. JONES:  Your Honor, that's exactly what we were looking for, just some guidance --

THE COURT:  Okay.

MR. JONES:  -- in light of everything.

THE COURT:  So I think maybe 30 days for the parties to go over this case, and maybe the others, as well, if you want to file a request to continue the other hearings.  Or if you want to have those hearings or status conferences, or whatever, it's up -- I'll leave it up to you.

MR. IMBLUM:  I think at this point, Your Honor, we'll talk and see if we can work it out.

**TRANSCRIPTS PLUS, INC.**
**215-862-1115● CourtTranscripts@aol.com**

57

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 20 of 32

21

MR. JONES:  Yeah.

MR. IMBLUM:  And if not, I'll ask for a hearing -- or we'll ask for a hearing.

THE COURT:  Right.  And then I'll be prepared to tell you the charges that I think really ought to be defended, and we'll follow the process.

Okay, so 30 days?

MR. JONES:  That's fine.

MR. IMBLUM:  That's fine, Your Honor.

MR. JONES:  The 22nd, I believe.

THE COURT:  That will put us November --

MR. IMBLUM:  Oh, the --

MR. JONES:  Don't rely on me, though.

THE COURT:  What's that?

MR. JONES:  I said I think it's the 22nd, but don't rely on me today.

THE COURT:  The 24th?

MR. JONES:  24th, I'm sorry.

MR. IMBLUM:  24th.

MR. JONES:  It's the 24th.

THE COURT:  Just before Thanksgiving.

MR. IMBLUM:  Yeah.

MR. JONES:  I was close.

THE COURT:  So the 24th at 9:30 -- we'll maybe make it 10 o'clock.

22

MR. JONES:  10 o'clock is fine.

MR. IMBLUM:  Okay, yes.

THE COURT:  Because I'm not going to do this --

MR. JONES:  That's fine, yeah.

THE COURT:  -- while we're going through regular confirmations.

MR. JONES:  Right.

THE COURT:  It will delay things too much.

MR. IMBLUM:  Understood.

THE COURT:  So if it's okay, 10 o'clock.

MR. IMBLUM:  Yes.

THE COURT:  And to the extent that you want to combine any of the others, I'm generally reluctant to combine records, but this seems like it's going to be administrative enough that if you're willing to put others on with it, I would be okay with that, as long as it doesn't get too confusing.

MR. JONES:  Right.

MR. IMBLUM:  Yes.

MR. JONES:  Yeah, I think the issues are set out, we just need to see if we agree or if we disagree, and proceed from there.

THE COURT:  Right.

MR. IMBLUM:  Yeah, we've discussed this, and I think there are certain categories of objections that can be addressed, if we need to do that.  And I think we can

**TRANSCRIPTS PLUS, INC.**
215-862-1115• CourtTranscripts@aol.com

59

Case 5:22-bk-01826-MJC   Doc 60-1   Filed 10/07/24   Entered 10/07/24 22:31:51   Desc
Exhibit A - Merriweather Transcript   Page 22 of 32

categorize them, and they apply to all the fee apps.

THE COURT:  And that's, I think, a wise approach; okay.

MR. JONES:  The latter objections, I think, were a little more organized than the Merriweather one was. Merriweather was -- just went right through.

THE COURT:  I thought Merriweather was actually pretty well organized, compared to what I --

MR. JONES:  Yeah, but I think the other one -- at least they grouped them as far as the types of objections.

THE COURT:  Yeah.

MR. JONES:  There are two others that are scheduled for the 10th, I suppose we should just request a continuance in regard to those also.

THE COURT:  Are all the parties here for those?

MR. IMBLUM:  It's just --

THE COURT:  Just the -- the --

MR. IMBLUM:  Yeah, it's on my fee apps.

THE COURT:  So which ones are those?  I'll sua sponte continue them, if you want me to, to the same date?

MR. IMBLUM:  That's okay, because I think in the meantime, we'll talk, and either we'll need a hearing, or we'll be able to resolve this.  So that -- yeah, that's fine to continue them.

THE COURT:  So which two are those?

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 23 of 32

24

MR. IMBLUM:  I don't know --

MR. JONES:  I'm trying to remember which two.

MR. SCHALK:  Your Honor, I think I have the list.

THE COURT:  Mr. Schalk, I forgot about you; I'm so sorry.  What's --

MR. SCHALK:  That's all right, I get ignored often.  It's all right.

(Laughter)

MR. SCHALK:  Your Honor, those two cases are Cohan, 19-00398, and Silks, S I L K S, 17-04205.

THE COURT:  Thank you.

MR. SCHALK:  Yup.

THE COURT:  The first one was Cohan?

MR. SCHALK:  Cohen, C O H A N.

THE COURT:  Okay.  So, Joan, let's go ahead and sua sponte continue those to the same date since all the parties are here.

But, Mr. Schalk, I should hear from the UST.  Do you have a position on this?

MR. SCHALK:  Your Honor, we were ordered by Judge Conway to appear in the Badyrka matter; we are interested in this issue.  We expressed similar concerns with the Standing Chapter 13 Trustee.  I think Your Honor hit on the key issue here, and I think it really is the issue of both duplication of service, whether that's happened here or not; and then the

**TRANSCRIPTS PLUS, INC.**
215-862-1115● CourtTranscripts@aol.com

61

Case 5:22-bk-01826-MJC   Doc 60-1   Filed 10/07/24   Entered 10/07/24 22:31:51   Desc
Exhibit A - Merriweather Transcript   Page 24 of 32

delegation of service, and what level that service should be provided at. Whether that's attorney time, paralegal time, or administrative, or overhead time.

We will note, Your Honor, that we do feel and believe that the Court should pay attention to whether or not the services are reasonably likely to benefit the debtor's estate, as provided under 330(a)(4)(A).

I think that's an issue with the United States Trustee that we see perhaps more so in post confirmation fee applications and not necessarily in first or initial fee applications filed with respect to getting a case started. So I'll withhold comment on that concern to the other matters. You'll --

THE COURT: So that's interesting. I would like to hear more on that because -- well, there's Baker Botts, I hope people aren't trying to collect for their defense of their fee applications.

MR. SCHALK: No, I don't think Mr. -- I'm 100 percent certain Mr. Imblum has never done that.

THE COURT: Yeah, I don't think so either.

MR. IMBLUM: No, I -- I'm aware that that's improper. I -- no, I haven't billed for that.

THE COURT: Yeah.

MR. SCHALK: That's a pretty clear one.

MR. IMBLUM: Yeah.

TRANSCRIPTS PLUS, INC.
215-862-1115● CourtTranscripts@aol.com

62

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 25 of 32

THE COURT: Yeah. So but --

MR. SCHALK: No, Your Honor --

THE COURT: But you -- you did --

MR. SCHALK: But I think that's better saved for later applications, because I think what you're seeing, Your Honor -- and I don't think Mr. Imblum would contest this with me -- Mr. Imblum, as you noted, is a prolific fee application filer. We often see fifth, sixth, seventh, eighth applications in cases that really do total up, Your Honor, and impact distribution to unsecured creditors. And I think there are certain things that may concern the Office of the United States Trustee that perhaps didn't concern the prior standing Chapter 13 Trustee, and that this standing Chapter 13 Trustee may want some clarification from the Court as to whether certain items really do benefit the estate or are necessary to the estate post confirmation.

Beyond that, Your Honor, we state no position on the reasonableness of the fees that have been sought as to the hourly rate. But, again, Your Honor, we are -- there is a general concern when it comes to the fact that we do have a presumptively reasonable rate to get a case to confirmation of forty-five hundred dollars, and we're seeing applications to get a fairly standard case to confirmation that's double that. And --

THE COURT: Well, you see, I think that's a mistake.

27

I don't think that one has anything to do with the other, and I've heard that before, and I just want to say that it doesn't matter to me.

MR. SCHALK:  I under --

THE COURT:  What matters is whether or not there is a fee agreement that was properly disclosed; the client agreed to it; the rate is reasonable; the services provided are being provided by the appropriate party; they're appropriately delegated, when necessary.

And although I didn't mention it, you're exactly right, Mr. Schalk, duplication of services is another concern I have, not on these fee applications that I've seen so far, but in others that I am very close to, and will likely now, sua sponte schedule hearings on.  I have seen excessive duplication of services in other fee applications, and it bothers me quite a bit, so I think that's also fair game.

MR. SCHALK:  Yeah.  Your Honor, and I understand that Your Honor may think it -- and here's why I bring that up, Your Honor.  That's part of Judge Conway's concern, so that may be a difference between Your Honor's.

THE COURT:  It could be, but to me, it doesn't -- what matter is is In Re Busy Beaver adhered to, which is all about market rate.  Did the client agree to this; is it a reasonable agreement?  Hey listen, billing in six-minute increments at 295 an hour, for example, the case in front of

**TRANSCRIPTS PLUS, INC.**
215-862-1115● CourtTranscripts@aol.com

64

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 27 of 32

28

me, I think is eminently reasonable.  It's eminently marketable in any area of the law, so no one has a challenge there.

To the comment of "death by a thousand cuts," I think that's what's at issue here.  Is it excessive billing in the sense that there are things that really are so administrative, they probably shouldn't be billed for, even though they're being billed in the smallest possible increment.  Again, I think about what would a regularly sophisticated client in another area of the law outside of bankruptcy find objectionable.  And perhaps glancing at a time stamp on a document or glancing at a docket entry, yeah, that might be something that would cause me as a normal client to pick up the phone and call my attorney and go, "Really?  You're going to bill me for that?  Come on, man."

MR. SCHALK:  I understand that, Your Honor.

THE COURT:  So I get that.

MR. SCHALK:  I understand.

THE COURT:  But if everything else adds up, I don't really care how much it is as long as it's -- the services were necessary at the time they were performed; they were reasonably calculated to help the estate; they weren't excessive in that you spent four hours on preparing an answer to a motion for relief.  Look, that's too much, right, unless there's really good reason for it.

But if all the charges add up to an amount that's

TRANSCRIPTS PLUS, INC.
215-862-1115● CourtTranscripts@aol.com

65

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 28 of 32

twice what the normal no-look fee is, I don't care, that doesn't bother me a bit.

MR. SCHALK:  Understood.  I understand, Your Honor. And all I would say is I think you did hit on a key point there: what's the reasonable customer or the reasonable client going to do?

THE COURT:  That's right.

MR. SCHALK:  When the answer is, "Well, it's just coming out of your unsecured creditor's pocket," that's a concern for the United States Trustee, right?  We also need to also look out for unsecured creditors that often are not coming in before this Court that are having -- you know, that's a question, are we seeing things that maybe take money away from creditors that would otherwise get it?

THE COURT:  No, I totally -- I think we're on the same page there, I agree with that.

MR. SCHALK:  Yup.

THE COURT:  So -- but --

MR. SCHALK:  That's all.

THE COURT:  So I think we've covered it.  I do have very well-developed thoughts on the matter.  One of the very first things I had to adjust to when I got this position was this issue.  And I, quite frankly, didn't struggle with it that much because I practiced for 18 years.  I spent the first five of it doing the no-look fee, and then I spent the remaining 13

TRANSCRIPTS PLUS, INC.
215-862-1115● CourtTranscripts@aol.com                66

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 29 of 32

doing a lodestar. And I can tell you, I have very clear opinions about which approach is better for both the client and the attorney. Personally I think clients get a much better representation from a lodestar approach because I have seen attorneys, and it has affected my own decision-making process. When I was no-look fee and nothing more, and I had 55 messages to return, phone calls to return, guess who got on the top of that pile? The clients with lodestar who would pay me for the time it took to call me back. And the first words out of my mouth were always, "Hey, Bill, how are you doing? I got to remind you, I've got to bill you for this call, so we'll try and keep it short. What's going on?" As opposed to someone where I've already got the plan confirmed, and they're calling because something happened, and I might have enough time by the end of the day to get through 55 messages and call them, but I might not.

The practice of law is a business, as well, and you have to be mindful that attorneys are doing their job, and selling their services. And if they do so in accordance with the well-defined fee agreement, and it's consistent with market practices, they should be paid for that, that's my view.

But I also agree with you, Mr. Schalk. If they're duplicating services, they're not properly delegating, or the services really aren't necessary or designed to protect the estate, that money should not come out of the expense of the

**TRANSCRIPTS PLUS, INC.**
215-862-1115● CourtTranscripts@aol.com

67

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 30 of 32

31

unsecured.  So that message is resonating with me, as well.

MR. SCHALK:  Thank you, Your Honor; nothing else.

THE COURT:  Appreciate it; okay, enough said.

MR. IMBLUM:  Thank you.

THE COURT:  Thank you, both.  We'll see you on November 24th.

MR. JONES:  Your Honor, there are two other cases that I just checked that are scheduled for the 10th, if we could continue those also to the 24th.

THE COURT:  Cohan and Silks.  There's two more besides those?

MR. JONES:  Correct.  Teresa Marie Becker, docketed to Number 18-02864.

THE COURT:  Okay.

MR. JONES:  And Robert Swan, docketed to 20-02797. Those have all now been scheduled.

THE COURT:  Okay, very good.  Joan will add those to the list, and we'll continue those sua sponte to the 24th.

MR. JONES:  Thank you.

THE COURT:  Thank you, both; appreciate it.

MR. SCHALK:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Schalk.

(Whereupon, at 10:32 a.m., the hearing was adjourned.)

