# No. 3:25-cv-01927-KM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

**DOMINIC DECANTIS,**
*Appellant,*

v.

**JACK ZAHAROPOULOS,**
*Appellee.*

_____

On Appeal from the United States Bankruptcy Court
for the Middle District of Pennsylvania
in Case No. 5:22-bk-01826-MJC

---

## APPELLANT'S REPLY BRIEF

---

Carlo Sabatini
SABATINI LAW FIRM, LLC
216 N. Blakely St.
Dunmore, PA 18512
(570) 341-9000
carlo@bankruptcypa.com

*Attorney for Appellant*
*Dominic DeCantis*

April 8, 2026

TABLE OF CONTENTS

Table of Contents ...................................................................................... ii

Table of Authorities ................................................................................. iii

I.     Introduction........................................................................................1

II.    Argument ............................................................................................1

       A.   Applicant has not engaged in a pattern of overbilling............................1

       B.   The 40% Reduction was Arbitrary ..........................................................3

       C.   The PRF was a Tether...............................................................................6

       D.   Relevant Market Evidence was Ignored ................................................11

            1.   *The trustee's claim that the bankruptcy court initially had
                 "reservations" regarding the statistical evidence does not
                 explain why the evidence was later ignored*...............................11

            2.   *The fact that Applicant is not a math expert is not a basis to
                 exclude the affidavit*.......................................................................14

            3.   *The statistical evidence directly bears on the factors that the
                 court is required to consider in determining appropriate
                 compensation* ..................................................................................16

            4.   *The statistical evidence is objective* .............................................17

            5.   *It **is** appropriate for a debtor to try to pay his creditors less, and
                 to pay attorney's fees with money that would otherwise have been
                 paid to creditors* .............................................................................17

III.   Conclusion ........................................................................................19

IV.    Certificate of Compliance.................................................................20

V.     Certificate of Use of Generative AI..................................................21

## TABLE OF AUTHORITIES

**Cases**

*Baker Botts L.L.P. v. ASARCO, LLC*, 576 U.S. 121 (2015) .......................................3

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) .....................................................7

*Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114 (10th Cir. 2005)...............................14

*Cnty. of Niagara v. Netherlands Ins. Co.*, 2017 WL 3917133 (W.D.N.Y. Sept. 7, 2017) ........................................................................................................................12

*Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981)..........................................................13

*Deeson v. United States*, 6 Ct. Cl. 227 (1870) ............................................................3

*Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038 (10th Cir. 2020) ..15

*Goodall v. Soc. Sec. Admin.*, 2019 WL 611502 (M.D. Tenn. Jan. 29, 2019)............4

*Goodall v. Comm'r, Soc. Sec. Admin.*, 2019 WL 587593 (M.D. Tenn. Feb. 13, 2019) ........................................................................................................................4

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000) ............ 3, 4, 5, 19

*Hill v. Gray*, 830 F. App'x 1 (D.C. Cir. 2020)...........................................................4

*Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013) ...................................................14

*In re 388 Route 22 Readington Holdings LLC*, 2023 WL 4249266 (3d Cir. 2023)..6

*In re Badyrka*, 2022 WL 4656034 (Bankr. M.D. Pa. Sept. 30, 2022)......................2

*In re Busy Beaver Bldg. Ctrs.*, 19 F.3d 833 (3d Cir. 1994) ............................ passim

*In re Long*, 553 B.R. 266 (Bankr. M.D. Pa. 2016) ................................................8, 9

*In re Roberson,* No. 5:22-02242-MJC (Bankr. M.D. Pa. Mar. 27, 2024) .................2

*In re Schuman*, 2013 Bankr. LEXIS 1159, (Bankr. N.D.N.Y. Mar. 22, 2013) .........7

*In re Strauss,* 2023 Bankr. LEXIS 841 (Bankr. M.D. Pa. Mar. 31, 2023) ...............6

*In re Vaughn*, 660 B.R. 827 (Bankr. S.D. Ohio 2024) ..................................... 18, 19