**TRANSCRIPTS PLUS, INC.**
**215-862-1115● CourtTranscripts@aol.com**

68

Case 5:22-bk-01826-MJC   Doc 60-1   Filed 10/07/24   Entered 10/07/24 22:31:51   Desc
Exhibit A - Merriweather Transcript    Page 31 of 32

32

CERTIFICATE OF TRANSCRIBER


        I, KAREN HARTMANN, a certified Electronic Court Transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


*Karen Hartmann*


Karen Hartmann, AAERT CET 475   Date: November 17, 2021
TRANSCRIPTS PLUS, INC.

**TRANSCRIPTS PLUS, INC.**
**215-862-1115● CourtTranscripts@aol.com**

69

Case 5:22-bk-01826-MJC    Doc 60-1    Filed 10/07/24    Entered 10/07/24 22:31:51    Desc
Exhibit A - Merriweather Transcript    Page 32 of 32

**Ashley Werner**

| | |
|---|---|
| **From:** | Carlo Sabatini |
| **Sent:** | Wednesday, July 3, 2024 2:42 PM |
| **To:** | Agatha McHale |
| **Cc:** | Ashley Werner |
| **Subject:** | Decantis; 5:22-bk-01826-MJC |
| **Attachments:** | Settlement Proposal.pdf |

I saved the two most-complicated cases for last. (The other, Pypiak, might come tomorrow. If not, next week.) These were the first two cases that were done, so it was before we had come to agreement on a number of issues. I've tried to work those later agreements into this proposal.

The attached .pdf shows the settlement proposal. In addition to our normal bill, this spreadsheet has two additional columns: "Aggie" and "Proposal."

"Aggie" shows what the bill would be if all of your objections are granted. For each entry where you objected, we lodged a discount in the Aggie column. That column also includes any time that we had already discounted. For you to be able to easily tell the difference, we assigned a fill color to each cell that contains a discount for one of your objections. In other words, the discounted amounts in that column which are just in a standard white cell are amounts that I had already discounted on the bill when the fee app was originally filed. The yellow cells in your column are the discounts that we think you would agree to based on subsequent agreements – e.g., the proof of claim review structure that we've been using. The orange cells in your column are the rest of your objections.

The "Proposal" column contains the discounts that I am proposing as settlement of the fee application. This column contains two additional colors. Blue means that we are not agreeable to the discount that you requested. Generally, blue means that we aren't discounting at all except that on the first page we did apply some discount to bring the time down to a lower rate. Grey in this column means that the time is for schedule prep. I've discounted all of the grey time except for 6 hours of paralegal and 2 hours of attorney time. Orange in that column means that I am accepting your objection. Yellow means that I'm agreeing to reduce the amount the same way that we have to similar entries in the past.

The totals at the bottom of the columns show that our original request was $11,869 and that we are willing to reduce that to $8,514.75. If all of your objections were allowed in full, the fees would be $5,983.25.

Please let me know if this works. If you me to explain this in person, let me know when is good for you. Thanks.

Carlo Sabatini
Sabatini Law Firm, LLC
216 N. Blakely St.
Dunmore, PA 18512
(570) 614-4444
carlo@bankruptcypa.com

**UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | **Chapter 13** |
| | : | |
| **Dominic Joseph DeCantis,** | : | **Case No. 5:22-01826-MJC** |
| | : | |
| **Debtor.** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

# O R D E R

**AND NOW**, upon consideration of the First Interim Application of Attorney for Chapter 13 Debtor for Compensation and Reimbursement of Expenses, filed on April 29, 2024, Doc. 48 ("Application") filed by Mr. Carlo Sabatini, Esquire as Counsel for the Debtor ("Applicant"), in which the Applicant requested interim allowance of compensation in the amount of $11,869.25[1] and the reimbursement of expenses in the amount of $449.85 for the period June 13, 2022 to December 1, 2023;

**AND**, the Chapter 13 Trustee ("Trustee") filed an Objection to the Application on May 20, 2024, Doc. 49 ("Objection");

**AND**, the Applicant and Trustee entered into a Stipulation resolving the Objection, Doc. 52, whereby the Applicant agreed to reduce his fees by $3,354.50, thereby reducing the Application request to $8,514.75, plus expenses ("Stipulation")(*see* Doc. 57);[2]

---

[1] The Application lists a staggering 57.2 hours, prior to any discounts, billed to this consumer Chapter 13 case thus far. Mr. Sabatini's time alone totaled 18.5 hours billed at $415 per hour. There are approximately 35 total hours entered prior to the petition being filed. This Application is identified as interim and as such, Applicant could seek payment of additional sums.

[2] The Court appreciates the Trustee's obligation to identify improper or excessive billing entries by the Applicant and the Applicant's agreement to settle the disputes by the terms of the Stipulation. However, the Court, after consuming an inordinate amount of time on Applicant's fee applications, has concerns with regard to Applicant's ongoing billing practices in these routine Chapter 13 cases.

72

**AND**, the Court having held a hearing on the Application on August 7, 2024[3] and the Applicant submitting a supplemental Brief and Affidavit on October 7, 2024 (Doc. 60, 61);

**AND**, based on Debtor's Schedules filed in this case, Debtor is married, employed as a cook at a local restaurant, and with his wife they have a total net monthly income of $4,543.42, monthly expenses of $4,119.36, leaving a monthly net income of $424.06. Doc. 1 (Schedules I and J). This net income is the monthly payment provided under the Debtor's 36-month Chapter 13 Plan for a total Plan payment of $15,266.16. Doc. 5. The Plan was confirmed by Order entered January 6, 2023. Doc. 37;

**AND**, only six (6) proofs of claim were filed by creditors indicating a total of $56,796.44 of secured claims and $15,505.65 of unsecured claims;

**AND,** Applicant's original interim request for fees of $11,869.25 and reimbursement of expenses of $449.85 for a total of $12,319.10 would account for over 80% of the total plan payments which, after payment of Chapter 13 administrative costs, would leave no funds available for distribution to creditors;

**AND**, upon review of the case docket and the Applicant's submissions, the Court finding that this case is a standard or routine Chapter 13 case with no unique or complex issues[4] and that a reduction in the amount of allowed compensation is necessary due to charges for services that are non-billable administrative tasks, paralegal or secretarial duties that should have been billed at non-attorney rates, and for excessive time billed for certain tasks;

**AND**, as Applicant knows from prior hearings, for requests for compensation, the burden of proof rests on the applicant to establish that the fees earned are reasonable and necessary. *Zolfo,*

---

[3] The Transcript of the hearing, Doc 62, shall be hereinafter referred to as "Tr." At the hearing, Mr. Sabatini appeared. The Debtor did not appear.

[4] Mr. Sabatini agreed that the case was not complex, "I don't think that there's anything complex about the case." Tr. at p. 8.

2

73

*Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 261 (3d Cir. 1995) (citing *In re Metro Transp. Co.*, 107 B.R. 50, 53 (E.D. Pa. 1989)); *In re Pochron*, 2022 WL 1085459, at *2 (Bankr. S.D. Ohio 2022); *In re Murray*, 2007 WL 2317523, at *2 (Bankr. E.D. Pa. 2007).  "This burden is not to be taken lightly, especially given that every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors or use by [the] debtor."  *In re Pettibone Corp.*, 74 B.R. 293, 299 (Bankr. N.D. Ill. 1987) (citing *In re Hotel Associates, Inc.*, 15 B.R. 487, 488 (Bankr. E.D. Pa. 1981));

**AND**, based on and incorporating the Court's legal analysis in *In re Badyrka*, 2022 WL 4656034 (Bankr. M.D. Pa. 2022), *In re Thomas*, 2023 WL 6885827 (Bankr. M.D. Pa. 2023), *In re Beckhorn*, Case No. 5:21-0849-MJC (Bankr. M.D. Pa. November 17, 2022) and *In re Grove*, Case No. 5:20-0698-MJC (Bankr. M.D. Pa. March 31, 2023);

**AND**, this District having set a Presumptively Reasonable Fee ("PRF") for routine Chapter 13 cases of $4,500, L.B.R. 2016-2 (c), which Courts have used as a "starting point" to what should be considered a "reasonable" fee in a routine Chapter 13 case. *See In re Schuman*, 2013 WL 1195279, at *6-7 (Bankr. N.D.N.Y. 2013) (describing presumptive fee as "pre-calculated lodestar" and utilizing it as a starting point for review of lodestar fee applications); [5]

**AND**, the Court finding that it is not required to make a line by line analysis of the fee application, *see In re 388 Route 22 Readington Holdings LLC*, 2023 WL 4249266, at *3 (3d Cir. 2023); *Badyrka*, 2022 WL 4656034, at *9; *In re McKeeman v. Laughlin,* 236 B.R. 667, 672 (B.A.P. 8th Cir. 1999) ("When ... a case presents routine chapter 13 matters, the court may review the fees requested in light of fees typically charged, and may reduce the requested fee accordingly.

---

[5] The PRF in this District was increased to $5,000 effective for cases filed on or after October 1, 2024.

It is not necessary for the court to find that the time spent on any given task was excessive before reducing the award.");

**AND,** at the August 7, 2024 hearing, the Court referenced several entries that appeared to be excessive, non-billable administrative or overhead.[6]  The Court asked Applicant what services were performed on the following billing entries: 6/23/22 - 1.7 hours; 6/29/22 - 1.7 hours; 7/1/22 - 1.7 hours.  Applicant was unable to support these entries and admitted that he was not able to meet his burden;[7]

**AND,** accordingly, the Court shall apply a forty percent (40%) reduction to the Application, *see In re Kern*, 2021 WL 3518806, at *5 (Bankr. D. N.J. 2021) ("If a court determines some of the time claimed by a party should be excluded, it may also use a percentage deduction as a practical means of trimming fat from a fee application." (*quoting In re Nicholas*, 496 B.R. 69, 76 (Bankr. E.D.N.Y. 2011)));[8]

It is hereby **ORDERED** that:

1. The Application is **GRANTED** in part and **DENIED** in part as set forth below.

2. Compensation for professional services on the Application is **ALLOWED** in favor of the Applicant in the amount of **$7,121.55**.

3. Reimbursement of expenses is **ALLOWED** in favor of the Applicant in the amount of **$449.85.**

---

[6] As discussed with Applicant at the hearing, during this period, the Court did approve approximately twelve (12) of Applicant's fee applications in other cases where the Trustee objected. Tr. at 5-6.

[7] Applicant indicated "I'm not carrying my burden of showing where the time is being spent preparing the schedules" and "I recognize that I'm not meeting my burden …" Tr. at 9, 20. When given additional post-hearing time, Applicant indicated that he was "unable to determine precisely what aspect of schedule preparation or plan review was being conducted on those dates." Doc. 61, at ¶44.

[8] This reduction still provides Applicant with a fee substantially in excess of the PRF and what most other practitioners in this District charge in a routine consumer Chapter 13 case.

4

75

4. To the extent the Applicant wishes to move for reconsideration of this Order, the Applicant may do so and the Court may hold a hearing, if requested.

By the Court,

Mark J. Conway, Bankruptcy Judge
Dated: September 30, 2025

76

77

Sabatini Law Firm, LLC
216 N. Blakely St., Dunmore, PA 18512
Statement as of 3/27/2024

78

**Dominic Decantis**
**830 N Main Ave.**
**Scranton, PA 18504**

### Professional

| Professional | | Gross |
|---|---|---|
| Carlo Sabatini | 18.5 hours at $415.00/hour. | $7,677.50 |
| Ashley Werner | 17.8 hours at $150.00/hour. | $2,670.00 |
| Tiffany Bator | 20.9 hours at $135.00/hour. | $2,821.50 |

### Rate Summary

| | Discount | Net |
|---|---|---|
| 1.3 hours | -518.75 | 7,158.75 |
| 3.2 hours | -475.00 | 2,195.00 |
| 2.3 hours | -306.00 | 2,515.50 |
| | | 11,869.25 |