*Ms. S. v. Reg'l Sch. Unit 72*, 916 F.3d 41 (1st Cir. 2019).........................................12

*Nicholas v. Oren (In re Nicholas)*, 496 B.R. 69 (Bankr. E.D.N.Y. 2011) ............5, 6

*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) ..............................................3

*Prandini v. National Tea Co.*, 585 F.2d 47 (3d Cir. 1978)........................................3

*Rawson v. Calmar S.S. Corp.*, 304 F.2d 202 (9th Cir. 1962) ..................................12

*Simko v. United States Steel Corp*, 992 F.3d 198 (3d Cir. 2021) ...........................15

*United States v. Matot*, 146 F.2d 197 (2d Cir. 1944)...............................................14

*United States v. Wadley*, 2022 WL 1011693 (3d Cir. Apr. 5, 2022)........................14

### Statutes

11 U.S.C. § 1324.....................................................................................................9

11 U.S.C. § 330 ...................................................................................... 9, 10, 16

### Rules

Fed. R. Bankr. P. 2003 ...........................................................................................9

Fed. R. Bankr. P. 8015............................................................................................20

Local Bankruptcy Rule 2016-2...............................................................................9

## I.    INTRODUCTION

The trustee generally explains that the bankruptcy court has broad discretion in awarding fees. Appellant agrees. (Opening brief p. 14.) However, discretion is not unfettered. Said another way, an award that is arbitrary or that is not explained cannot properly be reviewed by an appellate court and is therefore an abuse of discretion. Thus, the question is whether the court followed the correct procedures in exercising that discretion.

Appellant contends that the bankruptcy court erred in three ways: (1) that the 40% reduction was arbitrary, (2) that the award was improperly tethered to the presumptively reasonable fee, and (3) that the court failed to credit uncontroverted market evidence in the record. On each of these points, the trustee either fails to respond directly to the arguments presented or creates post hoc rationalizations that were never offered by the bankruptcy court itself.

## II.    ARGUMENT

### A.  APPLICANT HAS NOT ENGAGED IN A PATTERN OF OVERBILLING

The final paragraph of the trustee's Statement of the Case cites other decisions in which Judge Conway reduced Applicant's fee requests. The paragraph is not a statement of the facts of *this* case and seems misplaced in such a narrative. Instead, it is an attempt to make it appear that Applicant has engaged in a pattern of overbilling and has continued to ignore the bankruptcy court's guidance. To defend

1

against that implication, Applicant must explain the procedural histories of two of the prior cases mentioned by the trustee.

In *In re Badyrka,* 2022 WL 4656034 (Bankr. M.D. Pa. Sept. 30, 2022), the court criticized Applicant's billing for two specific reasons: certain tasks should have been delegated to a less expensive professional and certain entries were not billable at all. Applicant reflected on that criticism and modified his practices. In the next litigated case, *In re Roberson,* No. 5:22-02242-MJC, Doc. 58 (Bankr. M.D. Pa. Mar. 27, 2024), the court's line-by-line review did not eliminate a single entry on either of those grounds. Applicant had corrected the identified problems. *Roberson* then raised a new critique — vagueness — and again Applicant adapted, providing greater billing detail in subsequent applications, including the one at issue here. In the bankruptcy court's decision here, no entry was disallowed for vagueness.

This is not a practitioner ignoring a court's repeated instructions. It is a practitioner responding to each instruction as it was given. Notably, Applicant and the trustee resolved objections in approximately thirteen other cases following *Roberson* — the court approved all of those settlements except the for the one resolving the application at issue here. This appeal addresses the unresolved legal

2

questions that have been pending, in one form or another, since Judge Conway joined the bench. Applicant will not be compensated for bringing it.[1]

### B. THE 40% REDUCTION WAS ARBITRARY

Appellant provided Third Circuit and Supreme Court authority explaining that a court adjusting a fee by a percentage amount must explain how *that particular percentage* was chosen. See Opening brief pp. 14-16, discussing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000) and *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010). The Trustee attempts to distinguish those cases simply by explaining that the fee applications in *Gunter* and *Perdue* were much larger than the application at issue here. (Opp Br. n. 4.) However, he offers no authority to explain why the rule should be different based on the size of the case. And, of course, the principle that the size of a case does not change the standards to be used is ancient. *Deeson v. United States*, 6 Ct. Cl. 227, 229 (1870) ("[t]he amount in controversy in a case here cannot change the rules of law").