### Itemized Listing of Services

| Date | Description | Initials | Rate | Time | Amount | Disc. | Case | Date | Description (Comparable Entry) | Rate | Time | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/13/2022 | Meet with clients for consultation. | CS | 415 | 0.80 | 332.00 | -166.00 | Roberson | 09/27/2022 | Meet with client for initial bankruptcy evaluation | A | 1.50 | 290.50 |
| 06/13/2022 | Meeting with client concerning budget and the numbers looking like they won't work for a bankruptcy case. | CS | 415 | 0.80 | 332.00 | 0.00 | Roberson | | Meeting with client regarding budget/Zoom with client for a second budget analysis | A | 1.50 | 622.50 |
| 06/13/2022 | Third meeting with client regarding amended budget numbers. Discuss at length living within those numbers. Discuss bills that bankruptcy won't discharge. Discuss filing timeline. | CS | 415 | 0.40 | 166.00 | 0.00 | Roberson | | Meeting with client regarding budget/Zoom with client for a second budget analysis | A | 1.50 | 622.50 |
| 06/13/2022 | Receive and review email from client attaching budget. | ASW | 150 | 0.10 | 15.00 | -10.00 | | | | | | |
| 06/17/2022 | Call from client. She had questions concerning taxes. She said that she believes the tax information she gave us is incorrect. Provided correct tax information. | ASW | 150 | 0.30 | 45.00 | 0.00 | | | | | | |
| 06/18/2022 | Receive and review documentation needed to prepare schedules from client. Organize documentation and add to client's electronic file. | TLB | 135 | 0.30 | 40.50 | -25.50 | Roberson | 11/13/2022 | Receive and review documentation needed to prepare schedules from client. Organize documentation and add to client's electronic file. | P | 0.20 | 27.00 |
| 06/18/2022 | Receive and review documentation needed to prepare schedules from client. Organize documentation and add to client's electronic file. | TLB | 135 | 1.40 | 189.00 | -119.00 | Roberson | 11/13/2022 | Receive and review documentation needed to prepare schedules from client. Organize documentation and add to client's electronic file. | P | 0.20 | 27.00 |
| 06/19/2022 | Receive and review documentation needed to prepare schedules from client. Organize documentation and add to client's electronic file. | TLB | 135 | 1.80 | 243.00 | -153.00 | Roberson | 11/13/2022 | Receive and review documentation needed to prepare schedules from client. Organize documentation and add to client's electronic file. | P | 0.20 | 27.00 |
| 06/19/2022 | Prepare petition and schedules. | TLB | 135 | 1.90 | 256.50 | 0.00 | | | | | | |
| 06/20/2022 | Call from client. Answer questions concerning life insurance policy, social security document, garbage bill, listing assets in bankruptcy case. | ASW | 150 | 0.20 | 30.00 | 0.00 | | | | | | |
| 06/20/2022 | Call from client regarding life insurance policy. | ASW | 150 | 0.10 | 15.00 | 0.00 | | | | | | |
| 06/20/2022 | Continue preparing schedules. | TLB | 135 | 0.70 | 94.50 | 0.00 | | | | | | |
| 06/21/2022 | Do background check. Review file concerning filing timeline and issues with filing now. | ASW | 150 | 0.20 | 30.00 | 0.00 | | | | | | |
| 06/21/2022 | Work with I, J, MT, and Plan. | ASW | 150 | 1.20 | 180.00 | 0.00 | | | | | | |
| 06/21/2022 | Continue preparing schedules. | TLB | 135 | 1.10 | 148.50 | 0.00 | | | | | | |
| 06/22/2022 | Continue preparing schedules. | TLB | 135 | 0.40 | 54.00 | 0.00 | | | | | | |
| 06/23/2022 | Work with I, J, and MT. Prepare plan. | CS | 415 | 1.70 | 705.50 | 0.00 | | | | | | |
| 06/23/2022 | Continue preparing schedules. | TLB | 135 | 0.40 | 54.00 | 0.00 | | | | | | |

| Date | Description | Staff | Rate | Hours | Amount | Adj | Name | Date | Code | Hours | Amount | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/24/2022 | Call from client regarding UGI bill. | ASW | 150 | 0.20 | 30.00 | 0.00 | | | | | | |
| 06/24/2022 | Adjust I and MT, and special provisions attachment in plan. | ASW | 150 | 0.50 | 75.00 | 0.00 | | | | | | |
| 06/24/2022 | Receive and review documentation needed to prepare schedules from client. Organize documentation and add to client's electronic file. | TLB | 135 | 0.10 | 13.50 | -8.50 | Roberson | 11/13/2022 | P | 0.20 | 27.00 | Receive and review documentation needed to prepare schedules from client. Organize documentation and add to client's electronic file. |
| 06/25/2022 | Continue preparing schedules. | TLB | 135 | 1.20 | 162.00 | 0.00 | | | | | | |
| 06/26/2022 | Continue preparing schedules. | TLB | 135 | 1.80 | 243.00 | 0.00 | | | | | | |
| 06/26/2022 | Continue preparing schedules. | TLB | 135 | 1.50 | 202.50 | 0.00 | | | | | | |
| 06/29/2022 | Meet with paralegal to go over schedules, work on plan calculations, and address issues that she had flagged for me. | CS | 415 | 0.60 | 249.00 | 0.00 | | | | | | |
| 06/29/2022 | Continue preparing schedules. | TLB | 135 | 1.70 | 229.50 | 0.00 | | | | | | |
| 06/30/2022 | Continue preparing schedules. | TLB | 135 | 1.80 | 243.00 | 0.00 | | | | | | |
| 07/01/2022 | Continue preparing schedules. | ASW | 150 | 2.70 | 405.00 | 0.00 | | | | | | |
| 07/01/2022 | Draft post-filing instructions for client, draft plan attachment and complete my review of petition and schedules. | CS | 415 | 1.70 | 705.50 | 0.00 | | | | | | |
| 07/01/2022 | Continue preparing schedules. | TLB | 135 | 0.30 | 40.50 | 0.00 | | | | | | |
| 07/01/2022 | Call to client to ask for information regarding taxes, wage garnishment, and life insurance. | TLB | 135 | 0.40 | 54.00 | 0.00 | | | | | | |
| 07/01/2022 | Receive, review, and respond to email from Leininger with Portnoff Law garbage fee balances. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 07/02/2022 | Generate, review, and revise schedules. | TLB | 135 | 0.40 | 54.00 | 0.00 | | | | | | |
| 07/03/2022 | Zoom meeting with client. Discussed the difficulty they would have in making a payment large enough to cure the garbage fees arrears. They are going to re-consider and we will meet again. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 07/05/2022 | Email to Schuman regarding deposition continuance. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 07/05/2022 | Receive, review, and respond to email from Hannum regarding rescheduling deposition and allowing 30- day extension to respond. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 07/05/2022 | Receive, review, and respond to email from Leininger with breakdown of garbage debts. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 07/11/2022 | Receive and review email from client with collection letter. | CS | 415 | 0.10 | 41.50 | 0.00 | R.B. Dwyer | 07/25/2023 | A | 0.10 | 38.50 | Review email and attachment from D. Verdugno re: RH Courtright collection activity |
| 07/12/2022 | Prep objection in Midland v. Dominic Decantis. | ASW | 150 | 0.10 | 15.00 | 0.00 | | | | | | |
| 07/12/2022 | Review message from client. Call to client. No answer, leave message regarding plan payment. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 07/12/2022 | Return call from client concerning Sarah's new employment and what that means for the bankruptcy. Client asked about letter he received. Discuss the same. Discuss garbage bill and timeline for filing. | CS | 415 | 0.20 | 83.00 | 0.00 | | | | | | |
| 07/12/2022 | Receive and review email from Dugan attaching breakdown of delinquencies and interest. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 07/12/2022 | Email to Dugan regarding delinquencies and interest accrued. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 07/18/2022 | Prep letter to clerk with objection. | ASW | 150 | 0.10 | 15.00 | -10.00 | | | | | | |
| 07/20/2022 | Receive and review email from client regarding Honda. He wants to call this company to find out if this is related to the deposition. | ASW | 150 | 0.10 | 15.00 | 0.00 | | | | | | |
| 07/20/2022 | Call to client re phone message. He is going to go to court tomorrow to get a copy of the complaint and figure out the deal with Honda and Bank of America. They are to call us tomorrow to let us know what happened. | CS | 415 | 0.20 | 83.00 | 0.00 | | | | | | |

Case 3:25-cv-01927-KM   Document 14-1   Filed 03/25/26   Page 82 of 126

| Date | Description | | | | | |
|------|-------------|----|-----|------|-------|-------|
| 07/20/2022 | Email to Dugan concerning delinquencies. | CS | 415 | 0.10 | 41.50 | 0.00 |
| 07/21/2022 | Receive, review, and respond to email from Dugan regarding interest on liens. | CS | 415 | 0.10 | 41.50 | 0.00 |
| 07/21/2022 | Email to Dugan regarding interest accruing. | CS | 415 | 0.10 | 41.50 | -41.50 |
| 07/22/2022 | Call to client to find out how he made out at court. No answer, leave message. | ASW | 150 | 0.10 | 15.00 | -15.00 |
| 07/25/2022 | Receive and review email from client regarding case search. Review file. Email to client with specific instructions. | ASW | 150 | 0.10 | 15.00 | 0.00 |
| 07/27/2022 | Email to client regarding update concerning complaint from Judge Gallaghers. | ASW | 150 | 0.10 | 15.00 | -15.00 |
| 07/27/2022 | Email to Dugan asking after response to two emails. | CS | 415 | 0.10 | 41.50 | 0.00 |
| 07/28/2022 | Receive and review email from Dugan regarding waiting on a response from his client and probably getting back to me in a couple of days. | CS | 415 | 0.10 | 41.50 | -41.50 |
| 07/29/2022 | Receive, review, and respond to email from client regarding no update on complaint yet. | ASW | 150 | 0.10 | 15.00 | -15.00 |
| 08/01/2022 | Receive and review phone message from client regarding magistrate's office records. Call to client. No answer, leave message. | CS | 415 | 0.10 | 41.50 | 0.00 |
| 08/01/2022 | Return call from client. Discuss Sarah's employment. Discuss judgment against client. | CS | 415 | 0.10 | 41.50 | 0.00 |
| 08/09/2022 | Review new plan calculations. | CS | 415 | 0.10 | 41.50 | 0.00 |
| 08/14/2022 | Email to Dugan to follow up on garbage debts. | CS | 415 | 0.10 | 41.50 | 0.00 |
| 08/15/2022 | Receive and review email from Dugan regarding waiving interest on penalty amounts and concerning liens. | CS | 415 | 0.10 | 41.50 | 0.00 |
| 08/15/2022 | Email to Dugan regarding interest, liens, and total balance due. | CS | 415 | 0.10 | 41.50 | -41.50 |
| 08/17/2022 | Email to client asking after stub. | ASW | 150 | 0.10 | 15.00 | -10.00 |
| 08/23/2022 | Receive and review phone message from Jim Wood at Portnoff. Call to Jim Wood. He handles the bankruptcy cases for Portnoff. He is going to send me a case that says that garbage fees count as a municipal claim. He says that § 7101's definition of municipal claim would cover garbage service. (Reading the definition, there is a decent argument either way.) He offered to waive the interest on the penalty amounts. I said I'm not OK with them charging that improperly, and then just offering to waive it when they are challenged. He'll get me the authority for that. He also said that he thinks there is a case pending on this issue in Scranton and that he'll find out and send that information to me as well. | CS | 415 | 0.30 | 124.50 | 0.00 |
| 08/23/2022 | Read statute. Email to ASW with instructions. | CS | 415 | 0.10 | 41.50 | 0.00 |
| 08/24/2022 | Email to client asking after stub. | ASW | 150 | 0.10 | 15.00 | -10.00 |
| 08/26/2022 | Receive, review, and respond to email from Wood regarding doing an investigation and getting back to us next week. | CS | 415 | 0.10 | 41.50 | -41.50 |
| 09/01/2022 | Review mortgage modification paperwork. | CS | 415 | 0.10 | 41.50 | 0.00 |

Case 5:22-bk-01826-MJC   Doc 48-2   Filed 04/29/24   Entered 04/29/24 15:51:16   Desc
Exhibit B - Bill   Page 3 of 9

| Date | Description | Initials | Rate | Hours | Amount | Adj. | Reviewer | Rev. Date | Review Description | Rev. Hours | Rev. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/04/2022 | Receive and review email from Wood. Read Portnoff's explanation of authority to charge interest on penalty portion of claim for garbage fees. Read cases Portnoff cited. Analyze and approve calculations. They offered to waive $428.45 in interest. We also need the plan to provide for any trash fees they owe for 2021 and 2022 since Portnoff isn't collecting those. | CS | 415 | 0.40 | 166.00 | 0.00 | | | | | |
| 09/04/2022 | Email to Wood regarding plan presently and asking after years 2018-2020. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | |
| 09/06/2022 | Edit to schedule J and Plan. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | |
| 09/07/2022 | Received and review email from James Wood. Review the plan. Email to ASW. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | |
| 09/21/2022 | Conference with CS and client regarding information to prepare case. | TLB | 135 | 1.00 | 135.00 | 0.00 | | | | | |
| 09/21/2022 | Meet with paralegal to finalize schedules and plan. | CS | 415 | 0.60 | 249.00 | 0.00 | | | | | |
| 09/21/2022 | Meeting with client to finalize bankruptcy documentation. | CS | 415 | 0.60 | 249.00 | 0.00 | | | | | |
| 09/22/2022 | Conference with CS and client to review petition. | TLB | 135 | 1.90 | 256.50 | 0.00 | | | | | |
| 09/22/2022 | Prepare petition for signatures and send to client and CS. | TLB | 135 | 0.20 | 27.00 | 0.00 | | | | | |
| 09/22/2022 | File petition and schedules and additional documents. | TLB | 135 | 0.50 | 67.50 | 0.00 | | | | | |
| 09/23/2022 | Prepare wage attachment motion, order, certificate of service, and letter to employer. | ASW | 150 | 0.20 | 30.00 | 0.00 | | | | | |
| 09/23/2022 | File motion for wage attachment. | ASW | 150 | 0.10 | 15.00 | 0.00 | | | | | |
| 09/24/2022 | Receive and review voicemail from client regarding IRA. Called client. Discussed savings account. Discuss system to ensure that mortgage payments are made on time. | CS | 415 | 0.20 | 83.00 | 0.00 | | | | | |
| 09/26/2022 | Call from client re mortgage payment and automatic billpay through bank. | CS | 415 | 0.30 | 124.50 | 0.00 | | | | | |
| 09/26/2022 | Receive, review, and respond to message from client regarding cashier's check and tracking from USPS, new savings account information, and automatic transfer request information. | TLB | 135 | 0.10 | 13.50 | 0.00 | | | | | |
| 09/27/2022 | Send documents required by trustee for 341 meeting to trustee. | ASW | 150 | 0.10 | 15.00 | -10.00 | | | | | |
| 09/28/2022 | Receive, review, and respond to email from Marcy at 1stopbk regarding certificate having incorrect case number. | ASW | 150 | 0.10 | 15.00 | 0.00 | | | | | |
| 09/28/2022 | Call from client. She said they thought they put the wrong case number on the check to the trustee. Review trustee portal. Payment was received. Inform client. | ASW | 150 | 0.10 | 15.00 | 0.00 | | | | | |
| 09/28/2022 | Receive and review Notice of Chapter 13 Bankruptcy Case. (Calendar hearing, email to client with hearing notice and instructions, enter 341 meeting/trustee information into file) | ASW | 150 | 0.30 | 45.00 | -30.00 | | Roberson | 11/13/2022 | Receive and review Notice of Chapter 13 Bankruptcy Case. Process checklist of tasks for after 341 meeting has been scheduled. (Calendar hearing, email copy of notice to client with letter regarding instructions and enclosing preparation questions, enter 341 meeting/trustee information into file), set task to do preparation call with client two weeks before meeting and prepare file for meeting.) | 0.30 | 15.00 |
| 09/28/2022 | Receive and review BNC certificate of notice re 341 notice. No undeliverable recipients. NAN. | ASW | 150 | 0.10 | 15.00 | -15.00 | | | | | |