The trustee does not attempt to show how the bankruptcy court's opinion decided that the correct amount to reduce the application by was 40%. In fact, in

---

[1] Where prevailing party attorney's fees are awarded by statute, time spent on the fee application is usually compensable. *Prandini v. National Tea Co.*, 585 F.2d 47 (3d Cir. 1978). However, where fees are awarded not from the opposing party, and instead from a bankruptcy estate, time spent defending a fee application is not compensable. *Baker Botts L.L.P. v. ASARCO, LLC*, 576 U.S. 121 (2015).

the seven pages of its brief that it devotes to this issue, the trustee does not mention "40%" at all, other than in the heading to the section, and in the final conclusory sentence. (Opp Br. pp. 8 – 14.) The trustee does not directly engage with this argument. "Silence can sometimes be deafening." *Goodall v. Soc. Sec. Admin.*, 2019 WL 611502, at \*5 (M.D. Tenn. Jan. 29, 2019), *report and recommendation adopted sub nom. Goodall v. Comm'r, Soc. Sec. Admin.*, 2019 WL 587593 (M.D. Tenn. Feb. 13, 2019). The decision to "dodge this argument altogether rather than address it head-on suggests he doesn't have an adequate response." *Hill v. Gray*, 830 F. App'x 1, 2 (D.C. Cir. 2020).

Instead, the trustee devotes ample space to showing that the bankruptcy court explained why it believed the fee should be reduced. But that explanation has never been challenged. Appellant agrees that the court provided some reasoning for *why* it reduced the fee. However, even if that reasoning justified a reduction, the reasoning does not explain how *this* percentage was chosen. The *Gunter* language cited in Appellant's opening brief explains that justifiable reasons as to *why* the court made a reduction do not dispense with the need to explain how the actual discount ultimately chosen was selected. "The Circuit explained that a court abuses its discretion where it 'reduces an award by a particular percentage or amount (**albeit for justifiable reasons**) in an arbitrary or indiscriminate fashion.'"

(Opening brief p. 14, quoting *Gunter*, 223 F.3d at 196) (emphasis added, brackets removed). The trustee ignores that language.

The trustee claims that "[m]any courts have held that a percentage deduction is a practical way to 'trim' fees," Opp Br. p. 5, and cites four cases for this position. The trustee's first case on this is *Nicholas v. Oren (In re Nicholas)*, 496 B.R. 69 (Bankr. E.D. N.Y. 2011). In *Nicholas*, a consumer obtained a bankruptcy discharge. Thereafter, a creditor filed a state court action against the consumer, asserting five causes of action. *Id.* at 76. The consumer sought relief in the bankruptcy court and obtained a determination that three of the five claims in that state court action violated the bankruptcy discharge. *Id.* The bankruptcy court awarded the consumer his fees for defending those three claims. But the consumer was not entitled to recover for the time spent defending the other two claims. And the attorney's fee records did not "separately delineate time spent working on each cause of action." *Id.* Because the court could not evaluate the allocation of time between compensable and non-compensable work, and because the debtor "was awarded attorney's fees for the defense of three of the five causes of action asserted by [the creditor]," the court reduced the fees by forty percent – i.e., by the percentage that it estimated applied to the non-compensable claims. *Id.* Unlike

5

here, the court's percentage election in *Nicholas* was not arbitrary. Instead, it was grounded in math.[2]