81

| Date | Description | Code | Rate | Hours | Amount | Adj |
|---|---|---|---|---|---|---|
| 09/29/2022 | Receive and review objection to plan. Call to client regarding mortgage company filing objection. Discuss modification payments and discrepancy. | CS | 415 | 0.10 | 41.50 | 0.00 |
| 09/29/2022 | Call to Attorney Daniel Jones at Stern & Eisenberg. Discuss objection and plan. Ask Jones to withdraw objection. Discuss mortgage payments, modification, and discrepancy with numbers. I said I would wait a week to see the proof of claim and to see if he withdraws his objection. If they don't withdraw, I would want his clients to show the authority for their objection. | CS | 415 | 0.40 | 166.00 | 0.00 |
| 09/30/2022 | Receive, review, and respond to email from Marcy at 1stopbk regarding filing certificate. | ASW | 150 | 0.10 | 15.00 | -15.00 |
| 09/30/2022 | Receive and review email from Jones regarding the handling of mortgage claim in a previous case and attaching Decantis mortgage claim. | CS | 415 | 0.10 | 41.50 | 0.00 |
| 09/30/2022 | Receive and review email from client regarding paperwork they received from the mortgage company. | CS | 415 | 0.10 | 41.50 | 0.00 |
| 10/03/2022 | Call from client regarding mortgage payment change and amount to pay mortgage company. | ASW | 150 | 0.10 | 15.00 | 0.00 |
| 10/03/2022 | Receive and review letter from Select Portfolio Servicing regarding representation. | ASW | 150 | 0.10 | 15.00 | 0.00 |
| 10/03/2022 | Analyze proof of claim 1 filed on the docket. | ASW | 150 | 0.20 | 30.00 | 0.00 |
| 10/04/2022 | Receive and review order granting wage attachment. | ASW | 150 | 0.10 | 15.00 | -15.00 |
| 10/04/2022 | Analyze proof of claim 2 filed on the docket. | ASW | 150 | 0.20 | 30.00 | 0.00 |
| 10/04/2022 | Analyze proof of claim 3 filed on the docket. Prep new payment address letter to client. | ASW | 150 | 0.20 | 30.00 | 0.00 |
| 10/04/2022 | Receive and review bnc certificate of notice for order granting wage attachment. Employer served. NAN. | ASW | 150 | 0.10 | 15.00 | -15.00 |
| 10/04/2022 | Call to client's employer regarding wage garnishment and bankruptcy plan payments. | CS | 415 | 0.30 | 124.50 | 0.00 |
| 10/04/2022 | Review paralegal's analysis of claim 3. Mortgage looks current. They have unapplied funds. If those funds were applied, it would be current. They did a recalculation with the escrow analysis and I think that is the issue here. | CS | 415 | 0.20 | 83.00 | 0.00 |
| 10/04/2022 | Receive and review paralegal's analysis of claim 1 filed on the docket. No letter needed. | CS | 415 | 0.10 | 41.50 | 0.00 |
| 10/04/2022 | Receive and review paralegal's analysis of claim 2 filed on the docket. No letter needed. | CS | 415 | 0.10 | 41.50 | 0.00 |
| 10/05/2022 | Receive and review email from client confirming she made mortgage changes. | ASW | 150 | 0.10 | 15.00 | 0.00 |
| 10/06/2022 | Receive and review letter from Select Portfolio regarding lien subject to bankruptcy. | ASW | 150 | 0.10 | 15.00 | 0.00 |
| 10/06/2022 | Receive and review email from client regarding returned mail notice to Powerpay. Message to client regarding returned mail and asking for new address. | ASW | 150 | 0.10 | 15.00 | 0.00 |

82

| Name | Date | Description | Code | Hours | Amount |
|---|---|---|---|---|---|
| Roberson | 12/12/2022 | Receive and review objection to plan filed by Mario Hanyon for Wells Fargo | A | 0.10 | 41.50 |
| Roberson | 01/17/2023 | Call from McHale regarding objection. Discuss our positions concerning bottom line number on MT (discussed expenses at length), secured claim not listed in plan, and special provision concerning length of plan. | A | 0.80 | 332.00 |
| Roberson | 12/09/2022 | Analyze proof of claim 1 filed on the docket. | P | 0.20 | 30.00 |
| Roberson | 12/09/2022 | Analyze proof of claim 1 filed on the docket. | P | 0.20 | 30.00 |
| Roberson | 12/09/2022 | Analyze proof of claim 1 filed on the docket. | P | 0.20 | 30.00 |
| Roberson | 02/03/2023 | Review paralegal's analysis of proof of claim for signature loan cosigned by Greg (MCU). Evaluate treatment of the same in plan. | A | 0.10 | 41.50 |
| Roberson | 02/03/2023 | Review paralegal's analysis of proof of claim for signature loan cosigned by Greg (MCU). Evaluate treatment of the same in plan. | A | 0.10 | 41.50 |
| Roberson | 02/03/2023 | Review paralegal's analysis of proof of claim for signature loan cosigned by Greg (MCU). Evaluate treatment of the same in plan. | A | 0.10 | 41.50 |

Case 3:25-cv-01927-KM   Document 14-1   Filed 03/25/26   Page 85 of 126

| Date | Description | | Rate | Hours | Amount | Adj | Name | Date | Description | Type | Hours | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/12/2022 | Receive and review email from Jones regarding arrears and paying them outside of plan. Analyze escrow calculations and interpretation of instructions for Form 401A and their argument that the intructions permit the escrow calculation. Call to opposing counsel. Discuss calculations, objection, and paying arrears. | CS | 415 | 0.50 | 207.50 | 0.00 | | | | | | |
| 10/21/2022 | Receive, review, and respond to email from client regarding wage attachment. | ASW | 150 | 0.10 | 15.00 | 0.00 | | | | | | |
| 10/22/2022 | Prepare Debtor's Motion for Sanctions Under Rule 9011 In Connection With Doc. 12. | CS | 415 | 1.20 | 498.00 | 0.00 | | | | | | |
| 10/22/2022 | Time for instructions to paralegal regarding finalizing and preparing the motions. | CS | 415 | 0.10 | 41.50 | -41.50 | | | | | | |
| 10/25/2022 | Review file and organize it in preparation for 341 meeting. | ASW | 150 | 0.90 | 135.00 | -90.00 | | | | | | |
| 10/25/2022 | Review file. Review plan. Prepare three letters to three companies serving plan. | ASW | 150 | 0.20 | 30.00 | 0.00 | | | | | | |
| 10/26/2022 | Prep letter with plan to fourth company (Midland Funding). | ASW | 150 | 0.10 | 15.00 | 0.00 | | | | | | |
| 10/26/2022 | Prepare 9011 motion for filing. | ASW | 150 | 0.20 | 30.00 | 0.00 | | | | | | |
| 10/27/2022 | Finish prepping 9011 motions. | ASW | 150 | 0.10 | 15.00 | 0.00 | | | | | | |
| 10/27/2022 | Review claims for unexpected amounts or classifications and corresponding impact on plan. Confirm that all necessary claims have either been filed or that a task has been set to ensure filing. Set task if any claim needs future attention (e.g., objections/lien avoidance.) Draft summary memo to atty. | ASW | 150 | 0.90 | 135.00 | 0.00 | Roberson | 01/06/2023 | Analyze all claims in comparison with the plan to confirm if any came in at an unexpected amount or class and how that may affect plan funding and/or confirmation, and what actions need to be taken with respect to the same. Confirm that all claims we want to be filed have been filed, and, if not, set tasks for their deadline to be filed and to confirm they have been. Analyze whether we should object to any claims filed. Set any tasks required for future action to be taken (objections/lien avoidance/step plan/selling/surrendering property.) Draft memo to CS summarizing claims and case status. | P | 0.90 | 135.00 |
| 10/27/2022 | Review 9011 motion from ASW. Edit proposed orders. | CS | 415 | 0.30 | 124.50 | 0.00 | | | | | | |
| 10/27/2022 | Email to Jones asking if he would accept service of 9011 motions. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 10/28/2022 | Receive, review, and respond to email from client regarding zoom link for Monday. | ASW | 150 | 0.10 | 15.00 | -10.00 | | | | | | |
| 10/28/2022 | Receive and review email from Jones concerning not being authorized to accept service on client's behalf. | CS | 415 | 0.10 | 41.50 | -41.50 | | | | | | |
| 10/31/2022 | Prepare for 341 meeting. | CS | 415 | 0.20 | 83.00 | 0.00 | | | | | | |
| 10/31/2022 | Review ASW's analysis of claims filed and not yet filed. Advised that we do not need to file a not-yet-filed claim for Midland, and that we will not object to the unsecured status that is alleged on the claims of two holders of judicial liens. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 10/31/2022 | Meeting with client to prepare for 341 meeting. . | CS | 415 | 0.30 | 124.50 | 0.00 | Roberson | 01/09/2023 | Pre 341 meeting with client. | A | 0.70 | 290.50 |
| 10/31/2022 | Attend 341 Meeting. | CS | 415 | 0.50 | 207.50 | 0.00 | Roberson | 01/09/2023 | Attend 341 Meeting | A | 0.30 | 124.50 |
| 10/31/2022 | Review and approve certificate of service for sanctions motions. | CS | 415 | 0.10 | 41.50 | -41.50 | | | | | | |
| 10/31/2022 | File certificate of service. | ASW | 150 | 0.10 | 15.00 | 0.00 | Roberson | 01/24/2023 | File Request For Payment | P | 0.10 | 15.00 |
| 10/31/2022 | Memo to ASW regarding notes for the file from 341 hearing and agreement reached with McHale regarding continuation of confirmation hearing. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |

83

Case 5:22-bk-01826-MJC   Doc 48-2   Filed 04/29/24   Entered 04/29/24 15:51:16   Desc
Exhibit B - Bill   Page 6 of 9