The trustee's remaining three authorities on this point are also not helpful. The first is *In re Strauss,* 2023 Bankr. LEXIS 841 (Bankr. M.D. Pa. Mar. 31, 2023), which is another decision by Judge Conway, and which relies on the same quotation from *Nicholas* that is cited in the trustee's brief. The second is *In re Busy Beaver Bldg. Ctrs.*, 19 F.3d 833, 845 (3d Cir. 1994), which does not discuss a percentage reduction. The third is *In re 388 Route 22 Readington Holdings LLC*, 2023 WL 4249266 (3d Cir. 2023). The trustee simply cites *In re 388* for the statement that it is "within a bankruptcy court's discretion to reduce fees by a percentage" (Opp Br. p. 8), but the trustee fails to address the Applicant's observation that in *In re 388*, a line-by-line review was, in fact, conducted. (Opening brief pp. 21 – 22.)

C.   THE PRF WAS A TETHER

The trustee claims that Applicant's tethering argument "implies that the court here treats [the PRF] as a ceiling." (Opp Br. p. 20.) Not so. The amount

---

[2] Notably, the consumer in *Nicholas* was represented by two firms, so two fee applications were at issue. The second firm was not involved in defending the non-compensable state-court claims, so no percentage deduction was applied to its application. Instead, the court considered the creditor's specific objections and eliminated 1.65 of the 37.45 hours sought.

awarded here was above the PRF, so Applicant agrees that the PRF is not being used as a ceiling. A tether is a "a rope or chain used to tie, . . . to a post or other fixed place, usually so that it can move freely within a small area." https://dictionary.cambridge.org/us/dictionary/english/tether (last visited April 6, 2026.) That is exactly how the court appears to use the PRF. The PRF is the court's post or other fixed place. Unless the applicant can demonstrate unique case factors that justify a substantial departure, the court will apply a percentage discount or lump sum deduction to get the application down to "within a small area" of the PRF.

The trustee attempts to justify this application with another ad hoc rationalization – that the "[t]rustee believes that the court applies the PRF as a guidepost." (Opp Br. p. 20.) But how is a guidepost any better than a tether? The trustee does not explain how such a "guidepost" can appropriately be used in the exercise of the court's discretion. *See e.g., BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 605 (1996) (Scalia, J., dissenting) ("the 'guideposts' mark a road to nowhere; they provide no real guidance at all.").

The trustee also attempts to defend the PRF by explaining how a similarly named metric in a different district is treated. (Opp Br. p. 16.) In *In re Schuman*, 2013 Bankr. LEXIS 1159, (Bankr. N.D.N.Y. Mar. 22, 2013) the court described

the process that the court used when establishing its "presumptive fee." The court looked at the services that are customary in a bankruptcy case, calculated how long those services would ordinarily take, and multiplied that time by a reasonable hourly rate to come up with a "pre-calculated lodestar." However, the fact that that process was followed when calculating a presumptive fee in New York has no bearing here. There is no indication that any such similar process was ever followed when establishing the PRF in this district.

To the contrary, this district's presumptively reasonable fee dates to 2014. See *In re Long*, 553 B.R. 266, 268 (Bankr. M.D. Pa. 2016). In *Long,* Chief Bankruptcy Judge France explained the process by which the PRF was implemented. Although she said that a committee "evaluate[d] the local rules and standing orders of other bankruptcy courts and analyz[ed] current local practices," nowhere was it stated that the committee spent any time determining how many hours would be spent on a typical bankruptcy case. Without that type of analysis, the PRF cannot fairly be described as a "pre-computed lodestar."[3]

---

[3] Instead, she described the flat fees that were allowed by local rule by four other courts in the Third Circuit. *Id.* at 275 – 276. To the extent that those rules may have been considered in her determination of where to set the PRF here, it is unclear how that consideration would comport with *Busy Beaver*'s insistence on non-bankruptcy comparators. (Continued on next page.)