| Date | Description | By | Rate | Hrs | Amount | Adj. | Reviewer | Rev. Date | Reviewer Description | Cat | Rev. Hrs | Rev. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/31/2022 | Receive and review email from Kim DeSanto, legal secretary for Attorney Wood, regarding my client's plan to include the debt owed to the city of Scranton. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 11/04/2022 | Receive, review, and respond to email from client regarding wage garnishment check being sent to them instead of trustee. | ASW | 150 | 0.10 | 15.00 | 0.00 | | | | | | |
| 11/04/2022 | Receive and review email from client regarding people who handle Dom's checks. | ASW | 150 | 0.10 | 15.00 | -15.00 | | | | | | |
| 11/04/2022 | Receive and review email from client regarding speaking to employer and having the situation cleared up. | ASW | 150 | 0.10 | 15.00 | -15.00 | | | | | | |
| 11/04/2022 | Analyze claim 4 filed on the docket. | ASW | 150 | 0.30 | 45.00 | 0.00 | Roberson | 12/09/2022 | Analyze proof of claim 1 filed on the docket. | P | 0.20 | 30.00 |
| 11/04/2022 | Receive and review certification that 341 meeting held and confirmation hearing date set. Calendar confirmation hearing date. Draft letter to client regarding the same. Draft pre-confirmation certification. Review file to confirm all tax returns required to be filed have been filed. | ASW | 150 | 0.30 | 45.00 | -30.00 | R.B. Dwyer | 10/23/2023 | Emails from and to D. Verdugo re confirmation hearing date | A | 0.05 | 24.50 |
| 11/04/2022 | Review paralegal's analysis of claim 4. | CS | 415 | 0.10 | 41.50 | 0.00 | Roberson | 12/09/2022 | Analyze proof of claim 1 filed on the docket. | P | 0.20 | 30.00 |
| 11/04/2022 | Receive and review objection to Ch 13 plan filed on docket. | CS | 415 | 0.10 | 41.50 | 0.00 | Roberson | 12/12/2022 | Receive and review objection to plan filed by Mario Hanyon for Wells Fargo | A | 0.10 | 41.50 |
| 11/09/2022 | Receive and review signed pre-confirmation certification. File the same. | ASW | 150 | 0.10 | 15.00 | 0.00 | Roberson | 01/24/2023 | Receive and review signed pre-confirmation certification. File the same. | P | 0.10 | 15.00 |
| 11/09/2022 | Receive and review withdrawal of objection to confirmation of plan filed on docket. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 11/15/2022 | Prepare Request for Payment. | ASW | 150 | 0.10 | 15.00 | 0.00 | | | | | | |
| 11/16/2022 | File Request for Payment. | ASW | 150 | 0.10 | 15.00 | 0.00 | Roberson | 01/24/2023 | File Request For Payment | P | 0.10 | 15.00 |
| 11/17/2022 | Receive and review message from client regarding wage garnishment. Call to accountant. Accountant prepares the checks and sends them to employer. Call to Dom. Dom was at work. Spoke with Natasha. Natasha will rectify error and mail the checks. | ASW | 150 | 0.20 | 30.00 | 0.00 | | | | | | |
| 11/22/2022 | Analyze proof of claim 5 filed on the docket. | ASW | 150 | 0.20 | 30.00 | 0.00 | Roberson | 12/09/2022 | Analyze proof of claim 1 filed on the docket. | P | 0.20 | 30.00 |
| 11/23/2022 | Call to Jones' office. Nick Miller, managing paralegal, said the continuance of the hearing is acceptable. Email to trustee. | ASW | 150 | 0.10 | 15.00 | 0.00 | | | | | | |
| 11/23/2022 | Review paralegal's analysis of claim 5. | CS | 415 | 0.10 | 41.50 | 0.00 | Roberson | 02/03/2023 | Review paralegal's analysis of proof of claim for signature loan cosigned by Greg (MCU). Evaluate treatment of the same in plan. | A | 0.10 | 41.50 |
| 11/23/2022 | Receive and review email from trustee's regarding continuing confirmation hearing to 01/05. | ASW | 150 | 0.10 | 15.00 | -15.00 | | | | | | |
| 11/23/2022 | Review email from trustee's office asking to continue the confirmation hearing. Reply to email and give consent to continuance. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 11/23/2022 | Receive email from trustee's office regarding continuing confirmation hearing. Reply to email and give consent to continuance. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 11/23/2022 | Receive and review email from trustee's office regarding reaching out to attorney Jones and his return to office before the confirmation hearing. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 11/28/2022 | Call to client to inform him he doesn't have to attend hearing tomorrow and that it is going to be continued to January. | ASW | 150 | 0.10 | 15.00 | -10.00 | | | | | | |
| 12/02/2022 | Analyze proof of claim 6 filed on the docket. Email analysis to CS. | ASW | 150 | 0.20 | 30.00 | 0.00 | Roberson | 12/09/2022 | Analyze proof of claim 1 filed on the docket. | P | 0.20 | 30.00 |
| 12/06/2022 | Email to Resurgent requesting documents upon which claim is based. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |

84

| Date | Description | TK | Rate | Hours | Amount | Adj. | Reviewer | Rev. Date | Reviewer Note | Class | Rev. Hrs | Rev. Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/07/2022 | Receive and review notice of rescheduled confirmation hearing. | ASW | 150 | 0.10 | 15.00 | 0.00 | | | | | | |
| 12/13/2022 | Email to client with objection withdrawal, pre-confirmation certification of compliance, and cert of service of plan, and request for pmt filed on the docket. | ASW | 150 | 0.10 | 15.00 | -10.00 | Roberson | 01/18/2023 | Email to client with objection filed on the docket and cert of service. | P at S rate | 0.10 | 5.00 |
| 12/14/2022 | Receive and review withdrawal of claim 6 filed on the docket. | ASW | 150 | 0.10 | 15.00 | 0.00 | R.B. Dwyer | 09/11/2023 | Review withdrawal of Pathward claim | A | 0.05 | 24.50 |
| 12/19/2022 | Prepare lien avoidance motions (3). | ASW | 150 | 0.60 | 90.00 | 0.00 | | | | | | |
| 12/20/2022 | Review lien avoidance motions. | CS | 415 | 0.30 | 124.50 | -20.75 | | | | | | |
| 12/22/2022 | File and serve three motions to avoid liens. | ASW | 150 | 0.30 | 45.00 | 0.00 | | | | | | |
| 12/27/2022 | Review file to confirm there are no barriers to plan being confirmed. Call to client regarding delinquent payments. No answer, leave message. | ASW | 150 | 0.30 | 45.00 | 0.00 | | | | | | |
| 12/27/2022 | Email to McHale regarding entireties exemptions and whether the objection can be withdrawn. | ASW | 150 | 0.20 | 30.00 | 0.00 | | | | | | |
| 12/28/2022 | Call with client regarding payments. | ASW | 150 | 0.10 | 15.00 | -15.00 | | | | | | |
| 12/28/2022 | Receive, review, and respond to email from client with receipt and tracking information for check to trustee. | ASW | 150 | 0.10 | 15.00 | -15.00 | | | | | | |
| 12/28/2022 | Receive and review email from client regarding wage garnishment. | ASW | 150 | 0.20 | 30.00 | 0.00 | | | | | | |
| 12/28/2022 | Second call with client regarding missed plan payments. | ASW | 150 | 0.10 | 15.00 | 0.00 | | | | | | |
| 12/29/2022 | Receive, review, and respond to email from client with overnight receipt for 10/21 check. | ASW | 150 | 0.10 | 15.00 | -15.00 | | | | | | |
| 12/29/2022 | Call from client regarding missing trustee payment and check. | ASW | 150 | 0.20 | 30.00 | 0.00 | | | | | | |
| 12/29/2022 | Receive and review email from Bowers at trustee's regarding updates on objections. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 01/03/2023 | Receive and review withdrawal (objection to plan) filed on docket. | CS | 415 | 0.10 | 41.50 | 0.00 | R.B. Dwyer | 09/11/2023 | Review withdrawal of Pathward claim | A | 0.05 | 24.50 |
| 01/03/2023 | Call with client. He tried to track the trustee check down and they are assuming it got lost in the mail. They are going to call the accountant and cancel the check and then reissue a new check. | ASW | 150 | 0.10 | 15.00 | 0.00 | | | | | | |
| 01/04/2023 | Receive and review email from client with tracking for 12/02 check sent to trustee. | ASW | 150 | 0.10 | 15.00 | -15.00 | | | | | | |
| 01/04/2023 | Call to client to let him know he doesn't have to go to confirmation hearing. | ASW | 150 | 0.10 | 15.00 | -10.00 | R.B. Dwyer | 10/23/2023 | Emails from and to D. Verdugo re confirmation hearing date | A | 0.05 | 24.50 |
| 01/05/2023 | Receive and review email from client regarding sending 12/02 check. | ASW | 150 | 0.10 | 15.00 | -10.00 | | | | | | |
| 01/09/2023 | Email to client with withdrawal of objection and order confirming plan. | ASW | 150 | 0.10 | 15.00 | -10.00 | Roberson | 01/18/2023 | Email to client with objection filed on the docket and cert of service. | P at S rate | 0.10 | 5.00 |
| 01/13/2023 | Receive and review electronic notice of filing: Order Confirming Plan. Update file to reflect same. Serve order (prepare mailing, certificate of service, file the same.) | ASW | 150 | 0.30 | 45.00 | 0.00 | | | | | | |
| 01/18/2023 | Email to client with certificate of service filed on docket. | ASW | 150 | 0.10 | 15.00 | -10.00 | Roberson | 01/18/2023 | Email to client with objection filed on the docket and cert of service. | P at S rate | 0.10 | 5.00 |
| 02/07/2023 | Receive and review orders granting motion to avoid lien of LVNV (2) and Midland. Prepare letters to court asking for certified orders. | ASW | 150 | 0.20 | 30.00 | 0.00 | | | | | | |
| 02/10/2023 | Receive and review email from case administrator with certified orders avoiding liens. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 05/04/2023 | Receive and review message from client asking about roof warranty and whether that was affected by the bankruptcy filing. | CS | 415 | 0.10 | 41.50 | 0.00 | | | | | | |
| 07/20/2023 | Review notice of mortgage payment change. Email to client regarding the same. | ASW | 150 | 0.50 | 75.00 | 0.00 | | | | | | |

| Date | Description | | | | | | |
|---|---|---|---|---|---|---|---|
| 09/27/2023 | Email to Jones regarding escrow calculation. | CS | 415 | 0.10 | 41.50 | 0.00 | |
| 10/04/2023 | Email to Jones asking for response on escrow recalc. | CS | 415 | 0.10 | 41.50 | -41.50 | |
| 10/04/2023 | Receive, review, and respond to email from Jones regarding insurance. | CS | 415 | 0.10 | 41.50 | 0.00 | |
| 10/11/2023 | Email to Jones. to follow up on escrow recalculation. | CS | 415 | 0.10 | 41.50 | 0.00 | |
| 10/11/2023 | Receive and review email from Jones regarding clients new policy. | CS | 415 | 0.10 | 41.50 | 0.00 | |
| 10/30/2023 | Receive and review notice of mortgage payment change. | ASW | 150 | 0.20 | 30.00 | 0.00 | |
| 12/01/2023 | Review notice of mortgage payment change. | ASW | 150 | 0.20 | 30.00 | 0.00 | |
| | | | | Sub-total Fees: | **13,169.00** | -1299.75 | |
| | | | | Net Fees After Discount: | **11,869.25** | | |

**Expenses**

| Date | Description | Price | Units | Amount | Discount |
|---|---|---|---|---|---|
| 06/21/2022 | Accurint search. | 19.57 | 1 | 19.57 | 0.00 |
| 07/05/2022 | Best Case fee. | 8.00 | 1 | 8.00 | 0.00 |
| 09/23/2022 | Filing Fee. | 313.00 | 1 | 313.00 | 0.00 |
| 02/09/2023 | Filing Fee. | 11.00 | 3 | 33.00 | 0.00 |
| 06/20/2022 | Fax Received from Dominic Decantis regarding Life Insurance Policy. | 0.50 | 0 | 0.05 | 0.00 |
| 06/20/2022 | Fax Received from The Baltimore Life Insurance Company regarding Dominic Decantis' Life Insurance Policy. | 0.50 | 0 | 0.05 | 0.00 |
| 06/20/2022 | Fax Received from The Baltimore Life Insurance Company regarding Dominic Decantis' Life Insurance Policy. | 0.50 | 0 | 0.05 | 0.00 |
| 12/22/2022 | Postage for motion to avoid lien to Midland Funding, LLC (Officer, Managing, or General Agent). | 1.00 | 8 | 8.09 | 0.00 |
| 12/22/2022 | Postage for motion to avoid lien to Midland Funding, LLC. | 1.00 | 8 | 8.09 | 0.00 |
| 12/22/2022 | Postage for motion to avoid lien to Hayt, Hayt & Landau, LLC (Officer, Managing, or General Agent). | 1.00 | 8 | 8.09 | 0.00 |
| 12/22/2022 | Postage for motion to avoid lien to Resurgent Capital services as Servicer for LVNV Funding, LLC (Second Lien). | 1.00 | 8 | 8.09 | 0.00 |
| 12/22/2022 | Postage for motion to avoid lien to LVNV Funding (Officer, Managing, or General Agent). | 1.00 | 8 | 8.09 | 0.00 |
| 12/22/2022 | Postage for motion to avoid lien to LVNV Funding (Officer, Managing, or General Agent)(Second Lien). | 1.00 | 8 | 8.09 | 0.00 |
| 12/22/2022 | Postage for motion to avoid lien to Resurgent Capital services as Servicer for LVNV Funding, LLC. | 1.00 | 8 | 8.09 | 0.00 |
| 01/13/2023 | Postage and cost for service of Order confirming plan to creditors | 1.00 | 20 | 19.50 | 0.00 |
| | | | | ====== | |
| | | | Total: | **449.85** | |

**Total**

Net Fees After Discount: 11,869.25
Net Expenses After Discount: 449.85
======
12,319.10

Total post-discounted value of entries containing "email": 1,473.50
As a percentage of the total fees: 12.4%

EXHIBIT G

87

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF PENNSYLVANIA
WILKES-BARRE DIVISION

| | |
|---|---|
| IN RE: | ) Case No. 5:22-bk-01826-MJC |
| | ) Chapter 13 |
| DOMINIC JOSEPH DeCANTIS, | ) |
| | ) Via Teleconference |
| | ) 274 Max Rosenn U.S. Courthouse |
| Debtor. | ) 197 South Main Street |
| | ) Wilkes-Barre, PA 18701 |
| | ) |
| | ) August 7, 2024 |
| | ) 10:08 a.m. |

TRANSCRIPT OF APPLICATION FOR ALLOWANCE OF COMPENSATION AND
EXPENSES (48) FILED BY DEBTOR; OBJECTION FILED BY TRUSTEE (49)
BEFORE HONORABLE MARK J. CONWAY
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES VIA TELECONFERENCE:

| | |
|---|---|
| For the Debtor: | Sabatini Law Firm |
| | By:  CARLO SABATINI, ESQ. |
| | 216 N. Blakely Street |
| | Dunmore, Pennsylvania 18512 |
| | |
| For the Chapter 13 | Jack N. Zaharopoulos, |
| Trustee: | Standing Chapter 13 Trustee |
| | By:  AGATHA R. McHALE, ESQ. |
| | 8125 Adams Drive, Suite A |
| | Hummelstown, Pennsylvania 17036 |
| | |
| Audio Operator: | Lyndsey Price |
| | |
| Transcription Service: | TRANSCRIPTS PLUS, INC. |
| | 435 Riverview Circle |
| | New Hope, Pennsylvania 18938 |
| | Telephone:  215-862-1115 |
| | e-mail CourtTranscripts@aol.com |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

88

THE COURT:  We are here today, today being Wednesday, August 7th, 2024, in the case of Dominic Joseph DeCantis, Case Number 22-1826.  This is the application of allowance of compensation and expenses filed by the debtor at Docket Number 48; and the objection to that application filed by the Trustee at Docket 49.