Finally, the trustee misunderstands Applicant's argument regarding the relevance of non-bankruptcy compensation. Applicant does not contend that simply because some non-bankruptcy attorneys "charged their clients at least $11,000" (Opp Br. p. 17) that compensation in that amount would be appropriate here. Clearly, many attorneys charge much more than that for various services, including cases that may involve substantially more work. The gross dollar amount charged in non-bankruptcy cases is irrelevant. Instead, the court must simply respect the mandate imposed by 11 U.S.C. § 330(a)(3)(F), which requires an analysis of "the customary compensation charged by comparably skilled practitioners in cases other than cases under this title." The PRF is a bankruptcy-

---

Judge France did accurately observe that "the nature and extent of services being provided for the same fee amount varied widely among practitioners appearing before me." *Id.* at 269. She attempted to address that disparity when she implemented the PRF. To receive the PRF, a practitioner had to agree that certain services that might be needed throughout the case would be covered by the PRF. *Id.* at 270. However, after her retirement, the bankruptcy court eliminated the requirement that counsel use that "Rights and Responsibilities Agreement." Thus, the services are no longer standardized.

Additionally, the $4,000.00 PRF that she implemented only applied for services performed through confirmation, *Id.* at 270, which often occurs approximately 3 months into the case. See Fed. R. Bankr. P. 2003(a)(1)(C) and 11 U.S.C. § 1324(b). Additional fees for time spent after confirmation were recoverable with a lodestar fee application. *Long,* 553 B.R. at 271. More recently, the local rules were amended so that the PRF is now a flat fee for all time spent throughout the **entire** three-to-five-year case. See L.B.R. 2016-2(c)(1).

only construct, so it cannot inform the § 330(a)(3)(F) analysis of what non-bankruptcy attorneys charge.

The trustee also claims that it is "customary practice **in this** and neighboring **districts**, [to use] the PRF as a balance on the scale rather than a bright line constraint." (Opp Br. p. 20.) However, as explained in Applicant's opening brief, that is not Judge Van Eck's practice. (Opening brief pp. 27 – 28, citing *Merriweather* Transcript, AA 192-193) ("[b]ut if all the charges add up to an amount that's twice what the [PRF] is, I don't care, that doesn't bother me a bit.") Thus, in this district, it is only Judge Conway who uses the PRF in this fashion.

On this district split, the trustee insists that the judges "are entitled to their different viewpoints which serve to shape their decisions in this regard." (Opp Br. p. 18.) However, a court's discretion does not extend to the creation of the appropriate *standard* that should be applied. That is a legal question. And in *Busy Beaver* the Third Circuit answered the question by requiring fee applications to be determined using non-bankruptcy comparators.

The bankruptcy court inappropriately used the PRF as a tether. The fee application should have been decided with normal lodestar principles, and without reference to the PRF.

10

D.  RELEVANT MARKET EVIDENCE WAS IGNORED.

1.  *The trustee's claim that the bankruptcy court initially had "reservations" regarding the statistical evidence does not explain why the evidence was later ignored.*

The trustee quotes statements by the bankruptcy court to claim that "the court had reservations regarding" Applicant's statistical evidence. (Opp Br. p. 22.) The court's statements were made while it was allowing an additional two months for counsel to conduct discovery and submit the very evidence at issue. (Transcript of Hearing held 8/07/24, AA 115, 32:2 – 34:15) This procedural posture is important for two reasons. First, if the court had already concluded that the evidence would be irrelevant, it would not have allowed additional time for the express purpose of allowing the evidence to be developed. Thus, it did not make a finding of irrelevance.

Instead, notwithstanding the language quoted by the trustee, the court was merely expressing skepticism as to what the evidence might eventually show: "Having said that, I'm not going to tell you, you can't -- you can file whatever you want, but I'm just not sure if all that work is going to be worth it or mean any - - have any meaningful effect on the Court's analysis." (Transcript of Hearing held 8/07/24, AA 115, 32:17– 20) "You know, again, I'd be curious to see how you'd be able to correlate and tie all that together to make it useful in any way, shape, or form. But, again, I'm not going to prevent you from filing something." (Transcript

of Hearing held 8/07/24, AA 115, 33:23 – 34:1.) Thus, the court did not pre-judge the relevance of the evidence.