I will also indicate that counsel for the debtor and counsel for the Trustee had met or had meetings.  And I think the objection, as far as the Trustee is concerned, was resolved via the filing of a stipulation at Docket 52 on July 18, 2024.  That stipulation essentially indicated that the parties agreed to reduce the debtor's counsel's application by the amount of $3,354.50.  That stipulation does not identify what entries were agreed to be reduced specifically, so I'm not sure where that number comes from.

But I will also indicate that where we started in the application, the fees requested were 11,869.25, and expenses were 449.85.

Mr. Sabatini had received a retainer of $500, and a payment by the debtor of $313, which represented the advanced cost for the filing fee.

The total application indicated 57.2 total hours, less a courtesy discount of some sort of 6.8 hours, for a net of 50.4 hours.

Does that sound correct, Mr. Sabatini?

Case 5:22-bk-01826-MJC    Doc 62    Filed 02/03/25    Entered 02/03/25 09:38:54    Desc
Main Document    Page 2 of 37

3

MR. SABATINI:  It sounds correct.  I haven't double-checked all the math, but it doesn't sound wrong.

THE COURT:  Okay.  Well, I'm not intentionally giving you any wrong numbers.  I think I'm reading from the proper documents.

MR. SABATINI:  Sure.

THE COURT:  So, Ms. McHale, you objected to this fee application.  Why don't you tell me where the Trustee's at today?

MS. McHALE:  Well, Your Honor, we went through -- what we did was, in addition to this fee app, there were at least nine other fee apps.  And we -- after we had reviewed a certain number of them, we had come to a consensus, I think, on certain entries that we agreed could be used to -- that could be reduced, and then I think that caused us to come back to this one.

Now, I know when this proposal was made -- and this is color-coded.  I have a [sic] itemized listing of services, and we have it color-coded that would explain the changes that we made.  So, if Your Honor wants me to --

THE COURT:  Let me interrupt you.  Was that filed?

MS. McHALE:  No, I don't think that was filed as part of the -- that was part of the settlement negotiations.

THE COURT:  Can that --

MS. McHALE:  But I'm --

4

THE COURT:  Can that be filed?

MS. McHALE:  Mr. Sabatini, do you -- you -- what are your feelings on that?  I would be fine with that.

MR. SABATINI:  Yeah, I have no objection to filing it.  I mean, if it -- if it -- it would be faster, if Your Honor just wants to see it right now, I could email it.  I have it -- I have it up.

THE COURT:  Well, just file it on the record as an exhibit -- on the docket as an exhibit, and I'll look at it.

MR. SABATINI:  Okay.  Let me forward this to --

THE COURT:  So, there's -- that -- and I'll call it an exhibit.  That exhibit that we're talking about, that specifically identifies how you two got to the stipulated amount of 3,354.50?

MS. McHALE:  I believe it does.  Would you agree with that, Carlo?  Because you attached this to the proposal when you sent it to me.

MR. SABATINI:  And so --

MS. McHALE:  Are we looking for the same thing?  It's nine pages.

MR. SABATINI:  Right.  And the -- the net fee after the discount on that was 5,983.25.  Does that line up with -- oh, I'm sorry.  No, that's not wrong [sic] -- that's --

MS. McHALE:  No, because we reduced --

MR. SABATINI:  (Indiscernible - multiple speakers).

5

MS. McHALE:  -- it by 3,000.

MR. SABATINI:  Yeah, 8,514.75, right.  So, that -- and then 449, right.  So, this shows where the -- where all of the additional discounts were made, right.

MS. McHALE:  Right.  Because the difference between those two numbers would be the 3,000, right?  At the -- at the bottom of it, it's 8,514.75 -- less 5,983.25 -- no, that's only 2,000.

THE COURT:  Okay.  Well, let's --

MS. McHALE:  But I think it's --

THE COURT:  Let's -- let me interrupt.  Why don't you two figure out what the exhibit should be, and upload it onto the docket as an exhibit to the fee app, or to the stipulation, perhaps, whatever you think is appropriate?  So, I could see that, and see what reductions the Debtor agreed to with the Trustee, and maybe that will help the Court.

However, I -- obviously, there were many fee applications that the Chapter 13 Trustee objected to and agreed -- there was an agreement reached via a stipulation.  Again, the Court was somewhat in the dark as far as what the specific resolution of each and every one of those files were.  But the ultimate fee, although it was on the high side of what I think is reasonable, I didn't find it to be outrageous.  And I think I approved -- if there was 13 objections in 13 cases, I think I approved 12 of them, and the only case left is this DeCantis.

6

Does that sound right, Ms. McHale?

MS. McHALE:  Yes.

THE COURT:  Okay.

MS. McHALE:  Yes, it does.

THE COURT:  DeCantis is still on my desk because I can't figure out, Mr. Sabatini, how you could spend 57 hours on this case.  And just my quick summary review of the case, and having practiced for 30 years doing Chapter 13 work, it seems to me to be a simple case.  There's six proofs of claims filed, and only six proofs of claims filed.  There was one mortgage, one car loan.  There were three judgments that you avoided via motions to avoid lien, and they were standard pro forma motions to avoid liens that didn't seem to be complicated or even objected to in any way, shape, or form.  There was only two general unsecured creditors in the schedules.

The debtor is a cook at a local restaurant called Camelot up in Clarks Summit, which actually is a very nice place.  A friend of mine owns that, and good food, good drink; not that that's necessarily relevant.  But he makes about $3,000 a month.

So, I can't understand, as being a former practitioner, how you can spend 50 or 60 hours on this case. In particular, I think the Trustee zeroed in on, as did I, there's 25, almost 26 hours of time just preparing the schedules, the means test, and the plan; that equated to

7

$5,000.

And when you look at these documents, you've got to step back and -- Ms. McHale, have you ever prepared schedules for a debtor?

MS. McHALE:  I did, but very few, and that was a lot of years ago.

THE COURT:  Okay.

MS. McHALE:  Nothing under the amendments, no.

THE COURT:  Okay.  Was that via, like, a -- did you have a software program at the time?

MS. McHALE:  We did.

THE COURT:  Okay.

MS. McHALE:  And most of that work would have been done by my paralegal, as I recall.

THE COURT:  Right.  So, really, what it is, it's data entry.  And the data being entered into the schedules -- I mean, if you took Schedule I and, in particular, Schedule J out of it, as far as the volume of numbers actually being entered, there's about 15 numbers, 20 numbers, 30 numbers, don't hold me.  But there's not thousands of numbers, not thousands of entries that get put into schedules.

So, Mr. Sabatini, in all of these cases that we've been going around and around on, I'm at a loss as to how you spent 26 hours preparing schedules.  And maybe, I guess what I'm asking you is, can you identify what, in particular, makes

8

this case so unique, or complicated, or complex to be almost double -- or more than double, perhaps almost triple what is the 4,500 PRF in this District?

MR. SABATINI:  I don't think that there's anything unusually complex about the case.  The agreement that was reached with the Trustee -- and that -- and my staff is in the process of filing that exhibit right now.  So, hopefully, Your Honor will be able to see it in a few moments.

But most of the time that was spent preparing the schedules was written off.  So, I -- and I've mentioned before that this -- this case is older.  All right, so these schedules were prepared over two years ago.  And since that time, because of the -- you know, what I've learned about the Court's concerns about how much time I've been spending, I've put in new programming and procedures that will provide a lot more detail about exactly what's happening when we're preparing the schedules, and how much time is being spent on various tasks.

And I -- in one of your opinions on one of my fee applications, you -- you -- and I'm paraphrasing here, you mentioned that, you know, the -- that there was substantial work, and you questioned whether that level of detail was necessary.  And so, part of my goal here is to show you, you know, I'm spending this many hours doing this.  If you think that that, you know, that the -- the cost benefit analysis of that effort is not worth it, then I'll stop doing that.  Right?

And I'll go through, and the parts of my process that you think are, you know -- you know, that maybe they make the schedules technically more accurate, but that that degree of accuracy is not necessary for most cases, I have no -- you know, I'll cut those things out, and we won't spend the time doing that.

I think that we are doing -- you know, as I mentioned in prior hearings, I think that there's a wide range of effort that can go into a case -- into, you know, a garden variety case. There's a wide range of detail that could be put into that case and still be considered reasonable. And I think that, you know, obviously we're on the higher end of that range. It doesn't mean lawyers who do less aren't doing a good job. It just means that we have different perspectives about how much should go into it. And if you are looking at the breakdowns that you're going to get into these later cases that show you, look, they spent two hours going through credit reports to make sure that they got every debt, and you don't think that that's worth that time, then we'll stop going through the credit reports to get every debt. Right?

So -- so, this -- so, part of the reason why in this case I agreed to take off most of the time spent preparing the schedules is because I recognize that in prior cases, without me being able to provide you with a more specific breakdown as to what's happening in each step of that process, you know, I'm not carrying my burden of showing where the time is being spent

10

preparing the schedules.

So, the future cases, you know, with the -- the later cases, you know, that have -- will have that additional detail. And that's where, you know, hopefully I could, you know, make further adjustments to my process to eliminate the things that you think aren't necessary.

THE COURT: Okay. Well, I appreciate that. But I do look at your billing. Unfortunately, I've had the distasteful task, if I can paraphrase the Third Circuit in *Busy Beaver* -- the last thing I wanted to do when I came on the bench is to dissect attorneys' fees and fee applications. And I will say, and I will repeat what I've said before, that I would guesstimate that 90 percent-plus of the fee applications that go by my desk are approved without comment, without adjustment. So, the less than 10 percent of fee applications that go to a hearing, or have an objection, or -- either by a creditor, or the trustee or objected to by the Court must really be out of the ordinary of what I see on a day-to-day basis and how I prepared for Chapter 13 cases, Chapter 7 cases, Chapter 11 cases. So, I don't -- from a percentage basis, it's probably much less than 10 percent actually get pulled and reviewed closely by the Court or are subjected to a hearing by the Court.

But I think the Trustee did an excellent job in her objections, and really identified pretty much what the Court

11

looks at, as well, as to what just does not appear to be reasonable. And as I sit here, and as I put myself back at my desk in my law office, I can't understand what you and your staff would spend all this time on in a case where there just isn't that many moving parts. Again, there's two creditors, two general unsecured creditors and three or four secured creditors.

And I'll just point as an example, Mr. Sabatini, June 23rd, 2022, this is three months before the case was filed, you charged 1.7 hours for $705, quote, "Work with I, J and M.T. Prepare plan." Now -- and this -- again, I don't -- this isn't in a vacuum. This is after your staff spent, I don't know, say, 10 hours preparing the schedules, which, again, only have 10, 20, 30, 40 entries in it. I don't know how you, as a billing attorney at $415 per hour, can charge 1.7 hours to review or work with I and J. And it leads me to believe that either your staff isn't doing anything prior to that point, and you're doing all the ditch-digging, to borrow from my *Badyrka* opinion, or you're just -- or they don't know what they're doing, or you're doing all the data entry on June 23rd, 2022.

So, she raised -- Ms. McHale raised the fact that there's no specificity in your description. And I guess, because of all this time entries, I don't know what you could have done for 1.7 hours. That's -- that's -- you know, that's

12

an hour and a half-plus of sitting there working on this simple case. And, you know, and, again, that's just one of the charges that you put in.

On July 1st, a couple of days later, you put another 1.7 in. On June 29th, before that, you put 0.6 in. September 21, another 0.6. And then September 21, another 0.6. I just don't understand what you, as an attorney at $415 per hour, could possibly be looking at that's lawyer-related and not data collection, data entry type-related.

So, maybe you can enlighten me as to what you're actually doing for all of that time.

MR. SABATINI: So, Your Honor, I don't remember exactly what I did for 1.7 hours two years ago. The --

THE COURT: But can you generalize what you did, or what you could have done? I'd ask you to guess what you could have been doing for all that time because, to me, again, I've prepared -- you probably know my numbers more than I do. I don't know how many Chapter 13s I prepared over the last 30 years, but I did a lot of them. I don't know if it's 100 or 1000 of them. But I know I never spent that kind of time on a simple Chapter 13 case.

I sit here today and I can't imagine what you could have done for all that time. And, again, maybe you have the time in your practice to sit and look at these numbers, and look at them again, and look at them again. But I just know

13

that I was a fairly busy practitioner, and I looked at it as best I did. I think I did a thorough job for my client. But I never ever spent that kind of time in a simple Chapter 13 case.

So, if you could tell me exactly what you think you could have done for, I don't know, five or six hours.

MR. SABATINI: Your Honor, I can't tell you exactly what I did. But I can tell you that I think I, J, the means test, and the plan is the lawyer's job in these -- not to go collect the data and to put that raw stuff in, but to see what we can do to try and reduce the plan's payment. I think that -- and I -- I think I'll request some discovery from the Trustee's Office to get some information about my statistics in terms of what my clients pay unsecured creditors, compared to the averages in the District. I -- I believe it's quite low. And --

THE COURT: Mr. Sabatini, again --

MR. SABATINI: And if --

THE COURT: -- I know we've been on these fishing expeditions before as far as all discovery and comparing your numbers versus others. I -- I'm not sure if that has any relevance to my decision-making.