Second, because the statements were made before the court actually saw the evidence, the trustee cannot properly assume that the bankruptcy court made a premature final determination that the evidence was not probative. Preliminary statements made by a judge on discovery issues are not law of the case. *Ms. S. v. Reg'l Sch. Unit 72*, 916 F.3d 41, 48 (1st Cir. 2019)("decisions made on an inadequate record or designed to be preliminary or tentative are excepted from the law of the case doctrine.") (cleaned up); *see also Rawson v. Calmar S.S. Corp.*, 304 F.2d 202, 206 (9th Cir. 1962)("[t]he trial judge is not to be lashed to the mast on his off-hand remarks in announcing decision prior to the presumably more carefully considered deliberate findings of fact"); and *Cnty. of Niagara v. Netherlands Ins. Co.*, 2017 WL 3917133, at *5 (W.D.N.Y. Sept. 7, 2017)("[t]rial judges may admit or preclude the evidence produced during discovery. [Defendant] cites no authority which obligates a trial judge to accept factual determinations made during discovery.") (brackets in original).

Here, the court expressly reserved decision on the merits of the statistical evidence that it had not yet seen. To the extent that its comments might be read otherwise, it does not matter because it would be improper to assume that the court

12

decided the relevance of the evidence before it had been developed or offered.

More importantly, notwithstanding any initial skepticism, the results clearly showed that Applicant had achieved very favorable outcomes for his clients on two metrics: the total cost to the debtors and the likelihood that their cases would succeed. To the extent the court found the evidence unpersuasive, it should have explained why.

The trustee disagrees, claiming that "[t]here is not a specific requirement that the court cite with particularity the aspects of the evidence that it did or did not consider." (Opp Br. p. 23.) However, *Busy Beaver* requires <u>exactly</u> that. "Of course, if the bankruptcy court discounts any evidence presented by the fee applicant, the court should to the extent practicable make findings of fact and provide reasoned explanations in the record to facilitate review." *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 854 (3d Cir. 1994) (citations and quotations omitted); *see also Cotter v. Harris*, 642 F.2d 700, 706-707 (3d Cir. 1981)("Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper.") (review of the decision of a Social Security ALJ)(citation omitted).

2. *The fact that Applicant is not a math expert is not a basis to exclude the affidavit.*

The trustee complains that the statistical analysis is "self-serving." (Opp Br. p. 3.) However, "affidavits . . . by their nature are self-serving." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (ruling that the district court had erred in discrediting an affidavit "because of its 'self-serving' nature."); *see also* the observation of Judge Learned Hand in *United States v. Matot*, 146 F.2d 197, 198 (2d Cir. 1944)("What else but 'self-serving' the testimony of an accused person on his direct examination is likely to be, we find it difficult to understand.") Clearly, the whole purpose of the statistical analysis was to demonstrate counsel's relative success. If the statistics did not support the proposition, then the affidavit would not have been introduced.

The trustee also complains that the affidavits were "self-created," (Opp Br. p. 3) "self-generated," (Opp Br. p. 6) and not verified by a third-party expert (Opp Br. pp. 6, 23). However, where an affidavit involves only basic math, no expert is required. *United States v. Wadley*, 2022 WL 1011693, at \*3 (3d Cir. Apr. 5, 2022) (allowing "basic math to determine an estimated average" and citing *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005) ("Taking a simple average ... though technically a statistical determination, is not so complex a task that litigants need to hire experts in order to deem the evidence trustworthy.")).

14

Even more on point is *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1057 (10th Cir. 2020). There, exactly like here, a party offered evidence in the form of a median calculation that had been created by the proponent's counsel, and the opposing party contended that it could be admitted only as expert testimony. The court disagreed, concluding that "the simple calculation of a median constitutes lay testimony under Federal Rule of Evidence 701 because it involves only basic arithmetic—one merely arranges numbers in order and picks the middle one." *Id.* at 1057. The fact that Applicant is not a math expert is not a reason to reject the affidavit.