MR. SABATINI: I --

THE COURT: But you certainly are more than --

MR. SABATINI: Your Honor, I disagree.

THE COURT: Well, you could -- you could request

Case 5:22-bk-01826-MJC    Doc 62    Filed 02/03/25    Entered 02/03/25 09:38:54    Desc
Main Document    Page 13 of 37

14

whatever you think is appropriate.

MR. SABATINI:  Here's why I think it's very relevant, because if by studying every number on the means test, and Schedule J, and I, I'm able to identify, even just $100 that I can -- of an expense that can be accounted for in the plan, a payment of $100 less a month, that's $6,000 over the course of a five-year case.

THE COURT:  Right.  This --

MR. SABATINI:  Right?  So --

THE COURT:  This one's a three-year case, though, I think.

MR. SABATINI:  Okay.  So, it's $3,600.  If I find just $100, right, and -- and I think that it's very relevant that if the time that I'm putting in here means that my clients pay substantially less, then it makes sense to my clients for that time to be spent.  I don't think -- I don't view a lawyer's job is just looking over the information that the paralegal put in and saying, "All right.  Well, that's what it is.  It is what it is, and I'll just file the plan, using those numbers."  I think my job is to study that, and figure out what can I do to try and make this --

THE COURT:  I --

MR. SABATINI:  -- more economical for my client.

THE COURT:  Mr. Sabatini, I think you're -- I agree with you.  I'm trying to understand if, you know -- I feel as

Case 5:22-bk-01826-MJC   Doc 62   Filed 02/03/25   Entered 02/03/25 09:38:54   Desc
Main Document   Page 14 of 37

15

though I could study it and, again I'm -- I'm estimating -- I'm trying to recall my own practice. And I'm -- just can't understand what you actually did that would take five or six hours to study these few numbers, and that's what I'm trying to get at. I mean, if you had I and J, and the means test, and the plan in front of you, which, by the way, are all pretty much generated via a software program. Now, there's some manipulation that attorneys can do, which is what you're talking about, and which is what I did. But I still don't understand how you could sit in front of these numbers, which really don't move around a lot, and shouldn't move around a lot. But what you did for -- on June 23rd for 1.7 hours.

MR. SABATINI: Your Honor, I don't know specifically --

THE COURT: Okay.

MR. SABATINI: -- what numbers I was looking at on June 23rd. Right? What numbers in Schedule J and the means test. I can tell you that it's real, that I'm not lying and saying I spent 1.7 hours. I have my staff -- and you could see two days before, my staff spent 1.2 hours working with I, and J, and the means test, and the plan. Right? So, I'm not doing the raw entry. I am analyzing those numbers, saying, all right, if we make it -- and it's the -- and the software -- the bankruptcy software does not do the job, in my opinion. And I -- I've shown you my spreadsheet. Right? I -- I haven't

16

really.  I've shown you a taste of my spreadsheet.  And it's very complicated, and adjustments to one small place can have substantial downstream effects on a lot of the calculations.  Right?  So, it takes a lot of time.

THE COURT:  But what?  What does?

MR. SABATINI:  And --

THE COURT:  That's what I'm trying to get at.  I mean -- and I'm really wrestling with understanding what you're actually doing that takes a lot of time.  There's not many numbers here, especially in this case.  This is -- this is a case that -- when I was going through all of the ones that the Trustee objected to, this one, to me, appears to be one of the more simple cases out of those -- I think it was 13, but don't hold me to that number.  Out of the 13, this one appeared to be one of the more simple cases, at least from the docket and the schedules, and the lack of any default in mortgage, default in car loan.  There were two objections to the plan; that got resolved.  But, again, that's all standard stuff.

So, I'm just trying to understand why this one, you billed 12 -- 11 -- $12,000 versus the other ones that I approved.  And I just don't see the difference in the case.  And, in fact, the difference that I see is that this one was probably one of the more easier-looking cases to the Court.  And I'm asking you to tell me why this was one of the more complicated and time-consuming cases.

17

MR. SABATINI:  All right.  Well, I'll have -- I'll go back, and I will -- now that I'm -- understand what the Court's concern is with it -- with this particular application, I will go take a look at I and J, and the means test, and see if I could identify what, in particular, I was looking at.  Again, I won't be sure, but I might be able to look at those and -- because the -- the -- a case could be relatively simple in terms of -- for example, the case that Aggie and I are briefing right now, she just filed a brief today in Martir, right.  This case doesn't have over -- you know, over years to cure it.  It's -- this case is simply an above median income, income-driven plan.  And there's been a lot of time that's been spent on I and J, and the means test in that case because she's above median, and we're trying to make sure that she doesn't have to pay any more than she can.  And she has some unusual circumstances that -- which are going to be the subject of the brief.

But the fact that you look at the docket and there's no cramdowns, there's no -- there's no liens to avoid, there's nothing else complicated going on doesn't mean that the time spent on the income and expense analysis is any less.  So, even cases that are otherwise uncomplicated, like DeCantis, their income and expense situation could be very time-intensive.

So, all -- you know, now that I'm aware of the Court's concern on that June 23rd entry, I'll -- I'll, you

18

know, go back and look at my records and see if I can --

THE COURT:  Well, I am plucking that out of the entire bill, and that was part of the Trustee's objection.  You know, there's another 1.7 hours a couple days -- there's 0.6 six days later, similar entry.  And then there's 1.7 on July 1, similar entry.  And, again, the case wasn't filed until a month or two later, on September 22nd.  And it --

MR. SABATINI:  So, the point --

THE COURT:  It just boggles my mind as to what you and your staff could be doing for all those hours.  It's hours and hours.  You know, there's lots of cases out there where other judges have allocated, you know, saying it's more than reasonable for a law office to put together schedules in a Chapter 13 for five or six hours, four hours, seven hours.  And that's what I see primarily coming across my desk.  That's my recollection of the hours that were involved for my office.

So, to see a simple Chapter 13 case with 50 hours, it is somewhat mind-boggling to the Court that -- what you actually could have been doing for 50 hours, there's -- there's less than 50 entries on the schedules.  So, you know, again, I'm picking on those entries in particular because that's your fees at $415 an hour.  And if you're doing just paralegal work or overhead work, you and your staff, then perhaps a lot of this shouldn't be billed at all.

I do know from our prior hearings that the amount of

19

spreadsheets, and checklists, and checking checklists, that time doesn't appear to be in this particular bill like it used to be.  But, I mean, that was mind-numbing how many entries you had regarding a checklist in a simple case.

And, again, I reemphasize that your fees and billable rates are probably the highest in the District.  So, I think you have that -- all of those factors combined lead to these, what I find to be, unreasonable bills and as, I think, the Trustee found the bill to be unreasonable.

So, I'm still wrestling -- I think, going back to *Badyrka*, I think I'm still wrestling with the same issues, that I don't understand what you could be doing in these simple Chapter 13 cases to generate these kinds of bills.

MR. SABATINI:  So, I just want to make sure I didn't miss any of the specific entries.  You mentioned the June 23rd, the June 26th -- I'm sorry, the June 29th entry for 0.6 hours.  And then there -- you mentioned the, I think, July 1st -- did you mention July 1st?  June 29th --

THE COURT:  Well, I mentioned just the ones that you were involved in, yeah.  I mean, then you take all of the staff time that did the same work, and that -- I piggyback on what that Chapter 13 Trustee did, and on Page 10 of her objection, it's, you know, it's -- she says, "The applicant and staff billed approximately 25.7 hours in the amount of $4,991.50 for preparation of the petition, schedules, means test, and plan."

20

And, again, when the presumptive reasonable fee for an entire Chapter 13 case in this District is 4,500, or 5,000, or 5,500, depending on where it lands currently, I know that's subject to an increase, it's just -- it's hard for the Court to determine or to find exactly what work -- and I put work -- or services that you provided to generate $5,000 in fees.

So, I know I sound like a broken record, and I feel like this is Groundhog Day with your billing, Mr. Sabatini, but I still have yet to get a definitive explanation or a description of the actual work that is done over 26 hours.

MR. SABATINI:  Your Honor, this is what I explained at the beginning of my presentation, that a lot of the -- some of the entries that you're questioning specifically today were fully discounted.  Some were partially discounted in the negotiations with the Trustee.  And, again, the reason for that is because I recognize that I'm not meeting my burden of telling you specifically what was done in the preparation of the schedules.  And that cases that were prepared later with the newer software are going to have -- and I've already filed some of these applications that have much more detail about where the time was spent.

And, you know, again, I feel like I sound like a broken record, but if -- if you feel like the time that we're spending doing those particular tasks is not worth it, we'll stop doing those tasks.  So I -- you know, we filed all of

21

these applications at the same time because the Trustee had all of these on hold, pending *Badyrka* and *Roberson*. And the other benefit here was that it kind of gets rid of all of the older cases that aren't -- that don't have the detail that the Court's looking for.

So, I, you know, wrote down a lot of the time because, again, I --

THE COURT: Okay. Let me --

MR. SABATINI: -- I understand that I can't answer your question.

THE COURT: Let me interrupt you, Mr. Sabatini, only because I'm looking at the bill as submitted with your application, and none of the work preparing the schedules is discounted. So, what you're telling me is, in the exhibit that you were submitting to the Court today, the bulk of the --

MR. SABATINI: Right, that's been filed.

THE COURT: The bulk of the $3,300 is consumed in the preparation of the schedules?

MR. SABATINI: When you say the 3,300, is that the difference -- you're saying the additional discount --

THE COURT: Yeah, that's the --

MR. SABATINI: -- for the negotiation with the Trustee?

THE COURT: Yes, that's the amount that was in the stipulation, 3,300.

22

MR. SABATINI:  I would say that's -- eyeballing it, I would say that's accurate.  It's on the docket now, I believe, so if your [sic] Court wanted to see it --

THE COURT:  Okay.

MR. SABATINI:  If Your Honor wanted to see it, it's there.

But the other thing is, I understand that there are -- you know, that you're telling me I'm one of the few people that you have these hearings with.  I've -- I submitted in one of the -- it may be in *Roberson*, an exhibit showing that over the course of my career, I've been awarded 98 -- about 98 percent of the fees that I've requested in contested fee applications.  And, you know, this -- I -- I haven't had this type of experience with any other judge.  Right?  So, I understand everyone comes -- you know, has a different perspective, but I don't -- I -- these are the types of bills that I have been submitting in bankruptcy for 20 years.  Right? They're -- I didn't say, "Oh, Judge Conway is on the docket, I'm now going to really -- on the bench, and I'm now going to dramatically change my billing practices and start charging for a bunch of stuff I never charged before."  These -- these were -- so, *Badyrka*, I -- I was taken aback because I -- I felt that, you know -- obviously, it wasn't personal.  It felt personal because, you know, some of the -- some of the language in there was harsh, I thought, and was the type of language

that a judge uses for a lawyer who just isn't getting the message, who's been told by judge after judge, time after time that they have certain problems, and they're not addressing them. And I -- you know, I was surprised -- that -- that's just, you know -- and maybe since it was directed at me instead of one of my fellow practitioners, it felt more personal. I mean, I -- you know, I know it's not personal. And --

THE COURT: I assure you, Mr. Sabatini, it's not personal at all. In fact, I approved 12 --

MR. SABATINI: Right.

THE COURT: -- 12 out of 13 of these contested fee applications.

MR. SABATINI: Right.

THE COURT: This one, for the reasons I already stated, stuck out like a sore thumb and required further discussion. I wish --

MR. SABATINI: Sure.

THE COURT: I wish I was -- trust me, it's personal to me because I feel as though the Court is wasting a tremendous amount of time going through these fee applications and getting stuck talking about the same issues time after time. When I have a whole body of fee applications in Chapter 13 cases, including my own, that I've reviewed over 30 -- almost 35 years now, I guess I can say, that seem to go in one particular direction as far as what's reasonable, and what's

24

billed, and the work that the attorney and the attorney's staff perform for a Chapter 13 debtor. And then there's your bills that -- you know, there are 15 pages of -- well, they used to be 15 pages of checking checklists and all of that, which, again, after all those hearings, I'm still not sure what all of those checklists actually accomplished for the debtor and the debtor's estate. But now these bills don't have the checklists in it, but it does seem to have just the same amount of work with different descriptions.

So, I'm trying to sit here, and I'm asking, in one out of 13 of your recent filings, what work did you actually do in this simple Chapter 13 case? And that's -- I think that's where you and I are having a disconnect, because you're saying you did the work, but I fail to understand what work you did.

(Background noise from telephonic participant)

MS. McHALE: I'm sorry, Your Honor.

THE COURT: Okay. I just fail to understand what actual work was performed that was reasonable and necessary to move this case forward and that benefitted the debtor and/or the estate.

So -- and, again, here, you go back to Mr. DeCantis. He's a cook at a local restaurant making $3,000 a month. He files. He's in bankruptcy. He's a -- struggling to pay bills. And there's a bill for $12,000. The plan itself is a total of $15,000. It seems as though, you know, if you -- if I looked

25

at it -- it's interesting.  I guess, if I wanted to be difficult or make this personal with you, I could say something like the plan in your invoice seems to be nicely situated so that you can get all of your fees.  Now, I know that's not the case here.  I think the Trustee has indicated that it's -- your billing underfunds the plan by four or $5,000, which, I guess, means that, out of your $11,000 bill, you may only get six or $7,000 through the plan.