The trustee did not raise below its arguments as to "self-serving" or "unsupported by a third party expert." That failure is notable for two reasons. First, by failing to raise it in the first instance in the trial court, the trustee forfeit the argument, and therefore it is not reviewable on appeal, absent a showing of "truly exceptional circumstances" which the trustee has not attempted to demonstrate here. *Simko v. United States Steel Corp*, 992 F.3d 198, 205 (3d Cir. 2021). Second, because this issue was never discussed before the bankruptcy court, there is no basis to believe that the court considered either argument when it did not discuss the affidavit in its opinion.

3. *The statistical evidence directly bears on the factors that the court is required to consider in determining appropriate compensation.*

The trustee claims that the statistical evidence "does not contemplate the threshold questions courts are required to consider under 11 USCS § 330(a)(3)." (Opp Br. p. 23.) Applicant disagrees. One of the relevant factors is "with respect to a professional person, whether the person . . . has demonstrated skill . . . in the bankruptcy field." 11 U.S.C. § 330(a)(3)(E).[4] The statistical evidence demonstrated that cases filed by the Applicant had only a 5% failure rate, whereas cases filed without Applicant had a 45% failure rate. A markedly greater chance of success is evidence of relevant skill.

And by focusing solely on § 330(a)(3), the trustee fails to consider the requirement that the court must also evaluate the services with reference to § 330(a)(4)(B), which requires "a consideration of the benefit and necessity of such services to the debtor." The analysis required by this section is informed not only by the failure rate statistic discussed above, but also by the evidence regarding the total cost to the debtor. As explained in Applicant's opening brief (Opening brief

---

[4] At first blush, a second subsection of § 330(a) also appears to be relevant: "whether the services were . . . beneficial . . . toward the completion of, a case under this title." 11 U.S.C. § 330(a)(3)(C). However, § 330(a)(4)(A) essentially copies the language from that subsection, and simultaneously removes that factor from consideration when the benefit to the *debtor* can be demonstrated as provided for in § 330(a)(4)(B).

16

pp. 30 – 32), Applicant's clients pay less than half as much in attorney's fees and towards unsecured debts as compared to the rest of the bankruptcy cases filed in the district. Those savings are a clear benefit to the debtor.

### 4. *The statistical evidence is objective.*

The trustee complains that the equations in the statistical analysis should not have taken attorney's fees into account at all, and instead should have considered only the amount of unsecured debt that the debtor paid. (Opp Br. p. 24.) Again, like the trustee's arguments about the "self-serving" nature of the affidavit and the alleged requirement of expert verification, this argument was never raised below. It is forfeit. (See supra at 15.) Additionally, the trustee assumes that his critique of the equation explains the bankruptcy court's decision not to reference it. That assumption is a post hoc rationalization based on an argument that the bankruptcy judge never even heard.

Finally, the critique is flawed. For the reasons explained in the opening brief, the statistic would have been less objective (and, in fact, even more favorable to Applicant) if the attorney's fees paid had been excluded from the equation.

### 5. *It **is** appropriate for a debtor to try to pay his creditors less, and to pay attorney's fees with money that would otherwise have been paid to creditors.*

The trustee accurately observes that Applicant's position is that he should try to have his clients pay as little as possible towards debts that will be discharged.

17

The trustee claims this argument[5] "neglects the fundamental principle of bankruptcy court." (Opp Br. p. 24.) The trustee states that the bankruptcy "process" is designed, *inter alia*, to put the parties "as close to the position [sic] they were in before the proceeding" – i.e., to pay creditors as much as possible. (Opp Br. p. 25.) However, a debtor's attorney – zealously advocating for his client – should be doing exactly the opposite. As Judge Conway described his own prior experience in private practice:

> Well, I will tell you, I mean, my goal in representing Chapter 13 clients was to pay as very little as possible to the trustee; I don't want to shock Ms. McHale or disclose any of my practice secrets. But I think, Mr. Sabatini, every practicing, every good Chapter 13 attorney, their goal is to pay as little as possible to Ms. McHale.