So, I don't think your billing is tied to the plan. I'm not making that -- I'm not making that finding in any way, shape, or form because I know these bills are pretty consistent over the last couple of years from what our hearings have shown.  But I -- I suppose I'm going to -- why is this in Chapter 13 versus Chapter 7?  Can you answer that?

MR. SABATINI:  No, but I could have it -- I can -- at the same time that I'm looking into those other time entries, I could prepare something for you on that.

THE COURT:  And it may be because they're clearly over the means test, the income level.  You know, I feel bad for Mr. DeCantis, in a way, because he's in a Chapter 13 for three years paying $424, according to his plan and 11,000 of it was your fees, but then you take out whatever you have to take out, and maybe six or seven of it might be paid to you.  But did he need to be into a Chapter 13 plan?  He doesn't seem to have been behind on his mortgage; wasn't behind on his car

26

payment, or not much anyway. I'm not aware of any mortgage foreclosure or car repossession. There were three judgments, I think, that were entered, according to my review of the docket.

So, they're the things that the Court looks at, just to be practical and trying -- I was preparing for today, trying to get in your head in a way, and think of how this case could have been more complicated to warrant eleven or $12,000 in fees, and I just don't see it. And I assure you, it's not personal. I would prefer never to look at another one of your fee applications.

MR. SABATINI: Your Honor, in the motion to reconsider in *Roberson*, the last footnote in the opinion, I think that you and I had a miscommunication about what my argument was because -- I'll read the footnote, and then I'll address it. It says, "Mr. Sabatini has added a new argument that the Court may suffer from," quote, "commitment bias," close quote, "because it has consistently reduced his fees in other similar cases. However, the Court routinely, and almost daily, approves fee applications from other attorneys without objections. The Court deems those applications to be reasonable. It is only when the charges, such as here, are deemed unreasonable the Court is obligated to review the fees and reduce excessive billing when appropriate. There is no bias. Mr. Sabatini simply has not met his burden to convince the Court to change its opinion."

27

And I never intentionally said that the commitment bias is that you have a bias against me as evidenced from what has happened in other earlier cases.

By commitment bias, what I was saying is that the Third Circuit requires that before the Court issues a ruling on fees, that the attorney be given the opportunity to understand what the Court's concerns are and to address those before the ruling is made.  Right?  Because once the ruling is made, and that's out there and is a public opinion, it's just human nature that to change your mind is a harder ask than it is to explain -- you know, to provide the information to address your concerns before you publicly write an opinion saying why the fees are not warranted.

So, by commitment bias, I didn't mean to infer that any of your prior opinions are causing you to reduce your fees here.  Simply that in *Roberson*, you issued an opinion writing down fees for numerous entries and then said, you know, if you have a problem with this and you want to come in and provide the information and -- you can file a motion to reconsider. And, of course, a reconsideration motion has a much higher burden, right, than a -- than what my burden is here.  So --

THE COURT:  That's correct.

MR. SABATINI:  So, I didn't mean to say that I feel the Court has a bias against me, that's not what I'm saying.  I just wanted to clear the air on that.

28

THE COURT:  Okay.  I appreciate that, because that's what it appeared at that -- at that particular argument.  That is certainly what it sounded like.  That was an argument that it seemed like you were making.  And I do not have any type of bias.  I look at every case with fresh eyes.

And I -- again, I will repeat myself.  I look at the DeCantis case as a simple Chapter 13 case where I don't understand how you could bill twelve -- eleven or $12,000 in fees, having nothing to do with *Badyrka*, or *Thomas*, or any of those other cases that I wrote about, *Roberson* in particular -- and don't forget, *Roberson*, you were asking for one or two distinct entries and said, I should look at those entries in a vacuum.  I disagreed with you, and I think Ms. McHale disagreed, because, again, similarly to this case, you had five or ten hours of meetings already with the client.

So, I don't want to impugn your work in any way, shape, or form.  I think you put out a good work product.  But it's not $10,000 in fees better than anyone else in this District, and that's the problem.  I think a simple Chapter 13 bankruptcy is a simple Chapter 13 bankruptcy in this District.

So, I don't have any bias.  I look at these cases based upon the documents filed in the docket and what's shown.  And my purpose today for this discussion was for you to convince me that this case had special circumstances that warranted an eleven or $12,000 fee.  And I'm going to be honest

29

with you, I'm not hearing that.

MR. SABATINI:  Right.  I don't --

THE COURT:  So, then I have to look --

MR. SABATINI:  Your Honor --

THE COURT:  Then I have to look at what you and the Trustee agreed to as to cuts and see if that's appropriate.  Or should there be more cuts?  And I think that's what the Court is tasked with.  And I would prefer not to be tasked with this role.  But I think *Busy B* [sic], and all the other cases, say I have to do this, and I'm going to do this.

So, that's where we're at.  So, it seems like you're going to submit -- you want to submit something in support of, I guess, those few entries, and perhaps why this is a 13 versus a 7, or whatever other argument you want to make.

How much time do you need?

MR. SABATINI:  Two weeks.

THE COURT:  That's fine.  Where does that bring us to?

COURTROOM DEPUTY:  That takes us to 8/21

THE COURT:  8/21.

MR. SABATINI:  Yep.

THE COURT:  I'll look at that exhibit that was put up on the docket in connection with whatever supplemental statement, supplemental brief you want to file.  Whatever you want to call it, Mr. Sabatini; it doesn't matter to me.

30

Ms. McHale, do you think you need to file anything at this point, or do you want to get out of this --

MS. McHALE:  I --

THE COURT:  -- out of this matter?

MS. McHALE:  I -- I don't believe I need to file --

THE COURT:  And I'll laugh -- I'm laughing as I say that.

MS. McHALE:  I don't believe I need to file anything, Your Honor.

I would point out that when I look at this case, the debtor claimed state exemptions.  I believe it was filed for a Chapter -- filed as a Chapter 13 because of the equity that was in the house, and they didn't want to take the chance that the 7 trustee would sell it, so they claimed state exemptions.

THE COURT:  Okay.  But --

MS. McHALE:  And I think that's why --

THE COURT:  But, Ms. McHale, let me -- let's -- we're all seasoned attorneys, and I'm not a seasoned judge yet, but I guess I'm getting there slowly.  But I think I knew about exemptions, and tenants by the entireties property issues, and things of that nature.

If that's the only reason, Mr. Sabatini, was there a concern that there was joint debt and the Chapter 7 trustee would sell the property?

MR. SABATINI:  (No verbal response).

31

THE COURT:  And I think you're right, Ms. McHale.  My review of the case, I think the property may have been worth one eighty, and there may have been a fifty or $60,000 mortgage.  But I'm not sure if that is a definitive answer because I think you probably could accomplish the same things in a Chapter 7.

But, Mr. Sabatini, I'm not -- I think Ms. McHale was throwing you some help as far as perhaps what your reasoning was, but I'm not sure if that was it or not.

MR. SABATINI:  I -- I don't know.  I have to look back and see if there were other reasons.  That could be a reason that -- it certainly could -- it could certainly could be the reason.

THE COURT:  Okay.  Okay, again, I'm not sure how relevant that is.  It doesn't really change the scope of this particular Chapter 13.

So, is there anything else we can accomplish today?

MR. SABATINI:  Your Honor, I do think that my performance relative to the other attorneys in the District is relevant.  Right?  You're saying that I do a good job, but that I don't do a $10,000 better job than the other lawyers.  And if the statistical information shows that my clients pay substantially less to unsecured creditors than the clients of other attorneys, I think that would go a way towards justifying that what I'm doing in these cases, even though it might be

32

more time-consuming, is worthwhile.  So --

THE COURT:  Mr. Sabatini, I think you're overcomplicating this.  To me, and I apologize for saying this, this is a fee application that's before the Court.  You have a burden of showing me that your fees were reasonable and necessary.  Going off on tangents as far as other cases, other attorneys, I don't know what kind of statistics can be shown or who can verify your statistics, because I think every case -- at least my experience was, there's -- it's apples and oranges.  You have higher earning people, lower earning people.  You have mortgage foreclosures.  You have car repossessions.  You have clients that are good clients, clients that are bad clients, clients that are cooperative, clients that pay their bills, their post-petition bills, clients that don't pay their post-petition bills.  So, I'm not sure how any statistic that you're able to put together would be helpful to the Court.

THE COURT:  Having said that, I'm not going to tell you, you can't -- you can file whatever you want, but I'm just not sure if all that work is going to be worth it or mean any -- have any meaningful effect on the Court's analysis.

MR. SABATINI:  Well, Your Honor, I don't have -- I -- what I would like to do is discovery on the Trustee's Office to get statistics about my cases compared to the other attorneys.  I don't have -- there's no way for me to have that information.  It's not -- I've looked, I can't find any type of publicly

33

available information that I could use.  I think that the Trustee's Office does have the ability to generate a report that talks about what my cases look like compared to other cases.

And I agree with the Court, that every case is different, but that's -- you know, the point of a statistical analysis over a broad set is that there are trends.  And if, you know, my clients pay five percent of their unsecured debt on average, and the average Chapter 13 debtor pays half of their unsecured debt, I think that would mean a lot in terms of explaining why the additional time that I've put into Schedules I, and J, and the means test are beneficial to the client.

THE COURT:  Okay.  Well, I will tell you, I mean, my goal in representing Chapter 13 clients was to pay as very little as possible to the trustee; I don't want to shock Ms. McHale or disclose any of my practice secrets.  But I think, Mr. Sabatini, every practicing, every good Chapter 13 attorney, their goal is to pay as little as possible to Ms. McHale.  So, you know, for whatever reason my client would have paid 50 cents on the dollar versus five cents on the dollar, I don't know how a statistic would necessarily show why my clients paid 50 percent versus your five percent.

You know, again, I'd be curious to see how you'd be able to correlate and tie all that together to make it useful in any way, shape, or form.  But, again, I'm not going to

34

prevent you from filing something. I'm not sure if the Trustee has those documents, or will allow that discovery, or will provide it, or if it's something easy to provide, or something complicated to provide. But I guess you two can work that out.

MR. SABATINI: All right. So, in light of that, I would like to try and do that. So, instead of having 14 days, could I have two months so that I could serve the discovery, get a response, and then hopefully use that information to be able to prepare my filing?

THE COURT: Ms. McHale, any problem with that?

MS. McHALE: No problem, Your Honor, because I believe it is going to take some discussions, because I have a lot of thoughts running through my mind about it, as well.

THE COURT: Okay.

COURTROOM DEPUTY: October 7.

THE COURT: Mr. Sabatini, I will note -- and I have spent an inordinate amount of time on your fee applications over the last three years, and I feel as though the Court has been more than fair with you as far as providing you with time and opportunity to make your arguments. And it's difficult to hear today, after so many hearings and so much time spent on your fee applications, and I say that plural, that you're not able to tell me today exactly what work, what services were provided on June 22nd, 2022 that encompassed 1.7 hours.

Now, I think we talked prior to this actual hearing,

35

and I don't know if it was on a -- when this was scheduled to be heard, or if we just talked on a Chapter 13 day about this hearing. And I -- I think we did talk about this being more of a general discussion. So, I'm not going to hold you to not knowing the specifics of this particular case on that specific day. But that is -- part of the Court's problem is that I really can't understand what actual work was done for 1.7 hours in working on I, J, and the means test, and the plan after all the other work was done prior.

So, I'm trying to give you my thoughts. And I try to do that whenever I'm on the bench, to tell the litigants in front of me what I'm thinking and what I'm looking for. So, I hope that helps you. And I look forward to getting whatever paperwork you're going to supply on October 7th, 2024.

Anything else?

MR. SABATINI: Well, Your Honor, I -- I couldn't possibly prepare, you know, to be able to tell you in detail what I did on -- for each one of these time entries on this bill before today. Right? So, I -- well, I would hope that the Court would understand that I -- that there -- that I'm not prepared to tell you today about June 23rd, because since I didn't know about that particular entry being of particular concern --

THE COURT: I think -- I think that's what I said.

MR. SABATINI: -- it wouldn't have made sense --

36

THE COURT: I think that's what I said, Mr. Sabatini. But I --

MR. SABATINI: Well --

THE COURT: I think we all have been practicing a long time, and you would -- you know, typically you would know when you pick up a file from your paralegal, and it's ready to be reviewed by the attorney, you have a standard operating procedure of what you're looking for and what you're looking at. And I don't know what you would look at for 1.7 hours at that point in this particular case, and that's all I was asking.

And I also indicated that I understand you not knowing that specific entry today. So, I think we're on the same page there, at least for today.

MR. SABATINI: Okay. All right; thank you. I have nothing further. Thank you, Your Honor.

THE COURT: Ms. McHale?

MS. McHALE: Nothing further, Your Honor. Thank you.

THE COURT: Okay. Well, thank you. Appreciate that.

We're adjourned.

MS. McHALE: Thank you.

(Whereupon, at 11:06 a.m., the hearing was adjourned.)

37

CERTIFICATE OF TRANSCRIBER

I, KAREN HARTMANN, a certified Electronic Court Transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____ /s/ *Karen Hartmann* _____

Karen Hartmann, AAERT CET 475  Date:  February 3, 2025

TRANSCRIPTS PLUS, INC.