(Transcript of Hearing held 8/07/2024, AA115, 33:13-18.)

The trustee's sole support for its statement about the bankruptcy process is an out-of-Circuit case that is contrary to *Busy Beaver*. The trustee quotes *In re Vaughn*, 660 B.R. 827 (Bankr. S.D. Ohio 2024) for the statement that "the court is tasked with the careful balancing act between rewarding counsel for necessary

---

[5] The use of the phrase "this argument" in the trustee's brief is ambiguous. The phrase might instead refer to the trustee's argument that Applicant pays himself by "appropriating funds away from unsecured creditors and into his [own] coffer." (Opp Br. p. 24.) However, under either of the two possible meanings, Applicant's response here would be the same.

services to a debtor, while also ensuring that such compensation aligns with the broader objectives and outcomes of the bankruptcy process." *Id.* at 851. To the extent that "balancing" the "broader objectives and outcomes of the bankruptcy process" means a court should save money for unsecured creditors at the expense of paying reasonable attorney's fees, that interpretation is hard to reconcile with *Busy Beaver's* instruction: "Congress has unmistakably and expressly made a policy choice favoring full compensation for debtors' attorneys over greater proportionate compensation to the debtors' creditors." 19 F.3d at 851.

## III.    CONCLUSION

For the foregoing reasons, Appellant respectfully requests that this Court reverse the bankruptcy court's order and remand for recalculation of the fee award consistent with the following instructions.

First, if the bankruptcy court chooses to apply a percentage or lump-sum reduction, it must identify the specific methodology used to arrive at that figure. A generalized finding that fees were excessive does not, standing alone, supply the reasoning required by *Gunter.* The court must connect its reasoning to the actual percentage chosen — not merely to the decision to reduce at all.

Second, the bankruptcy court should be instructed that the PRF may not function as a gravitational center that predetermines the outcome of a lodestar analysis. The PRF is a bankruptcy-only construct. Under *Busy Beaver,* the court

19

should apply the same lodestar analysis that governs non-bankruptcy attorneys — and that analysis must be conducted without the PRF as a ceiling, a tether, or a presumptive endpoint.

Third, the bankruptcy court should address the statistical evidence submitted by Applicant. If the court finds the evidence unpersuasive, it should explain why, so that a reviewing court can determine whether that determination was itself an abuse of discretion.

This appeal is brought not for the fees in this case alone, but to vindicate the principle that bankruptcy attorneys in this district are entitled to the same transparent, standards-based fee review as practitioners in any other federal court. Applicant respectfully submits that the order entered September 30, 2025 should be vacated and this matter remanded for proceedings consistent with this Court's opinion.

## IV.   CERTIFICATE OF COMPLIANCE

1. This document complies with the 6,500 word type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B)(ii) because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g) this document contains 4,733 words.

2. This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) because this document has been prepared in a proportionally spaced typeface using

Microsoft Word for Microsoft 365 MSO Version 2601 in 14-point Times New Roman Font.

### V.   CERTIFICATE OF USE OF GENERATIVE AI

Claude.ai, ChatGPT, Westlaw AI Deep Research, and Grammarly were used to assist in the preparation of this brief.

Westlaw AI Deep Research was used extensively while conducting research to find the authorities that are in Section II. However, other than identifying authorities, Westlaw AI Deep Research did not generate any of the prose that is in Section II. After Section II was written, I pasted it into Claude.ai and ChatGPT for suggestions. I made some modifications based on those suggestions and would estimate that over 95% of Section II was my own at that point. I did not add to this section any citations or authorities suggested by Claude.ai or ChatGPT. I would estimate that more than 50% of the Conclusion is from Claude.ai. I also used Grammarly and adopted many of its grammatical suggestions throughout the entire brief.

I verify that I have checked the accuracy of each portion of the document generated by AI, including all citations and legal authority.

Date: April 8, 2026                                    s/ Carlo Sabatini
                                                       Carlo Sabatini